IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>FUSE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-10872 (___)<br><br>(Joint Administration Requested) |

## DECLARATION OF MIGUEL ROGGERO
## IN SUPPORT OF FIRST DAY MOTIONS

I, Miguel Roggero, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the interim Chief Executive Officer of Fuse Media, Inc. and its wholly owned subsidiaries (collectively, the "Debtors" or "Company"). I joined Fuse Media, Inc. in November 2006, and am responsible for the Company's day to day business operations. Prior to joining the Debtors, I founded a private investment company that focused on middle market companies and multi-family real estate properties from 2001 through 2006. I also served as a group executive with Reed Business Information, a division of Reed Elsevier, where I led a portfolio of international publishing businesses. During my tenure with Reed Business Information, I also served as Chief Operating Officer for its eLogic, Inc. subsidiary, a cloud-based provider of real time information and content management. I have also held executive positions at The Walt Disney Company, Pizza Hut, and Paramount Pictures.

---

[1]  The Debtors and the last four digits of their taxpayer identification numbers include: Fuse Media, Inc. (9721); Fuse Media, LLC (0560); Fuse, LLC (1888); JAAM Productions, LLC (5499); SCN Distributions, LLC (9656); Latino Events LLC (8204); Fuse Holdings LLC (5673); Fuse Finance, Inc. (8683); and FM Networks LLC (6500). The Debtors' headquarters and service address is 700 North Central Avenue, Suite 600, Glendale, CA 91203.

2.      I hold a Bachelor of Science in Business Administration from the University of Southern California, and a Master of Business Administration from the University of Pennsylvania.

3.      The Debtors have filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above-captioned chapter 11 cases. Contemporaneously with the filing of the chapter 11 cases, the Debtors filed their prepackaged chapter 11 plan (the "Plan") and disclosure statement (the "Disclosure Statement"). These cases were filed in order to preserve the value of the Debtors' business and maintain continued operations pending the Debtors' implementation of a financial and operational restructuring. To minimize the adverse effects of commencing these chapter 11 cases, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Motions").

## PART I

### BACKGROUND

**A.    The Company's Business**

4.      The Debtors are a leading multicultural media company, composed principally of two cable networks, *Fuse* and *FM*. The Company is headquartered in Glendale, California and also maintains an office in New York, New York. As of the Petition Date, the Company employed approximately 98 full-time employees and 8 independent contractors. The Company also employs approximately 35 people on a temporary full-time basis through various staffing agencies.

5.      *Fuse* and *FM* are the result of former American cable television network NuvoTV's (formerly known as Sí TV) acquisition of Fuse in 2014. Prior to the acquisition,

NuvoTV catered to the Latino community with exclusively English-language programming and was distributed to 28 million homes, which overlapped with Fuse's subscriber base. Accordingly, the combined media company was able to launch FM in 2015 with distribution of 28 million homes.

6.      Prior to January 1, 2019, *Fuse* reached approximately 61 million homes (as measured by Nielsen), making it one of the largest privately-held independent cable networks in the United States.  As a nationally recognized brand, *Fuse* is also one of the largest cable networks targeting the fast-growing young, multicultural and Latino audience.  A traditional focus for the network, English-speaking Hispanic consumers, are the fastest growing demographic in the United States, boasting rapidly increasing purchasing power and household income that surpasses the national Hispanic median.

7.      *FM*, the sister network of *Fuse*, reached approximately 40.5 million homes at its peak and delivers music-centric content.  Launched in 2015, *FM* is a multicultural music network featuring music programming and popular artists, their fans, and the stories that surround them. *FM* is dedicated to all things music – songs, artists, lifestyle, and culture – engaging with its audience through both traditional linear pay-TV platforms and interactive digital platforms.  Like *Fuse*, beyond linear TV, *FM* also reaches viewers with ancillary content via native mobile applications and third-party platforms, such as Hulu, YouTube, Facebook, and major social media platforms.

8.      Fuse.tv is the Company's digital extension of its on-air brand, delivering content covering today's most popular musicians and the latest in news and culture.  At fuse.tv, consumers can access some of the Company's television programming, including exclusive clips, limited full episodes, news, and other culturally relevant information.

9.     The Company generates revenue principally from three sources: (a) affiliate fees for linear distribution, (b) advertising sales on the linear networks and digital media platforms, and (c) sponsored live events and music festivals.  For fiscal year ended December 31, 2018, the Company generated $114.7 million in net revenue.

10.     <u>Affiliate Fees</u>.  The Company enters into multi-year affiliation agreements with distributors who carry the networks.  Under these affiliation agreements, the Company receives monthly per subscriber license fees, known as "affiliate fees," typically with annual rate increases that generate recurring and predictable sources of contracted affiliate revenue.

11.     <u>Advertising Revenue</u>.  The Company also generates revenue from the sale of advertising inventory, program sponsorships, and other bundled advertising packages on both traditional and digital media platforms.  A majority of the Company's advertising revenue is produced through the upfront advertising process, in which advertisers commit in advance to buy commercial inventory for the upcoming broadcast and calendar year at pre-determined rates, providing both price certainty for ad buyers and greater ad revenue stability for the Company.

12.     <u>Miscellaneous Revenue</u>.  The Company maintains additional revenue streams through sponsorship of live events and music festivals.

**B.     <u>Corporate and Capital Structure of the Company</u>**

13.     Debtor Fuse Media, Inc. (formerly known as SiTV Media, Inc.) is a Delaware corporation and owns 85% of the membership interests in Debtor Fuse Media, LLC (formerly known as SiTV Media, LLC), a Delaware limited liability company.[2]  Fuse Media, LLC holds all of the membership interests in Fuse, LLC, which is a Delaware limited liability company and the primary operating entity within the Debtors' organizational structure.  The remaining debtors are

---

[2]     Non-debtor MSG Holdings, L.P. owns the remaining 15% of Fuse Media, LLC.

direct or indirect wholly-owned subsidiaries of Fuse, LLC.  Attached hereto as **Exhibit A** is an organizational chart of the Company.

14.     As described above, the Company's primary source of cash flow is generated from affiliate fees and advertising.

15.     In July 2014, in connection with the acquisition of Fuse Media by SiTV Media, SiTV, LLC (now known as Fuse, LLC) and SiTV Finance, Inc. (now known as Fuse Finance, Inc.) issued $240 million of 10.375% Senior Secured Notes due 2019 (the "Senior Secured Notes") pursuant to that certain *Indenture* dated July 1, 2014.  The Company's obligations under the Senior Secured Notes are secured by substantially all of the Company's assets.

16.     On August 21, 2017, the Company issued $2 million of additional Senior Secured Notes.  The Senior Secured Notes mature on July 1, 2019 with interest payments due January 1 and July 1 each year the notes are outstanding.

17.     On January 1, 2019, the Company did not make the interest payment owed on the Senior Secured Notes.  Prior to the expiration of the cure period, the Company entered into a forbearance agreement with a majority of the holders of the Senior Secured Notes, as amended, covering the period through April 22, 2019.

18.     As of the Petition Date, the outstanding principal balance of the Senior Secured Notes is $242 million, plus accrued interest, fees, and expenses.

19.     As of the Petition Date, the Company owes various vendors, suppliers, and other unsecured trade creditors approximately $10 million to $25 million.

C.     **Events Leading to the Commencement of the Chapter 11 Cases**

20.     For the majority of the Company's revenue, the Company distributes its original and acquired content in the form of a 24/7 linear television "network" or "channel" to cable,

satellite and telco pay-tv operators, which include the Company's networks (*Fuse* and *FM*) in a package of linear networks that these operators sell to their customers on a monthly subscription basis. This traditional distribution model produces two principal sources of revenue: (1) affiliate fees (addressed below); and (2) advertising revenue. By the end of 2014, the Company had projected affiliate fees of approximately $495 million through 2020.

21.    Two intervening and inter-related factors have contributed to the Company's commencement of the current bankruptcy proceeding. First, there have been rapid changes in the media marketplace adversely affecting the pay-tv television industry, which in turn adversely affected the Company's revenues and precluded the Company from refinancing its current debt (*i.e.*, the Senior Secured Notes). And second, capital constraints (including debt service levels and lack of available investment capital) impeded the Company's ability to grow investment in original content development/production and marketing at competitive levels.

22.    With regard to the first factor, the overall pay-TV industry is in a period of substantial transformation as the result of the introduction into the marketplace in recent years of high quality and relatively inexpensive and consumer friendly content alternatives (*e.g.*, Netflix, Hulu and others). The ongoing marketplace changes have resulted in, and will continue to cause, a material decline in pay-tv subscribers and related affiliate fee revenue as a result of a declining number of new subscribers, "cord-cutting" (the cancellation of an existing pay-tv subscription), and "cord-shaving" (the downgrading of a pay-tv subscription from a higher priced package to a lower priced package). Each quarter the Company receives less revenue from its traditional pay-tv distribution partners as the result of the decline in subscribers receiving the Company's networks. And new sources of revenue for the Company, although developing and in progress,

DOCS_SF:98842.18 29402/001

have not grown sufficiently to offset revenue declines in the legacy business. As a result of these trends, the refinancing of the Company's debt was not viable.

23.    Evidencing the pressures within the pay-tv business, effective December 31, 2018, Comcast and Verizon Fios, which together represented a significant and material portion of the Company's 2018 contracted revenue and 2018 subscriber base, ceased distributing the *Fuse* network.

24.    Separately, in mid-February 2019, DirecTV (a major distributor of the Fuse network and a source of material revenue) claimed that the Company had breached its affiliation agreement with DirecTV by failing to offer DirecTV an early right to terminate the affiliation agreement prior to its stated expiration date. DirecTV's notice of breach provided the Company with 30 days to cure the alleged default and indicated that DirecTV might terminate the affiliation agreement if the Company did not timely cure the claimed breach. The Company disputes that DirecTV has a legitimate basis to claim that the Company has violated the terms of its agreement with DirecTV or to terminate its distribution obligations with respect to the *Fuse* network. The Company filed a complaint for declaratory relief against DirecTV in California state court and sought injunctive relief to prevent DirecTV from exercising any asserted termination rights. The parties have since stipulated to a "standstill" under which DirecTV has agreed to refrain from taking any action to terminate the *Fuse* agreement or remove the *Fuse* network from the DirecTV, DirecTV Now and AT&T U-Verse distribution platforms for the specific reason set forth in DirecTV's original claim of contract breach, pending final resolution of such matter by the court.

25.    By letter dated April 16, 2019, DirecTV again claimed that the Company had breached its affiliation agreement with DirecTV by: (a) failing to provide satisfactory

programming content and (b) offering more favorable promotional previews, free of charge, to new subscribers of another distributor. DirecTV's notice of breach provided the Company with 60 days to cure the alleged default under item (a) in the foregoing sentence and 30 days to cure the alleged default under item (b) in the foregoing sentence, and suggests that DirecTV might take steps to terminate the affiliation agreement if the Company did not timely cure the claimed breaches. As with DirecTV's prior notice of breach, the Company disputes that DirecTV has a legitimate basis to claim that the Company has violated the terms of its agreement with DirecTV or to terminate its distribution obligations with respect to the *Fuse* network.

26.     As a result of fast-moving transformational shifts in the pay-tv industry caused by changes in programming alternatives and consumer behavior, the Company has been forced to restructure its operations and implement staff reductions. The Company began to consider restructuring options during 2018 and commenced discussions with its largest noteholders. After months of negotiations, the parties reached agreement on a debt-for-equity swap that would be implemented through the Plan.

**D.      Goals of the Chapter 11 Cases**

27.     The Debtors commenced solicitation of the Plan prior to the Petition Date and have already received ballots from approximately 82% of the outstanding Senior Secured Notes in dollar amount. Although the solicitation process is ongoing, no creditor constituency, aside from the holders of the Senior Secured Notes, is entitled to vote on the Plan.

28.     The Debtors intend to move promptly towards confirmation of the Plan and to exit bankruptcy as quickly as possible in order to minimize any potential adverse impact of the bankruptcy filing on the Debtors' business. The Debtors believe that the proposed Plan is in the best interests of the Debtors' creditors and will maximize the value of these estates.

29.    Through the Plan, the Debtors will de-leverage their balance sheet and implement certain other limited restructuring transactions.  Although the Company intends to assume many of its ordinary course contractual obligations, certain contracts and/or leases may be rejected in order to allow the Company to emerge from bankruptcy with a stronger financial foundation. Upon doing so, the Company will be better able to effectively support its core linear networks business, as well as pursue growth areas, such as virtual multichannel video programming distribution (*e.g.*, YouTube TV and Hulu Live), advertising supported distribution (AVOD), and complementary areas such as live events and music festivals.  The Company also will be well-positioned post-emergence to explore strategic transactions that can accelerate greater growth in new areas for stakeholders.

## PART II

## FIRST DAY MOTIONS

30.    In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases, the Debtors have requested various types of relief in the First Day Motions filed simultaneously with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

31.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

DOCS_SF:98842.18 29402/001

**A.    Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing (the "Cash Collateral Motion")**

32.    As noted above, the Debtors are an active media company with employees, vendors, and customers that depend on the Debtors' continuing performance of their ongoing business obligations.  The Debtors have an urgent and immediate need for authority to use Cash Collateral subject to the terms of the Cash Collateral Motion in order to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with employees, vendors, and customers; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs.  The foregoing expenditures are critically necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Debtors' proposed prepackaged plan.  Without access to Cash Collateral, the Debtors would be forced to cease operations and liquidate their assets.

33.    The Debtors intend to use Cash Collateral consistent with their ordinary course prepetition practices.  The Debtors have the consent of the Senior Secured Notes Trustee and a majority in holdings of the Senior Secured Noteholders to access Cash Collateral on the terms described in the Cash Collateral Motion.  In consideration of the foregoing, the Debtors are willing to stipulate and acknowledge the validity, priority, and extent of the liens and claims of the Senior Secured Notes Trustee and the Senior Secured Noteholders, as set forth in the proposed form of Interim Order approving the Cash Collateral Motion.

34.    The Debtors negotiated with the majority Senior Secured Noteholders in good faith and at arms length regarding the terms of the Debtors' use of Cash Collateral.  In this regard, the Debtors have agreed to provide adequate protection to the Senior Secured Notes Trustee by: (i) granting, solely to the extent of any Diminution of Value, additional and

replacement security interests in and liens on the Debtors' assets (excluding Avoidance Actions but, subject only to and effective upon entry of the Final Order, the Collateral would include Avoidance Proceeds); (ii) granting, solely to the extent of any Diminution of Value, to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative claim in these chapter 11 cases; and (iii) reimbursing the Senior Secured Notes Trustee's and the supporting Senior Secured Noteholders reasonable fees and costs in connection with these bankruptcy cases, in accordance with the proposed Interim Order. Further, the Debtors request to modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the Final Order.

35.    I believe that the various cash collateral protections described above are sufficient under the present circumstances to provide adequate protection to the Senior Secured Notes Trustee. The Budget contemplates that the Debtors will use the Cash Collateral to satisfy their ordinary course obligations.

36.    The urgent need to preserve going concern value, and avoid immediate and irreparable harm to all of the Debtors' estates, makes it imperative that the Debtors be authorized to use the Cash Collateral, pending the Final Hearing, in order to continue their operations and to allow the Debtors to administer their cases. Without the ability to use Cash Collateral, the Debtors would be unable to meet their ongoing obligations and would be unable to fund their working capital needs, thus causing irreparable harm to the Debtors and the value of these estates. Accordingly, the Debtors respectfully request that, pending the hearing on a Final Order, the proposed Interim Order be approved in all respects and that the terms and provisions of the proposed Interim Order be implemented and be deemed binding and that, after the Final Hearing,

11

the Final Order be approved in all respects and the terms and provisions of the Final Order be

implemented and be deemed binding.

**B.**     **Motion of Debtors for Order Authorizing (A) Continuance of Existing Cash Management System, (B) Intercompany Transactions, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief ("Cash Management Motion")**

37.     The Debtors' cash management system facilitates the timely and efficient

collection, management, and disbursement of funds used in the Debtors' business.  Pursuant to

the Cash Management Motion, the Debtors seek the entry of an order authorizing: (a) the

Debtors to continue using their existing cash management system and related bank accounts in

the ordinary course of business; (b) the Debtors to make intercompany transactions described in

the Cash Management Motion; and (c) a limited waiver of certain deposit and investment

requirements.

38.     The cash management system is expressly designed to effectuate the collection of

revenue, pay operating expenses, and maintain payroll obligations.  I believe that any disruption

caused by requiring the Debtors to close their existing bank accounts, open new bank accounts,

and establish a new cash management system would jeopardize the Debtors' ability to satisfy

their obligations and maintain their relationships with carriers, advertisers, subscribers, and

vendors.

39.     The cash management system constitutes an essential business practice and was

created and implemented by the management of the Debtors in the exercise of their business

judgment.  I believe that the existing cash management system provides numerous benefits

including the ability to (a) receive customer payments; (b) allow a mechanism for deposits; (c)

pay employee wages and benefits; and (d) pay vendors.  In addition, preserving a "business as

usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the cash management system.

40.     Debtors Fuse, LLC and FM Networks LLC routinely engage in intercompany cash transactions between themselves, including transfers of cash receipts from the Secondary Operating Account to the Main Operating Account in order to fund payments to certain trade creditors that are paid from the Main Operating Account and transfers of funds from the Main Operating Account to the Secondary Operating Account to fund payments of payroll and employee benefits for certain employees of the other (the "Intercompany Transactions").  While these transactions are not reimbursed, book entries are made to inter-company accounts reflect these Intercompany Transactions.

41.     Several of the Debtors are parties to various licensing agreements with third parties to allow the Debtors to exhibit licensed content (the "Licensing Agreement").  Fuse, LLC pays the licensing fees due under the Licensing Agreements on behalf of the particular Debtor entity that is the signatory to a License Agreement.  In exchange for these payments, Fuse, LLC and FM Networks LLC sell advertising during the exhibition of licensed content and receive all of the advertising revenue derived from these transactions.

42.     Fuse, LLC also makes direct payments to certain equipment and other lessors and equipment lenders, on behalf of other Debtor affiliates for the use of office and computer equipment, software and other personal property.  Fuse, LLC is the principal operating subsidiary and user of the equipment and is not reimbursed for these payments.  Postpetition, the Company will track intercompany payables and receivables derived from these transactions.  I believe that the continuation of the Intercompany Transactions is beneficial to Company and should be preserved as described in the Cash Management Motion.

C.     **Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")**

43.     Through the Joint Administration Motion, the Debtors seek the entry of an order authorizing and directing the joint administration of the Debtors' related chapter 11 cases for procedural purposes only.

44.     Joint administration is warranted in these chapter 11 cases because (a) the Debtors' financial affairs and business operations are closely related and (b) such administration will ease the administrative burden on the Court and other parties.

45.     With respect to the proximity of relations, as discussed above, the Debtors are under common ownership and management.   They also share certain creditors and parties in interest.   As a result, joint administration will prevent duplicative efforts and unnecessary expenses, without any risk of prejudice.

46.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors.   With nine affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.

D.     **Motion of Debtors for Entry of Order Authorizing Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor (the "Consolidated Matrix Motion")**

47.     Through the Consolidated Matrix Motion, the Debtors seek the entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor.

48.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the obligatory notices and other documents in these chapter 11 cases.   The Debtors believe that the information, as maintained in

14

computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2. Requiring the Debtors to segregate and convert their computerized records to an entity-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings. Accordingly, by the Consolidated Matrix Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

49.     I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these chapter 11 cases.

**E.      Application for an Order Appointment Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f) (the "Claims Agent Motion")**

50.     The Debtors request authority to retain Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for the Debtors on the terms set forth in the Engagement Agreement attached as Exhibit A to the Application.

51.     As set forth in the Claims Agent Motion, the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, I believe that, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

52.     Although the Debtors have not filed their schedules of assets and liabilities, it is anticipated that there will be in excess of 200 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

**F.**     **Motion for Interim and Final Orders (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, and (D) Granting Related Relief (the "Utility Motion")**

53.     The Debtors utilize various utility services provided by numerous utility companies (collectively, the "Utility Companies"). Because the Utility Companies provide essential services to the Debtors and their operations, any significant interruption in utility services would be highly problematic. In fact, the temporary or permanent discontinuation of utilities services at any of the Debtors' locations could irreparably disrupt business operations, and, as a result, fundamentally undermine the Debtors' restructuring efforts. On average, the Debtors pay approximately $15,474.00 each month for third party Utility Services.

54.     The Debtors will propose procedures to protect the rights of Utility Companies by providing such Utility Companies with a deposit in an amount equal to approximately two weeks of the Debtors' aggregate utility expenses. The Debtors submit that the deposit (which will be in the amount of $8,000.00, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business and their existing security deposits constitutes sufficient adequate assurance of future payment to the Utility Companies. I believe that such relief is necessary to prevent immediate and irreparable harm to the Company.

**G.**     **Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief (the "Critical Vendor Motion")**

55.     The Debtors' generate revenues consisting of (a) fees received under certain affiliation agreements with distributors who carry the networks, (b) advertising revenue, and (c) miscellaneous revenue from additional revenue streams through sponsorship of live events and music festivals. The Debtors' business relies on their access to and relationship with a

network of vendors and service providers. Any disruption in provision of critical services to the Debtors' would have a far-reaching economic and operational impact on their business.

56.    The vast majority of the services that the Debtors depend on are provided by a broad network of vendors and service providers that, for the most part, conduct business with the Debtors on an invoice by invoice or purchase order by purchase order basis, and not pursuant to long-term contracts. These vendors typically supply their customers with services and products on trade terms based on their experience with and perceived risk of conducting business with such customers.

57.    The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source or primary provider of services or products; (ii) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured. As a result of their critical review and evaluation, the Debtors have identified a narrow subset of vendors as Critical Vendors.

58.    As of the Petition Date, the Debtors will owe amounts to certain Critical Vendors (a) that have been billed and invoiced, and/or (b) that have accrued immediately prior to the Petition Date for which they have not yet been invoiced or payment is not yet due. The Debtors anticipate the total amount of Critical Vendor Claims will be approximately $250,000.

59.    Given the importance of the goods or services provided by the Critical Vendors, I believe that it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Critical Vendors up to the Critical Vendor

17

Cap, as any disruption in the Debtors' ability to adequately maintain their networks would cause immediate and irreparable damage to the Debtors' business. Failure to continue receiving services needed to maintain the networks through their existing network of vendors and service providers on commercially reasonable terms could have catastrophic consequences for the Debtors.

**H.** **Motion For Entry Of An Order Authorizing The Debtors To (i) Pay and/or Honor Prepetition Wages, Salaries, Commissions, Employee Benefits, and Other Compensation and Pay Third Parties; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented For Payment and Honor Certain Fund Transfer Requests ( the "Wage Motion")**

60.     The Company's workforce consists of employees (the "Employees"); independent contractors (the "Independent Contractors") and third party labor provided by certain staffing agencies used by the Debtors (the "Staffing Agencies"). Each of these groups performs critical functions for the Debtors. Employees perform a wide variety of functions crucial to the Company's business operations. For example, several Employees are critical to the Company's advertising, content management, and broadcast operations. These Employees' specific skills, knowledge, and understanding of the Company's operations and the industry in general are essential to preserving operational and financial stability and cannot easily be replaced without materially impairing the Company's operations. Other Employees perform specialized technical functions, including graphic design and web content management, which support the Company's digital growth initiatives. Finally, certain Employees, perform critical back office, accounting and human resource functions.

61.     The Independent Contractors provide a variety of specialized and industry-specific services that relate to growing revenues from television networks and programming

services, business development, marketing and distribution, production budgeting, government

liaisons, project management, contract negotiation and legal documentation and administration.

62.    The Staffing Agencies perform a range of functions that support the Company's

brand and content not provided by Employees or Independent Contractors.   Many of these

individuals work in the Company's brand creative department, taking on marketing roles that

involve public relations and social media presence.   In addition, many of the individuals

provided by the Staffing Agencies serve broadcast and digital operations roles, such as

copywriting, captioning, designing, producing and editing, among others.   Other roles performed

by the Staffing Agencies employees include various back office support in the human resource,

financial planning and analysis and IT department.

63.    The majority of the Employees and Independent Contractors rely exclusively on

their compensation and benefits to pay their daily living expenses and to support their families.

If the Debtors are not permitted to continue paying wages and salaries, providing employee

benefits, and maintaining certain programs in the ordinary course of business, certain of the

Employees and Independent Contracts will be exposed to significant financial constraints. In

addition, if the Staffing Agencies are not paid the prepetition amounts owed to them, the Debtors

risk losing the individuals provided by the agencies who perform critical functions.

Consequently, the Debtors respectfully submit that the relief requested herein is necessary and

appropriate under the facts and circumstances of these chapter 11 cases.

64.    The Debtors seek authority to pay, in their discretion, any prepetition amounts

owed for the programs described in the Wage Motion and other benefits described in the Wage

Motion up to the cap amounts set forth therein.   The Debtors also seek authority to continue to

pay amounts related to the programs described in the Wage Motion in the ordinary course of business and in their discretion.

65.     I believe that if the Debtors are unable to honor accrued compensation and benefits described in the Wage Motion, that employee morale and loyalty will be jeopardized at a time when employee support is critical.    I believe that any uncertainty with regard to continuation of Employee compensation and the benefits provided to these Employees will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency.

66.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of their chapter 11 cases.    Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets.    I also believe that payment of the Employee wages and compensation and continuation of the benefit programs described in the Wage Motion is necessary to maintain morale and to insure continued, efficient operation in order to maximize value for all creditors.

I.      **Debtors' Motion for Entry of on Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement, (B) Confirmation of Prepackaged Plan of Reorganization, and (C) the Assumption of Executory Contracts and Cure Amounts; (II) Fixing the Deadlines to Object to Disclosure Statement, Prepackaged Plan, and Proposed Assumption or Rejection of Executory Contracts and Cure Amounts; (III) Approving (A) Prepetition Solicitation Procedures and (B) Form and Manner of Notice of Commencement, Combined Hearing, Assumption of Executory Contracts and Cure Amounts Related Thereto, and Objection Deadlines; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Section 341(A) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (V) Granting Related Relief (the "Solicitation Motion").**

67.     As discussed above, the Debtors intend to effectuate a restructuring through a prepackaged Plan.

20

68.     The Debtors commenced solicitation of votes to approve the Plan (the "Solicitation") on April 18, 2019.  In connection with the Solicitation, the Debtors' notice and voting agent, KCC caused the Disclosure Statement, Plan, the Plan Supplement and appropriate Ballot to be delivered to the Holders of Class 3 Senior Secured Notes Claims.  The Debtors also served the brokers, dealers, commercial banks, trust companies, or other agents or nominees with respect to Class 3 through which certain Holders of Class 3 Senior Secured Notes Claims hold their respective securities.  Holders of Claims in Class 3 are the only class of Claims impaired and entitled to vote under the Plan (the "Voting Class").  The Debtors established May 9, 2019 at 4:00p.m. (prevailing Eastern Time) as the deadline (the "Voting Deadline") for the receipt of votes from the Holders of Claims in the Voting Class.

69.     As such, the Debtors are bound by certain milestones, including, but not limited to, deadlines for solicitation and entry of an order confirming the Plan.  The Solicitation Motion sets up the timeline for achieving those goals and requests related relief.

70.     Specifically, through the Solicitation Motion the Debtors seek entry of an order:

   (a) Scheduling a combined hearing (the "Combined Hearing") to consider (i) approving the adequacy of the *Disclosure Statement for the Debtors' Prepackaged Joint Plan of Reorganization* (as may be amended, modified or supplemented from time to time the "Disclosure Statement"),[3] (ii) confirmation of the *Debtors' Prepackaged Joint Plan of Reorganization* (as may be amended, modified, or supplemented from time to time, the "Plan"),[4] and (iii) the proposed assumption or rejection of executory contracts, unexpired leases and any related cure costs in connection therewith (the "Cure Amounts");

   (b) Establishing the deadline (the "Plan/Disclosure Statement Objection Deadline") to object to the adequacy of the Disclosure Statement and confirmation of the Plan;

---

[3]  The Disclosure Statement (with the Plan attached as an exhibit thereto) has been filed contemporaneously with this Motion.

[4]  Capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan.

(c) Establishing the deadline (the "Executory Contract Objection Deadline" and, together with the Plan/Disclosure Statement Objection Deadline, the "Objection Deadlines") to object to the proposed assumption or rejection of Executory Contracts and Unexpired Leases and any related Cure Amounts;

(d) Approving the prepetition Solicitation Procedures (as set forth in the Solicitation Motion), including the forms of Ballots (as defined below);

(e) Approving the form and manner of notice of the commencement of the Chapter 11 Cases, the Combined Hearing, the assumption of Executory Contracts and Unexpired Leases, Cure Amounts, and the Objection Deadlines;

(f) Conditionally (i) directing the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") not to convene an initial meeting of creditors under section 341(a) of the Bankruptcy Code, and (ii) waiving the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities; and

(g) Granting related relief.

71.      The following table identifies the key dates proposed in the Solicitation Motion:

| Proposed Timetable | |
|---|---|
| Voting Record Date | April 5, 2019 (prepetition) |
| Commencement of Solicitation | April 18, 2019 (prepetition) |
| Voting Deadline | May 9, 2019, at 4:00 p.m. (prevailing Eastern Time) (prepetition) |
| Plan Supplement Filing Date | Five (5) Business Days prior to the Combined Hearing |
| Proposed Plan/Disclosure Statement Objection Deadline | Five (5) Business Days prior to the Combined Hearing, at 4:00 p.m. (prevailing Eastern Time) |
| Proposed Executory Contract Objection Deadline | Five (5) Business Days prior to the Combined Hearing, at 4:00 p.m. (prevailing Eastern Time) |
| Proposed Plan/Disclosure Statement Reply Deadline | Three (3) Business Days prior to the Combined Hearing |

| Proposed Combined Hearing Date | First week of June 2019 |
|---|---|

72.    The Solicitation Motion also seeks an extension of time to file and, if confirmation of the Plan is achieved, a waiver of the requirement to file the Debtors, Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") and requests that the Court direct the U.S. Trustee not to convene a meeting of creditors or equity security holders pursuant to section 341(e) of the Bankruptcy Code if the Plan is confirmed by June 28, 2019. This relief is appropriate under the circumstances because the Debtors anticipate prompt confirmation of the prepackaged Plan with the support of Holders of Senior Secured Notes Claims and subsequent emergence from chapter 11.

73.    As discussed above, the Debtors began soliciting acceptances of the Plan prior to the Petition Date and expect to receive acceptances from the requisite number of creditors and amount of Claims in the Voting Class. The Debtors intend to complete the Plan confirmation process and emerge from Chapter 11 by June 2019. Accordingly, the Debtors submit that the meeting of creditors contemplated by section 341 of the Bankruptcy Code need not be convened if the Debtors consummate the Plan on or before such date.

74.    The Debtors also request that the time for filing their Schedules and SOFAs be extended until June 28, 2019 and be waived in the event the Plan is confirmed on or prior to that date. I am informed that the Debtors are already entitled to a thirty-day extension of the requirement to file their Schedules and SOFAs because the Debtors have more than 200 creditors. Here, cause exists to further extend the deadline because requiring the Debtors to file Schedules and SOFAs would distract the Debtors' management and advisors from the work of ensuring a smooth transition into these Chapter 11 Cases and prompt confirmation of the Plan. Given the accelerated confirmation timeline in these Chapter 11 Cases, the Schedules and

SOFAs also would be of limited utility to most parties in interest -- the Debtors have already begun the process of soliciting acceptances of the Plan from creditors in the Voting Class. The minimal benefit of requiring the Debtors to prepare the Schedules and SOFAs will be significantly outweighed by the substantial expenditure of time and resources the Debtors will be required to devote to the preparation and filing of the documents. For these reasons, the Court should only potentially require the Debtors to file SOFAs and Schedules if the Plan is not consummated on or before June 28, 2019.

75.     The relief requested in the Solicitation Motion is necessary to ensure that the milestones set forth in the Plan are met. As such, I believe that the relief requested in the Schedules Motion is necessary to prevent immediate and irreparable harm to the Debtors' and their estates.

**J.      Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order Authorizing Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees (the "Tax Motion")**

76.     The Debtors incur or collect and remit certain taxes including sales, franchise, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees"). The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of their business. The Taxes and Fees are generally paid either monthly, quarterly, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

77.     I am informed that (i) portions of the Prepetition Tax Obligations do not belong to the Debtors' bankruptcy estates because they may constitute "trust fund" taxes held for the benefit of relevant taxing authority; (ii) portions of the Prepetition Tax Obligations may be

24

entitled to priority payment under applicable bankruptcy law; and (iii) the Taxing Authorities or the parties who ordinarily collect the Prepetition Tax Obligations may file liens, initiate audits, or otherwise proceed against the Debtors for unpaid Prepetition Tax Obligations and such actions will result in unnecessary expense and distraction from the Debtors' efforts to maximize the value of their estates.  I believe that the Tax Motion is in the best interests of the Debtors and their estates.

*[remainder of page intentionally left blank]*

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this 22nd day of April 2019 at Glendale, California.

Miguel Roggero
Chief Financial Officer and Chief Operating Officer