THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Fuse, LLC, *et al.*,[1] | § | Case No. 19-_____ (___) |
| | § | |
| Debtors. | § | Joint Administration Requested |
| | § | |

## DISCLOSURE STATEMENT FOR
## DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION

Dated:  April 18, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar 4042)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100
Fax:  (302) 652-4400
E-mail: rpachulski@pszjlaw.com
          ikharasch@pszjlaw.com
          mlitvak@pszjlaw.com
          joneill@pszjlaw.com

Proposed Counsel for the Debtors

---

[1]  The Debtors and the last four digits of their taxpayer identification numbers include:  Fuse Media, Inc. (9721); Fuse Media, LLC (0560); Fuse, LLC (1888); JAAM Productions, LLC (5499); SCN Distributions, LLC (9656); Latino Events LLC (8204); Fuse Holdings LLC (5673); Fuse Finance, Inc. (8683); and FM Networks LLC (6500).  The Debtors' headquarters and service address is 700 North Central Avenue, Suite 600, Glendale, CA 91203.

*For the avoidance of doubt, Debtors Fuse Media, Inc. and Fuse Media, LLC are not proponents of the Plan and the provisions of the Plan shall not extend to those entities.*

**ARTICLE I.** EXECUTIVE SUMMARY ......................................................................... 8

    A.     AN OVERVIEW OF THE CHAPTER 11 PROCESS ................................. 9

    B.     SUMMARY OF THE PLAN ........................................................... 9

    C.     PURPOSE AND EFFECT OF THE PLAN ................................................. 10

          1.     Plan of Reorganization Under Chapter 11 of the Bankruptcy Code ................................................................ 10

          2.     Financial Restructurings in Connection With the Plan .................... 11

          3.     Plan Overview .................................................................... 11

          4.     Who May Vote on the Plan ...................................................... 12

          5.     Summary of Solicitation Package and Voting Instructions ............. 13

          6.     Confirmation of the Plan ........................................................ 14

          7.     Confirming and Consummating the Plan ........................................ 14

          8.     Rules of Interpretation ........................................................ 15

          9.     The Voting Record Date ........................................................ 15

          10.    Other Restructuring Documents ................................................ 15

          11.    Distribution of Confirmation Hearing Notice to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims ........................................................ 15

          12.    Filing of the Plan Supplement ................................................ 16

          13.    The Confirmation Hearing ...................................................... 16

          14.    The Deadline for Objecting to Confirmation of the Plan ............... 16

          15.    Notice Parties .................................................................... 17

          16.    Effect of Confirmation of the Plan ............................................ 17

    D.     CONSUMMATION OF THE PLAN ........................................................ 17

    E.     RISK FACTORS ............................................................................ 17

**ARTICLE II.** BACKGROUND TO THE CHAPTER 11 CASES .................................... 18

    A.     THE COMPANY'S BUSINESS .......................................................... 18

B.      CORPORATE AND CAPITAL STRUCTURE OF THE COMPANY .................................................................................19

C.      EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASES .............................................................19

D.      INTENDED COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES ....................................................................21

E.      PROPOSED USE OF CASH COLLATERAL ...........................21

F.      ANTICIPATED BANKRUPTCY FILINGS ............................22

        1.      Employment of Advisors .................................................22

        2.      First Day Motions for Relief to Enable the Debtors to Continue Operating Their Business ..................................22

G.      REORGANIZATION STRATEGY .............................................23

        1.      Enhancing the Debtors' Business Operations....................23

        2.      Appropriate Capital Structure and Conversion of Noteholder Debt.................................................................23

H.      EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES ....................................................................23

I.      DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY ................................23

J.      SUMMARY OF THE NEW SECURED DEBT ........................24

K.      SUMMARY OF KEY EMPLOYEE RETENTION PLAN .......24

L.      SUMMARY OF THE NEW MEMBERSHIP INTERESTS OF REORGANIZED PARENT / OPERATING AGREEMENT ....24

**ARTICLE III.** SUMMARY OF THE PLAN ....................................................25

A.      ADMINISTRATIVE AND PRIORITY TAX CLAIMS............25

        1.      Administrative Expense Claims ......................................25

        2.      Priority Tax Claims..........................................................26

B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS.......................................26

        1.      Summary..........................................................................26

2.      Separate Classification of Other Secured Debt Claims ...................27

3.      Elimination of Vacant Classes........................................................27

4.      Voting; Presumptions; Solicitation in Good Faith...........................27

5.      Cramdown.......................................................................................27

6.      Classification and Treatment of Claims and Equity Interests .........28

7.      Special Provision Governing Unimpaired Claims...........................30

8.      Discharge of Claims .......................................................................30

9.      Subordinated Claims.......................................................................30

10.     Intercompany Claims......................................................................31

C.      ACCEPTANCE OR REJECTION OF THE PLAN ...................................31

1.      Presumed Acceptance of Plan ........................................................31

2.      Presumed Rejection of Plan............................................................31

3.      Voting Class...................................................................................31

4.      Acceptance by Impaired Classes of Claims.....................................31

5.      Confirmation Pursuant to Section 1129(b) of the
        Bankruptcy Code ...........................................................................31

D.      MEANS FOR IMPLEMENTATION OF THE PLAN ...............................31

1.      General Settlement of Claims.........................................................31

2.      Corporate Existence........................................................................32

3.      Vesting of Assets in the Reorganized Debtors ................................32

4.      New Secured Debt and Sources of Cash for Plan
        Distributions ..................................................................................33

5.      Treatment of Vacant Classes ..........................................................33

6.      Key Employee Retention Agreements.............................................33

7.      Issuance of New Membership Interests and Related
        Documentation................................................................................34

8.      Substantive Consolidation for Plan Purposes .................................34

9.      Release of Liens, Claims and Equity Interests .................................35

10.     New Organizational Documents.......................................................35

11.     Managers and Officers of Reorganized Parent................................35

12.     Corporate Action .............................................................................36

13.     Cancellation of Notes, Certificates and Instruments ......................37

14.     Cancellation of Instruments Governing Existing Security
        Interests............................................................................................38

15.     Equity Interests in Subsidiaries; Corporate Reorganization............38

16.     Restructuring Transactions ...............................................................38

17.     Plan Supplement, Other Documents and Orders .............................38

E.      LITIGATION TRUST.................................................................................38

1.      The Litigation Trustee ......................................................................38

2.      The Fuse Litigation Trust .................................................................39

3.      The Litigation Trust Oversight Committee ......................................40

4.      Closing the Chapter 11 Cases ..........................................................41

F.      TREATMENT OF EXECUTORY CONTRACTS AND
        UNEXPIRED LEASES ...............................................................................41

1.      Assumption and Rejection of Executory Contracts and
        Unexpired Leases..............................................................................41

2.      Assignment of Executory Contracts or Unexpired Leases ..............42

3.      Claims on Account of the Rejection of Executory Contracts
        or Unexpired Leases .........................................................................42

4.      Cure of Defaults for Assumed Executory Contracts and
        Unexpired Leases..............................................................................43

5.      Assumption of Director and Officer Insurance Policies..................43

6.      Indemnification Provisions...............................................................44

7.      Compensation and Benefit Programs ...............................................44

8.      Insurance Policies .............................................................................44

G.      PROVISIONS GOVERNING DISTRIBUTIONS ...................................44

        1.      Dates of Distributions .......................................................44

        2.      Distribution Agent ............................................................45

        3.      Cash Distributions ...........................................................45

        4.      Rounding of Payments......................................................45

        5.      Distributions on Account of Claims Allowed After the
                Effective Date ..................................................................46

        6.      General Distribution Procedures........................................46

        7.      Address for Delivery of Distributions ...............................46

        8.      Undeliverable Distributions and Unclaimed Property....................46

        9.      Withholding Taxes............................................................47

        10.     Setoffs ............................................................................47

        11.     Surrender of Cancelled Instruments or Securities ...........47

        12.     Lost, Stolen, Mutilated or Destroyed Securities...............48

H.      PROCEDURES FOR RESOLVING CONTINGENT,
        UNLIQUIDATED AND DISPUTED CLAIMS .........................................48

        1.      Disputed Claims...............................................................48

        2.      Procedures Regarding Disputed Claims ...........................48

        3.      Allowance of Claims ........................................................49

I.      CONDITIONS PRECEDENT TO CONSUMMATION OF THE
        PLAN ..................................................................................50

        1.      Conditions Precedent to Consummation .........................50

        2.      Waiver of Conditions........................................................52

        3.      Effect of Non Occurrence of Conditions to Consummation ...........52

J.      RELEASE, INJUNCTION AND RELATED PROVISIONS....................52

        1.      General..............................................................................52

        2.      Release ..............................................................................52

K.      THIRD PARTY RELEASE BY HOLDERS OF CLAIMS ........................54

      1.      Discharge of Claims ..........................................................54

      2.      Exculpation ......................................................................55

      3.      Injunction ........................................................................55

L.      BINDING NATURE OF PLAN.................................................................55

M.      CONFIRMATION PROCEDURES..........................................................56

      1.      Confirmation Hearing......................................................56

      2.      Filing Objections to the Plan ...........................................56

N.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF
THE PLAN ............................................................................................56

      1.      Best Interests of Creditors Test/Liquidation Analysis....................58

      2.      Feasibility .......................................................................58

      3.      Valuation.........................................................................59

      4.      Acceptance by Impaired Classes ......................................61

      5.      Confirmation Without Acceptance by Impaired Classes................62

      6.      No Unfair Discrimination .................................................63

      7.      Fair and Equitable Test ....................................................63

O.      CONSUMMATION OF THE PLAN.........................................................64

ARTICLE IV. RISK FACTORS...........................................................................64

A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS .........................64

      1.      Parties in Interest May Object to the Debtors' Classification
of Claims and Equity Interests.........................................64

      2.      The Conditions Precedent to the Effective Date of the Plan
May Not Occur. ...............................................................64

      3.      The Debtors May Fail to Satisfy the Vote Requirement. ...............64

      4.      The Debtors May Not Be Able to Secure Confirmation of
the Plan. ..........................................................................64

5.      Non-Consensual Confirmation of the Plan May Be
        Necessary. ........................................................................... 65

6.      Continued Risk Upon Confirmation. ............................... 66

7.      The Debtors May Object to the Amount or Classification of
        a Claim or Equity Interest. ............................................ 66

8.      The Effective Date May Not Occur. ................................ 66

9.      The Chapter 11 Cases May Be Converted to Cases Under
        Chapter 7 of the Bankruptcy Code ................................ 66

10.     Releases, Injunctions, and Exculpations Provisions May
        Not Be Approved ............................................................ 67

B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF
        SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR
        RECOVERIES UNDER THE PLAN ........................................... 67

1.      There May Be a Lack of a Trading Market for the New
        Membership Interests. ..................................................... 67

2.      To Service the Reorganized Debtors' Indebtedness and
        Meet Their Operational Needs, the Reorganized Debtors
        Will Require a Significant Amount of Cash.  Their Ability
        to Generate Cash Depends on Many Factors Beyond Their
        Control. ........................................................................... 67

3.      The Estimated Valuation of the Reorganized Debtors and
        the New Membership Interests and the Estimated
        Recoveries to Holders of Allowed Claims Are Not
        Necessarily Representative of the Private or Public Sale
        Values of the New Membership Interests. ....................... 68

4.      Large Holders of the Senior Secured Notes May Control
        Reorganized Parent. ........................................................ 68

5.      It is Unlikely That Reorganized Parent Will Pay Dividends
        in the Foreseeable Future. ............................................... 68

6.      Tax Implications of the Plan. .......................................... 69

C.      RISKS ASSOCIATED WITH FORWARD LOOKING
        STATEMENTS ........................................................................ 69

1.      The Financial Information Contained Herein is Based on
        the Debtors' Books and Records and, Unless Otherwise
        Stated, No Audit was Performed. .................................... 69

2.      Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary. ...................................................................................69

D.      DISCLOSURE STATEMENT DISCLAIMER ..........................................70

1.      The Information Contained Herein is for Soliciting Votes Only. .................................................................................................70

2.      This Disclosure Statement was Not Approved by the Securities and Exchange Commission. .............................................70

3.      The Debtors Relied on Certain Exemptions From Registration Under the Securities Act. ............................................70

4.      This Disclosure Statement Contains Forward Looking Statements. .......................................................................................70

5.      No Legal or Tax Advice is Provided to You by This Disclosure Statement. ........................................................................70

6.      No Admissions Are Made by This Disclosure Statement. ..............71

7.      No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections. .....................................71

8.      Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets. .........................................................................................71

9.      The Information Used Herein was Provided by the Debtors and was Relied Upon by the Debtors' Advisors.............................71

10.     The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update...........................................................................71

11.     No Representations Made Outside the Disclosure Statement Are Authorized. ...............................................................................72

**ARTICLE V.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .....................................................................72

A.      LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE .........................................................................................................72

B.      FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION...................................................................................72

**ARTICLE VI.** ISSUANCE AND RESALE OF NEW MEMBERSHIP
INTERESTS UNDER THE PLAN ..........................................................73

    A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF
THE SECURITIES ACT AND BLUE SKY LAWS ................................73

        1.    Section 3(a)(9) and Section 4(a)(2) of the Securities Act
(Solicitation of the Plan)..................................................73

        2.    Section 1145 of the Bankruptcy Code (Distribution to
Holders of Senior Secured Notes) ...................................74

    B.    RESALES OF NEW MEMBERSHIP INTERESTS.................................74

        1.    Resales of the 1145 Securities ..........................................74

    C.    LISTING OF NEW MEMBERSHIP INTERESTS ..................................75

**ARTICLE VII.** SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN TO HOLDERS OF  ALLOWED
SENIOR SECURED NOTES CLAIMS.................................................75

    A.    DEFINITION OF U.S. PERSON AND NON-U.S. PERSON ...................76

    B.    TREATMENT OF THE SATISFACTION OF SENIOR
SECURED NOTES CLAIMS FOR CASH, LITIGATION TRUST
INTERESTS, NEW SECURED DEBT AND NEW
MEMBERSHIP INTERESTS ....................................................77

    C.    TAX CONSEQUENCES FOR U.S. PERSONS HOLDING
ALLOWED SENIOR SECURED NOTES CLAIMS...............................77

        1.    Exchange of Senior Secured Notes Claims for New
Membership Interests, New Secured Debt, and Cash.....................77

        2.    Distributions in Discharge of Accrued Interest ...............78

        3.    Limitations on the Use of Capital Losses ........................79

    D.    TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING
ALLOWED SENIOR SECURED NOTES CLAIMS...............................79

        1.    Gain Recognition ...............................................................79

        2.    Distributions in Discharge of Accrued Interest ...............80

    E.    TAX TREATMENT OF THE FUSE LITIGATION TRUST....................81

    F.    TAXATION OF REORGANIZED PARENT AND HOLDERS OF

NEW MEMBERSHIP INTERESTS ............................................................ 82

    1.    Tax Consequences for a Holder of New Membership Interests ............................................................................. 82

    2.    Certain Additional Tax Consequences for U.S. Person Holding New Membership Interests .................................. 83

    3.    Certain Additional Tax Consequences for Non-U.S. Person Holding New Membership Interests ........................ 84

G.    TAXATION OF HOLDERS OF NEW SECURED DEBT ....................... 85

    1.    U.S. Person Holding New Secured Debt ......................... 85

    2.    Non-U.S. Person Holding New Secured Debt ................. 86

H.    FATCA ................................................................................ 86

I.    INFORMATION REPORTING AND BACKUP WITHHOLDING ......... 87

    1.    Information Reporting ................................................... 87

    2.    Backup Withholding ..................................................... 87

J.    GENERAL DISCLAIMER .......................................................... 88

**ARTICLE VIII.** RECOMMENDATION ............................................................ 88

Fuse, LLC ("Parent") and its debtor affiliates (collectively, the "Debtors" or the "Company") are sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor entitled to vote to approve the *Debtors' Prepackaged Joint Plan of Reorganization* dated April 18, 2019, as the same may be amended from time to time (the "Plan").[2]  The Company is soliciting your vote to approve the Plan (the "Solicitation") *BEFORE* the filing of voluntary reorganization cases under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). Because the chapter 11 cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  Following the commencement of the chapter 11 cases, the Debtors expect to promptly seek orders of the Bankruptcy Court (I) approving this Disclosure Statement as containing adequate information, (II) approving the solicitation of votes as being in compliance with sections 1125 and 1126(b) of the Bankruptcy Code, and (III) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.  The Debtors expect that the Plan will have the support of the Supporting Noteholders (as defined therein).

**ONLY HOLDERS OF SENIOR SECURED NOTES CLAIMS (CLASS 3) ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED UNDER THIS DISCLOSURE STATEMENT.**

<div style="border:1px solid">

**THE VOTING DEADLINE IS 4:00 P.M. PREVAILING CENTRAL TIME ON MAY 9, 2019 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**BENEFICIAL HOLDERS RECEIVING BENEFICIAL HOLDER BALLOTS MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE INTERMEDIARY RECORD OWNERS AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR INTERMEDIARY RECORD OWNERS TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT SUBMITTED ON YOUR BEHALF TO YOUR NOMINEE MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT FOR YOU TO READ**

</div>

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IV HEREIN.

**THE PLAN IS SUPPORTED BY THE DEBTORS AND THE DEBTORS EXPECT TO HAVE THE SUPPORT OF THE SUPPORTING NOTEHOLDERS REPRESENTING APPROXIMATELY 82.5% OF THE ALLOWED SENIOR SECURED NOTES CLAIMS.  THE DEBTORS URGE HOLDERS OF SENIOR SECURED NOTES CLAIMS TO VOTE TO ACCEPT THE PLAN.**

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE NEW MEMBERSHIP INTERESTS TO BE ISSUED UNDER THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL OR REGULATORY AUTHORITY. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THIS SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING

ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:

- **BUSINESS STRATEGY;**

- **COMPETITION;**

- **CONCENTRATION OF CUSTOMERS;**

- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**

- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**

- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**

- **VARIATION FROM PROJECTED OPERATING AND FINANCIAL DATA; AND**

- **AVAILABILITY AND TERMS OF CAPITAL.**

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE NEW MEMBERSHIP INTERESTS DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("BLUE SKY LAWS").

THE DEBTORS INTEND TO RELY ON SECTIONS 3(A)(9) AND/OR 4(A)(2) AND 18(B)(4)(E) OF THE SECURITIES ACT TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS THE

OFFER OF NEW MEMBERSHIP INTERESTS TO HOLDERS OF SENIOR
SECURED NOTES CLAIMS PRIOR TO THE FILING OF THE CHAPTER 11
CASES, INCLUDING IN CONNECTION WITH THE SOLICITATION.  THE
DEBTORS INTEND TO RELY ON SECTION 1145 OF THE BANKRUPTCY CODE
TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT THE
ISSUANCE OF THE NEW MEMBERSHIP INTERESTS TO HOLDERS OF
SENIOR SECURED NOTES CLAIMS.  THE DEBTORS RECOMMEND THAT
POTENTIAL RECIPIENTS OF ANY NEW MEMBERSHIP INTERESTS
PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL
CONCERNING THE SECURITIES LAWS GOVERNING THE
TRANSFERABILITY OF ANY SUCH NEW MEMBERSHIP INTERESTS.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS
DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A
CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS
WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR
BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE
PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED
THEREBY.  FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE
ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE
STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S
APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE
BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE
INFORMATION CONTAINED HEREIN.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL
INSOLVENCY COUNSEL TO THE DEBTORS.  PSZ&J HAS RELIED UPON
INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH
PREPARATION OF THIS DISCLOSURE STATEMENT.  PSZ&J HAS NOT
INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS,
SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN
EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS
RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND
INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER
WITH THE PLAN SUPPLEMENT.  ALTHOUGH THE DEBTORS BELIEVE THAT
THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE
QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES
DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR
STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE
EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN
A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND
PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED
HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL
GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE
OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED
IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE
DEBTORS' MANAGEMENT.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS
RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND
RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS'
BUSINESS.  THE DEBTORS' MANAGEMENT HAS REVIEWED THE

- 4 -

FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE IV HEREIN, "RISK FACTORS."

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (EASTERN TIME) ON MAY 9, 2019, UNLESS EXTENDED BY THE DEBTORS IN THEIR DISCRETION.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN), THE DEBTORS WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NOTWITHSTANDING ANY RIGHTS OF APPROVAL AS TO THE FORM OR SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NEITHER THE SUPPORTING NOTEHOLDERS, NOR THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS OR AGENTS, HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR  AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

## <u>EXHIBITS</u>

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Organizational Chart of the Debtors

EXHIBIT C – Liquidation Analysis

EXHIBIT D – Financial Projections

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE
AS THOUGH FULLY SET FORTH HEREIN.

---

# ARTICLE I.
## EXECUTIVE SUMMARY

**Only Holders of Senior Secured Notes Claims (Class 3) are entitled to vote on the Plan and are being solicited under this Disclosure Statement.**

This Executive Summary is being provided to Holders of Senior Secured Notes Claims as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' operating and financial history;

- the significant events that have occurred to date;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations, and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

The Plan contemplates deemed substantive consolidation of the Debtors for voting and Plan distribution purposes only with respect to the Claims.  If, however, the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required.  The Debtors intend to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims or Equity Interests that is Impaired as set forth in Article III hereof.

In connection with developing the Plan, the Company reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries in various liquidation scenarios.  As a result, the Company concluded that the Company's enterprise value would be maximized by continuing to operate as a going concern. The Company believes that its business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation analysis described herein, the value of the Company's assets would be considerably greater if the Company operates as a going concern instead of liquidating.  Moreover, the Company believes

that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation, or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would diminish the Company's enterprise value. **Accordingly, the Company strongly recommends that all Holders of Senior Secured Notes Claims (Class 3) vote to accept the Plan.**

## A.   AN OVERVIEW OF THE CHAPTER 11 PROCESS

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

## B.   SUMMARY OF THE PLAN

After months of active and arm's-length negotiations, the Company, in consultation with its advisors, reached agreement on the terms of the Plan with the Supporting Noteholders, representing a substantial majority by principal amount of the Holders of Senior Secured Notes Claims. The Company believes that the Plan is the best restructuring alternative reasonably available to the Company. Because Holders of Senior Secured Notes Claims are the only impaired creditor Class not deemed to reject under the Plan, only such Holders are entitled to vote on the Plan.

The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously. The Plan will also provide an efficient restructuring through the prepackaged process, which is designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for renewed success. Through confirmation of the Plan, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; and retain additional

flexibility to maximize enterprise value on a going forward basis. With respect to the Debtors' Litigation Claims, a new Fuse Litigation Trust will be created in order to evaluate and pursue any viable Litigation Claims of the Estates. For all of the reasons set forth herein, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

As of the date hereof, the Debtors had outstanding secured debt having a principal amount of $242 million. Accordingly, the Reorganized Debtors will have a significantly deleveraged and improved balance sheet and a more appropriate capital structure under the Plan. The Debtors expect that the Plan will have the support of Holders of approximately 82.5% in principal amount of the Senior Secured Notes.

Under the Plan, the Senior Secured Notes will be exchanged for (a) Cash in the Debtors' accounts, except for Cash needed in the Reorganized Debtors' operations as mutually agreed upon by the Debtors and the Supporting Noteholders, (b) the New Secured Debt consisting of the $45 million term loan facility, (c) 100% of the New Membership Interests of Reorganized Parent, and (d) 100% of the Litigation Trust Interests in the Fuse Litigation Trust. Allowed Other Secured Debt Claims either will be reinstated or paid in full under the Plan, or will receive the Collateral securing such claims. Accordingly, the Reorganized Debtors will have a significantly deleveraged and improved balance sheet and a more appropriate capital structure under the Plan.

Because the Debtors have pledged substantially all of their assets that have any material value as Collateral to secure the Senior Secured Notes Claims and no unencumbered assets in the Estates have any material value (taking into account the deficiency claims arising under the Senior Secured Notes and the Administrative Expense Claims that the Holders of the Senior Secured Notes are expected to assert for the diminution in the value of their Collateral during the Chapter 11 Cases), the Holders of Class 4 General Unsecured Claims will receive no distributions under the Plan.

Equity Interests in the Debtors will be extinguished. However, such Equity Interests shall be reinstated upon the Effective Date and deemed issued to and held by Reorganized Parent, directly or indirectly as applicable, as such Equity Interests were held prior to the Effective Date (except for the Equity Interests of Fuse, LLC, which shall be held directly by the Reorganized Parent).

The Plan is feasible and will be implemented with existing cash-on-hand. The Plan contemplates substantive consolidation of the Debtors' estates for voting, confirmation, and distribution purposes.

This Disclosure Statement contains descriptions of the material terms of the New Secured Debt and other Plan-related documentation. The definitive documents are in the process of being finalized and will be filed with the Bankruptcy Court as part of the Plan Supplement at a later date.

## C.     PURPOSE AND EFFECT OF THE PLAN

### 1.     Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their business going forward and does not mean that the Debtors will be liquidated or forced to go out of business. Additionally, a bankruptcy court's confirmation of a plan binds the debtor, any

entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

2. **Financial Restructurings in Connection With the Plan**

The Plan contemplates certain transactions, including, without limitation, the following (described in greater detail in Article III herein):

- Holders of Allowed Senior Secured Notes Claims totaling $242 million in principal amount will receive, on account of such Claims, (a) Cash in the Debtors' accounts, except for Cash needed in the Reorganized Debtors' operations as mutually agreed upon by the Debtors and the Supporting Noteholders, (b) the New Secured Debt, (c) 100% of the New Membership Interests of Reorganized Parent; and (d) 100% of the Litigation Trust Interests in the Fuse Litigation Trust. The Cash, New Secured Debt, New Membership Interests, and Litigation Trust Interests will be distributed to the Holders of Senior Secured Notes Claims on a Pro Rata basis;

- The New Secured Debt will be issued, which will consist of a first lien term loan in the aggregate principal amount of $45 million. The lenders under the New Secured Debt will be each of the existing Holders of the Senior Secured Notes The New Secured Debt will have a five-year maturity date and will accrue interest at the rate of 12.00% per annum, which shall be payable in Cash on a quarterly basis. The New Secured Debt shall have a first lien on all of the assets of the Reorganized Debtors, *except* certain customary permitted liens;

- On or soon after the Effective Date of the Plan, the Reorganized Debtors will adopt, execute and implement the Key Employee Retention Agreements, as applicable;

- Holders of General Unsecured Claims will receive not receive any recovery on account of their Allowed Claims because the Debtors have pledged substantially all of their assets that have any material value as Collateral to secure the Senior Secured Notes Claims and no unencumbered assets in the Estates have any material value (taking into account the deficiency claims arising under the Senior Secured Notes and the Administrative Expense Claims that the Holders of the Senior Secured Notes are expected to assert for the diminution in the value of their Collateral during the Chapter 11 Cases); and

- The Equity Interests in the Debtors will be extinguished. However, such Equity Interests shall be Reinstated upon the Effective Date and deemed issued to and held by Reorganized Parent, directly or indirectly as applicable, as such Equity Interests were held prior to the Effective Date (except for the Equity Interests of Fuse, LLC, which shall be held directly by the Reorganized Parent).

3. **Plan Overview**

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

- 11 -

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[3]  Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for five (5) Classes of Claims against and/or Equity Interests in the Debtors.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE IV BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class | Type of Claim or Interest | Estimated Claim Amount | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|-------|---------------------------|------------------------|------------|------------------|-------------------------------|
| 1 | Other Priority Claims | $0 | No | No | 100% |
| 2 | Other Secured Claims | $0 | No | No | 100% |
| 3 | Senior Secured Notes Claims | $242,000,000 plus interest, fees, and expenses | Yes | Yes | Substantially greater than liquidation value, but substantially less than outstanding claims |
| 4 | General Unsecured Claims | $10,000,000 – $25,000,000[4] (approx.) | Yes | No | 0% |
| 5 | Equity Interests in Debtors | N/A | Yes | No | 0% |

4.      **Who May Vote on the Plan**

Each Holder of an Allowed Claim in Class 3 is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Claims in Class 3 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.  An Impaired Class of Claims shall have accepted the Plan if:  (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Classes 1 and 2 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan.  To

---

[3]  This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

[4]  This amount excludes the Deficiency Claim.

the extent Class 4 is entitled to vote in favor of the Plan, the Supporting Noteholders have each agreed to vote in favor of the Plan with respect to such holders' Deficiency Claim. Classes 4 and 5 are Impaired under the Plan and deemed to reject the Plan by operation of law. Holders of Claims in Classes 4 and 5 are not entitled to vote on the Plan. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

5.     **Summary of Solicitation Package and Voting Instructions**

The following materials constitute the solicitation package with respect to the Plan enclosed herewith (the "Solicitation Package"):

- a solicitation cover letter from the Company addressed to the voting creditor;

- the appropriate form of Ballot and instructions for completing the Ballot;

- this Disclosure Statement with all exhibits; and

- the Plan (as an exhibit hereto).

Only Holders of Senior Secured Notes Claims (Class 3) are entitled to vote to accept or reject the Plan and shall be served by email or with paper copies of this Disclosure Statement and the Plan. All parties entitled to vote to accept or reject the Plan shall receive by email, or a paper copy of, each appropriate Ballot. Any party who desires additional paper copies of these documents may request copies from Kurtzman Carson Consultants LLC (the "Voting Agent") at no charge by: (i) accessing the Debtors' restructuring website at http://www.kccllc.net/fusemedia; (ii) calling the Voting Agent at (888) 647-1737 (toll free) or +1 (310) 751-2624 (international); or (iii) emailing FuseMediaInfo@kccllc.com.

The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan. To be counted, Ballots cast by Holders must be received by the Voting Agent by **4:00 p.m. (prevailing Eastern Time) on May 9, 2019, the Voting Deadline**. Voting instructions are attached to each Ballot.

**If you are a Beneficial Holder of Class 3 Senior Secured Notes Claims, you must deliver your Ballot to your broker, bank, dealer, agent, or other nominee (each of the foregoing, a "Nominee"). Please promptly return your Ballot to your Nominee in order to allow for sufficient time to permit your Nominee to deliver a Master Ballot including your vote to the Debtors' Voting Agent by the Voting Deadline.**

Unless the Company in its discretion decides otherwise, any Ballot received after the Voting Deadline shall not be counted. The Voting Agent will process and tabulate received Ballots and will File a voting report as soon as practicable on or after the Petition Date.

Parties may contact the Voting Agent with any questions related to the solicitation procedures applicable to their Claims.

The Plan Supplement will be Filed by the Debtors no later than five (5) Business Days (unless otherwise ordered by the Bankruptcy Court) before the date fixed by the Bankruptcy

Court to consider confirmation of the Plan.  When Filed, the Plan Supplement will be available in both electronic and hard copy form.

**Any Ballot that is properly executed by the Holder of a Claim but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**All Ballots are accompanied by voting instructions.  It is important to follow the specific instructions provided with the Ballot.  Voting tabulation procedures are set forth in the Ballots.**

**The Company intends to rely on sections 3(a)(9) and/or 4(a)(2) and 18(b)(4)(E) of the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer of New Membership Interests of Reorganized Parent on account of the treatment of Claims in connection with the Solicitation and the Plan.  The Company intends to rely on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of the New Membership Interests of Reorganized Parent on account of the treatment of Claims in connection with the Plan.**

6.    **Confirmation of the Plan**

(a)    <u>Generally</u>

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

(b)    <u>The Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Following commencement of the Chapter 11 Cases, the Company intends to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

7.    **Confirming and Consummating the Plan**

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors.  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

8.     **Rules of Interpretation**

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

9.     **The Voting Record Date**

**The Voting Record Date is April 5, 2019**.  Only Holders of Allowed Claims in the Voting Class on the Voting Record Date received the Solicitation Package and are allowed to vote to accept or reject the Plan.

10.     **Other Restructuring Documents**

Holders of Senior Secured Notes Claims (Class 3) on the Voting Record Date will receive the Solicitation Package, which will be delivered by the Company via its Voting Agent.

In addition to the Solicitation Package, Holders of Senior Secured Notes Claims on the Voting Record Date will receive, after the commencement of the Chapter 11 Cases and as ordered by the Bankruptcy Court, the following supplemental materials (the "Supplemental Materials"):

(i)     a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice"); and

(ii)     such other materials as the Bankruptcy Court may direct.

11.     **Distribution of Confirmation Hearing Notice to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages or Supplemental Materials but, instead, will only receive the Confirmation Hearing Notice, after the commencement of the Chapter 11 Cases, that explains, among other things, (i) that Classes 1 and 2 are Unimpaired under the Plan, and therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) that Holders of Class 4 General Unsecured Claims and Class 5 Equity Interests in Debtors are Impaired and shall receive no distribution under the Plan on account of such Claims and Equity Interests and are therefore deemed to have

- 15 -

rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, (iii) instructions for Holders of Claims and Equity Interests in all Classes on how they may obtain a copy of the Plan and this Disclosure Statement, (iv) the deadline by which to object to confirmation of the Plan; and (v) the Confirmation Hearing date and time.

    *Contract and Lease Counterparties.*  Parties to certain of the Debtors' executory contracts and unexpired leases may not have Claims pending the disposition of their contracts or leases by assumption or rejection under the Plan.  Such parties nevertheless will receive the Confirmation Hearing Notice after the Debtors' chapter 11 cases are filed, as well as notice of the projected disposition of their contracts and/or lease and the scheduled Confirmation Hearing.

    12.    **Filing of the Plan Supplement**

    The Debtors will file the Plan Supplement no later than five (5) Business Days before the Confirmation Hearing.  The Debtors will transmit a copy of the Plan Supplement to the "Distribution List," as defined below.  Additionally, parties may request obtain a copy of the Plan Supplement by:  (i) accessing the Debtors' restructuring website at http://www.kccllc.net/fusemedia; (ii) calling the Voting Agent at (888) 647-1737 (toll free) or +1 (310) 751-2624 (international); or (iii) emailing FuseMediaInfo@kccllc.com.

    As used herein, the term "Distribution List" means (a) the Office of the United States Trustee, (b) counsel for the Committee, if any is appointed, (c) counsel to the Supporting Noteholders, (d) counsel to the Senior Secured Notes Trustee, (e) the Securities and Exchange Commission, (f) the Internal Revenue Service, (g) all parties that, as of the filing of the Plan Supplement, have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, and (h) any parties affected by an addition to Plan Schedules.

    13.    **The Confirmation Hearing**

    **The Bankruptcy Court has not yet scheduled a Confirmation Hearing Date.**  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

    14.    **The Deadline for Objecting to Confirmation of the Plan**

    **The Bankruptcy Court has not yet scheduled a Confirmation Objection Deadline**. Subject to order of the Bankruptcy Court, any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

    CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH

RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF
CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

15.  **Notice Parties**

(a)  <u>The Debtors</u>, Fuse, LLC, *et al*., 700 North Central Avenue, Suite 600, Glendale, CA 91203 (Attn: Michael Schwimmer, Chief Executive Officer);

(b)  <u>Counsel to the Debtors</u>, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn:  Richard M.  Pachulski, Ira D. Kharasch, Maxim B. Litvak, and James E. O'Neill);

(c)  <u>Counsel to the Supporting Noteholders</u>, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 (Attn:  Brad Eric Scheler, Peter B. Siroka, and Andrew M. Minear) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Michael J. Merchant); and

(d)  <u>The Office of the United States Trustee for the District of Delaware</u>, 944 King Street, Suite 2207, Wilmington, DE 19801.

16.  **Effect of Confirmation of the Plan**

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the release of the Released Parties by the Debtors and the Holders of Claims or Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties.

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND
EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED
BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER
(A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY
UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11
CASES (IF ANY ARE FILED), OR (C) FAILED TO VOTE TO ACCEPT OR REJECT
THE PLAN OR VOTED TO REJECT THE PLAN.

D.  **CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article X of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

E.  **RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS IS URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IV HEREIN TITLED, "RISK FACTORS."**

## ARTICLE II.
## BACKGROUND TO THE CHAPTER 11 CASES

**A.     THE COMPANY'S BUSINESS**

The Debtors are a leading multicultural media company, composed principally of two cable networks, *Fuse* and *FM*.  The Company is headquartered in Glendale, California and also maintains an office in New York, New York.  The Company currently employs approximately 98 full-time employees and 8 independent contractors.   The Company also employs approximately 35 people on a temporary full-time basis through various staffing agencies.

*Fuse* and *FM* are the result of former American cable television network NuvoTV's (formerly known as Sí TV) acquisition of *Fuse* in 2014.   Prior to the acquisition, NuvoTV catered to the Latino community with exclusively English-language programming and was distributed to 28 million homes, which overlapped with *Fuse*'s subscriber base.  Accordingly, the combined media company was able to launch *FM* in 2015 with distribution to 28 million homes.

Prior to January 1, 2019, *Fuse* reached approximately 61 million homes (as measured by Nielsen), making it one of the largest privately-held independent cable networks in the United States.  As a nationally recognized brand, *Fuse* is also one of the largest cable networks targeting the fast-growing young, multicultural and Latino audience.   A traditional focus for the network, English-speaking Hispanic consumers, are the fastest growing demographic in the United States, boasting rapidly increasing purchasing power and household income that surpasses the national Hispanic median.

*FM*, the sister network of *Fuse*, reached approximately 40.5 million homes at its peak and delivers music-centric content.   Launched in 2015, *FM* is a multicultural music network featuring music programming and popular artists, their fans, and the stories that surround them. *FM* is dedicated to all things music – songs, artists, lifestyle, and culture – engaging with its audience through both traditional linear pay-TV platforms and interactive digital platforms.  Like *Fuse*, beyond linear TV, *FM* also reaches viewers with ancillary content via native mobile applications and third-party platforms, such as Hulu, YouTube, Facebook, and major social media platforms.

Fuse.tv is the Company's digital extension of its on-air brand, delivering content covering today's most popular musicians and the latest in news and culture.   At fuse.tv, consumers can access some of the Company's television programming, including exclusive clips, limited full episodes, news, and other culturally relevant information.

The Company generates revenue principally from three sources: (a) affiliate fees for linear distribution, (b) advertising sales on the linear networks and digital media platforms, and (c) sponsored live events and music festivals.  For fiscal year ended December 31, 2018, the Company generated $114.7 million in net revenue.

Affiliate Fees.   The Company enters into multi-year affiliation agreements with distributors who carry the networks.  Under these affiliation agreements, the Company receives monthly per subscriber license fees, known as "affiliate fees," typically with annual rate increases that generate recurring and predictable sources of contracted affiliate revenue.

Advertising Revenue.  The Company also generates revenue from the sale of advertising inventory, program sponsorships, and other bundled advertising packages on both traditional and digital media platforms.  A majority of the Company's advertising revenue is produced through the upfront advertising process, in which advertisers commit in advance to buy commercial inventory for the upcoming broadcast and calendar year at pre-determined rates, providing both

price certainty for ad buyers and greater ad revenue stability for the Company.

Miscellaneous Revenue.  The Company maintains additional revenue streams through sponsorship of live events and music festivals.

## B.   CORPORATE AND CAPITAL STRUCTURE OF THE COMPANY

Debtor Fuse Media, Inc. (formerly known as SiTV Media, Inc.) is a Delaware corporation and owns 85% of the membership interests in Debtor Fuse Media, LLC (formerly known as SiTV Media, LLC), a Delaware limited liability company.[5]  Fuse Media, LLC holds all of the membership interests in Fuse, LLC, which is a Delaware limited liability company and the primary operating entity within the Debtors' organizational structure.  The remaining debtors are direct or indirect wholly-owned subsidiaries of Fuse, LLC.  Attached hereto as **Exhibit A** is an organizational chart of the Company.

As described above, the Company's primary source of cash flow is generated from affiliate fees and advertising.

In July 2014, in connection with the acquisition of Fuse Media by SiTV Media, SiTV, LLC (now known as Fuse, LLC) and SiTV Finance, Inc. (now known as Fuse Finance, Inc.) issued $240 million of 10.375% Senior Secured Notes due 2019 (the "Senior Secured Notes") pursuant to that certain *Indenture* dated July 1, 2014.  The Company's obligations under the Senior Secured Notes are secured by substantially all of the Company's assets.

On August 21, 2017, the Company issued $2 million of additional Senior Secured Notes. The Senior Secured Notes mature on July 1, 2019 with interest payments due January 1 and July 1 each year the notes are outstanding.

On January 1, 2019, the Company did not make the interest payment owed on the Senior Secured Notes.  Prior to the expiration of the cure period, the Company entered into a forbearance agreement with the Supporting Noteholders, as amended, covering the period through April 22, 2019.

The current outstanding principal balance of the Senior Secured Notes is $242 million, plus accrued interest, fees, and expenses.

In addition, the Company currently owes various vendors, suppliers, and other unsecured trade creditors approximately $10 million to $25 million.

## C.   EVENTS LEADING TO THE COMMENCEMENT OF THE BANKRUPTCY CASES

For the majority of the Company's revenue, the Company distributes its original and acquired content in the form of a 24/7 linear television "network" or "channel" to cable, satellite and telco pay-tv operators, which include the Company's networks (*Fuse* and *FM*) in a package of linear networks that these operators sell to their customers on a monthly subscription basis. This traditional distribution model produces two principal sources of revenue: (1) affiliate fees (addressed below); and (2) advertising revenue.  By the end of 2014, the Company had projected affiliate fees of approximately $495 million through 2020.

---

[5]  Non-debtor MSG Holdings, L.P. owns the remaining 15% of Fuse Media, LLC.

Two intervening and inter-related factors have contributed to the Company's commencement of the current bankruptcy proceeding. First, there have been rapid changes in the media marketplace adversely affecting the pay-tv television industry, which in turn adversely affected the Company's revenues and precluded the Company from refinancing its current debt (*i.e.*, the Senior Secured Notes). And second, capital constraints (including debt service levels and lack of available investment capital) impeded the Company's ability to grow investment in original content development/production and marketing at competitive levels.

With regard to the first factor, the overall pay-TV industry is in a period of substantial transformation as the result of the introduction into the marketplace in recent years of high quality and relatively inexpensive and consumer friendly content alternatives (*e.g.*, Netflix, Hulu and others). The ongoing marketplace changes have resulted in, and will continue to cause, a material decline in pay-tv subscribers and related affiliate fee revenue as a result of a declining number of new subscribers, "cord-cutting" (the cancellation of an existing pay-tv subscription), and "cord-shaving" (the downgrading of a pay-tv subscription from a higher priced package to a lower priced package). Each quarter the Company receives less revenue from its traditional pay-tv distribution partners as the result of the decline in subscribers receiving the Company's networks. And new sources of revenue for the Company, although developing and in progress, have not grown sufficiently to offset revenue declines in the legacy business. As a result of these trends, the refinancing of the Company's debt was not viable.

Evidencing the pressures within the pay-tv business, effective December 31, 2018, Comcast and Verizon Fios, which together represented a significant and material portion of the Company's 2018 contracted revenue and 2018 subscriber base, ceased distributing the *Fuse* network.

Separately, in mid-February 2019, DirecTV (a major distributor of the *Fuse* network and a source of material revenue) claimed that the Company had breached its affiliation agreement with DirecTV by failing to offer DirecTV an early right to terminate the affiliation agreement prior to its stated expiration date. DirecTV's notice of breach provided the Company with 30 days to cure the alleged default and indicated that DirecTV might terminate the affiliation agreement if the Company did not timely cure the claimed breach. The Company disputes that DirecTV has a legitimate basis to claim that the Company has violated the terms of its agreement with DirecTV or to terminate its distribution obligations with respect to the *Fuse* network. The Company filed a complaint for declaratory relief against DirecTV in California state court and sought injunctive relief to prevent DirecTV from exercising any asserted termination rights. The parties have since stipulated to a "standstill" under which DirecTV has agreed to refrain from taking any action to terminate the Fuse agreement or to remove the *Fuse* network from the DirecTV, DirecTV Now and AT&T U-Verse distribution platforms for the specific reason set forth in DirecTV's original claim of contract breach, pending final resolution of such matter by the state court.

By letter dated April 16, 2019, DirecTV again claimed that the Company had breached its affiliation agreement with DirecTV by: (a) failing to provide satisfactory programming content and (b) offering more favorable promotional previews, free of charge, to new subscribers of another distributor. DirecTV's notice of breach provided the Company with 60 days to cure the alleged default under item (a) in the foregoing sentence and 30 days to cure the alleged default under item (b) in the foregoing sentence, and suggests that DirecTV might take steps to terminate the affiliation agreement if the Company did not timely cure the claimed breaches. As with DirecTV's prior notice of breach, the Company disputes that DirecTV has a legitimate basis to claim that the Company has violated the terms of its agreement with DirecTV or to terminate its distribution obligations with respect to the *Fuse* network.

- 20 -

As a result of fast-moving transformational shifts in the pay-tv industry caused by changes in programming alternatives and consumer behavior, the Company has been forced to restructure its operations and implement staff reductions. The Company began to consider restructuring options during 2018 and commenced discussions with its largest noteholders. After months of negotiations, the parties reached agreement on a debt-for-equity swap that would be implemented through a prepackaged chapter 11 plan (the "<u>Plan</u>"). No creditor constituency, aside from the holders of the Senior Secured Notes, is entitled to vote on the Plan.

## D. INTENDED COMMENCEMENT OF THE DEBTORS' CHAPTER 11 CASES

In order to obtain confirmation of the Plan, the Debtors intend to file for chapter 11 bankruptcy protection in order to effectuate an orderly restructuring of their capital structure. In light of current market conditions and operating results, the Debtors cannot continue to service their existing debt load, particularly with reference to the Senior Secured Notes, without jeopardizing their business.

Through the Plan, the Debtors will de-leverage their balance sheet and implement other restructuring transactions, such as freeing the Company of certain contractual liabilities, in order to allow the Company to emerge from bankruptcy with a stronger financial foundation. Upon doing so, the Company will be better able to effectively support its core linear networks business, as well as pursue growth areas, such as virtual multichannel video programming distribution (*e.g.*, YouTube TV and Hulu Live), advertising supported distribution (AVOD), and complementary areas such as live events and music festivals. The Company also will be well-positioned post-emergence to explore strategic transactions that can accelerate greater growth in new areas for stakeholders.

The Debtors intend to move promptly towards confirmation of the Plan and to exit bankruptcy as quickly as possible in order to minimize any potential adverse impact of the bankruptcy filing on the Debtors' business. The Debtors believe that the proposed Plan is in the best interests of the Debtors' creditors and will maximize the value of these estates.

## E. PROPOSED USE OF CASH COLLATERAL

A critical goal of the Debtors' business stabilization efforts has been to ensure that the Debtors maintain sufficient liquidity to operate their business over the long term. Fortunately, the Debtors have adequate cash on hand in order to fund operations and administer the contemplated Chapter 11 Cases. The Debtors expect to have agreement with the Senior Secured Agent as to the terms of a consensual cash collateral order.

On the Petition Date, the Debtors intend to file a motion seeking approval of the consensual form of cash collateral order. By this motion, the Debtors will seek permission to grant adequate protection liens and superpriority claims in favor of the Senior Secured Agent to the extent of any diminution in the collateral position of such creditor.

The proposed use of cash collateral will allow the Debtors to, among other things: (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various administrative professionals fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs – all of which are necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Plan.

**F.      ANTICIPATED BANKRUPTCY FILINGS**

Aside from the Plan, this Disclosure Statement, and related documentation and the use of cash collateral described in the foregoing section, the Debtors intend to seek the relief described below following the commencement of the Chapter 11 Cases.

1.      **Employment of Advisors**

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the contemplated Chapter 11 Cases, the Debtors will file applications seeking authorization to retain and employ certain advisors, whose terms of retention will be subject to approval by the Bankruptcy Court including FTI Consulting, LLC as financial advisors to the Debtors, and Pachulski Stang Ziehl & Jones LLP, as general insolvency counsel to the Debtors.

2.      **First Day Motions for Relief to Enable the Debtors to Continue Operating Their Business**

The Debtors intend to file the "first day" motions listed below:[6]

(a)      Motion for Authorization to: (1) Pay Employee Wages, (2) Reimburse Business Expenses, and (3) Honor Employee Benefits;

(b)      Motion for Authorization to Pay Certain Critical Vendors;

(c)      Motion for Authorization to Continue Use of Cash Management System/Use of Existing Business Forms;

(d)      Motion for Authorization to Use Cash Collateral;

(e)      Motion to Provide Utilities "Adequate Assurance" of Payment;

(f)      Motion to Pay Prepetition Use and Sales Taxes;

(g)      Motion to Employ Ordinary Course Professionals;

(h)      Motion for Joint Administration of Chapter 11 Cases;

(i)      Motion to Employ Claims Agent;

(j)      Employment Applications for Professionals; and

(k)      Motion to Schedule Combined Hearing to Consider Approval of Disclosure Statement and Confirmation of Plan.

These motions, if granted, will enable the Debtors, among other things, to;

- access cash collateral to fund ongoing operations and payment of administrative expenses;

---

[6] This list is for illustrative purposes only.  The Debtors reserve their rights not to file all of the motions listed below and/or to file additional motions and applications in their discretion.

- prepetition obligations to critical trade creditors and employees so that the Debtors' business operations may continue in the ordinary course;

- maintain existing bank accounts, continue operation of their existing cash management system; and

- remit and pay certain prepetition taxes and fees.

## G.    REORGANIZATION STRATEGY

### 1.    Enhancing the Debtors' Business Operations

With the assistance of their advisors, the Debtors have been focused on developing and executing a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing, and (c) enable the Debtors to emerge from chapter 11 as a stronger, more viable company.  Specifically, this reorganization strategy is primarily (though not exclusively) focused on:

- restructuring the Debtors' balance sheet and emerging from chapter 11 with a long-term capital structure conducive to future profitability; and

- managing the Debtors' business to enhance its financial and operating performance, including utilizing the unique powers and opportunities afforded to a chapter 11 debtor in possession.

### 2.    Appropriate Capital Structure and Conversion of Noteholder Debt

The Debtors currently have over $242 million of outstanding principal obligations under the Senior Secured Notes, plus projected accrued interest, fees, and expenses.  Upon emergence from chapter 11 under the Plan, the Reorganized Debtors expect to have outstanding debt primarily consisting of obligations under the contemplated New Secured Debt of $45 million.  Accordingly, the Reorganized Debtors will have a substantially improved balance sheet and more appropriate capital structure.  These improvements will result from the conversion of the Senior Secured Notes into 100% of the New Membership Interests.  In addition to the reduction of leverage of the Reorganized Debtors upon emergence from chapter 11, the Reorganized Debtors also expect to benefit from an annual decrease in cash interest obligations associated with the conversion to equity of the Senior Secured Notes.

## H.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

## I.    DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors must assume or reject unexpired leases of nonresidential real property is 120 days from the Petition Date, unless extended by order of the Bankruptcy Court.

**J.      SUMMARY OF THE NEW SECURED DEBT**

On the Effective Date, Reorganized Parent, as borrower, and the remaining Debtors, as guarantors, will consummate the New Secured Debt, which will consist of a first lien term loan in the aggregate principal amount of Forty-Five Million Dollars ($45,000,000). The lenders under the New Secured Debt will be each of the existing Holders of the Senior Secured Notes.

The New Secured Debt will mature in five years from the date of the issuance thereof and will accrue interest at the rate of 12.00% per annum, which shall be payable in Cash, quarterly in arrears. Excess cash flow of the Reorganized Debtors (to be defined in the New Secured Debt Documents as mutually agreed upon by the Debtors and the Supporting Noteholders), shall be distributed to the Holders of the New Secured Debt on a quarterly basis. The New Secured Debt shall have a first lien on substantially all of the assets of the Reorganized Debtors, subject to customary exceptions to be set forth in the New Secured Debt Documents.

**K.      SUMMARY OF KEY EMPLOYEE RETENTION PLAN**

On or soon after the Effective Date the Reorganized Debtors will adopt and implement a new key employee retention plan designed to compensate and retain certain key employees of the Reorganized Debtors. The terms of such plan are set forth in the Key Employee Retention Agreements that are included in the Plan Supplement.

Except as otherwise set forth therein, the Key Employee Retention Agreements shall supersede any existing employment agreement or retention agreement with respect to any individual covered by, included in or receiving compensation under any of the Key Employee Retention Agreements, including any severance benefit plans or policies, any "Liquidation Event" bonuses and any other bonuses, benefits or form of compensation, including accrued vacation or paid time off benefits, and such existing agreements shall be deemed rejected and all Claims arising under or relating thereto shall be forever waived, extinguished and discharged (other than as set forth in the Key Employee Retention Agreements).

**L.      SUMMARY OF THE NEW MEMBERSHIP INTERESTS OF REORGANIZED PARENT / OPERATING AGREEMENT**

On the Effective Date, the Reorganized Parent will be authorized to and will issue the New Membership Interests without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity. From and after the Effective Date, the Reorganized Debtors will cease to be under any disclosure or other obligations under the Senior Secured Notes Indenture.

The New Membership Interests of Reorganized Parent shall constitute a single class of Equity Security in Reorganized Parent and there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Parent. Upon the Effective Date, after giving effect to the transactions contemplated hereby, the New Membership Interests of Reorganized Parent shall be governed by the New Organizational Documents.

On the Effective Date, as a condition to receiving any distribution of New Membership Interests, all holders of the New Membership Interests shall be deemed parties to and bound by the New Operating Agreement that will be filed with the Plan Supplement and that shall contain customary terms including transfer restrictions, preemptive rights, right of first offer, tag-along rights, drag-along rights, and certain information rights. The New Operating Agreement shall be binding on Reorganized Parent and all parties receiving, and all holders of, the New Membership

Interests (whether received under the Plan or otherwise) regardless of whether such parties execute the New Operating Agreement.

The New Board will be comprised initially of five (5) members designated by the Supporting Noteholders, including a lead director who shall have such authority and duties as the New Board may determine.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date.  As of the Effective Date, the Reorganized Parent shall be the sole member of Fuse, LLC, and Fuse, LLC shall be the sole member and manager of the Reorganized Debtors, other than Reorganized Parent, FM Networks LLC, and Fuse Finance, Inc.  Fuse Holdings, LLC shall be the sole member and manager of FM Networks LLC.  Fuse, LLC shall be the sole shareholder of Fuse Finance, Inc.  Except as set forth in the Plan, any other managers of the Debtors shall be deemed removed as of the Effective Date.

<div align="center">

**ARTICLE III.**
**SUMMARY OF THE PLAN**

</div>

---

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

---

A.      **ADMINISTRATIVE AND PRIORITY TAX CLAIMS**

1.      **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

*Professional Fee Claims*.  Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, within thirty (30) days after the Effective Date, and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; *provided* that the Reorganized Debtors will pay Professionals in the ordinary course of business, for any work performed after

the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim; *provided, further*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party within fourteen (14) days after the Filing of the applicable request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.

*Restructuring Expenses and Senior Secured Notes Trustee Fees*.  The fees and expenses incurred by the Supporting Noteholder Professionals and the Senior Secured Notes Trustee Fees will be paid in connection with this Plan or any applicable orders entered by the Bankruptcy Court, including, as applicable, the Cash Collateral Order, on the Effective Date or as soon as reasonably practicable thereafter.  Nothing herein shall require such professionals (or the Senior Secured Notes Trustee) to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

2.    **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases *provided, however*, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

**B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

1.    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified as described in Article III.B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a

particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Debt Claims | Unimpaired | Deemed to Accept |
| 3 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |
| 5 | Equity Interests in Debtors | Impaired | Deemed to Reject |

2.      **Separate Classification of Other Secured Debt Claims**

Although all Other Secured Debt Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

3.      **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

4.      **Voting; Presumptions; Solicitation in Good Faith**

Only holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Class 3 have received ballots containing detailed voting instructions.

The Debtors have, and upon the Effective Date the Reorganized Debtors shall be deemed to have, solicited votes on the Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Accordingly, the Debtors and the Reorganized Debtors and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

5.      **Cramdown**

If any Class of Claims is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors intend to (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or

Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

6.    **Classification and Treatment of Claims and Equity Interests**

(a)    Class 1 - Other Priority Claims

o    *Classification*:  Class 1 consists of the Other Priority Claims.

o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Allowed Class 1 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

o    *Impairment and Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

(b)    Class 2 - Other Secured Debt Claims

o    *Classification*:  Each Class 2 Claim is an Other Secured Debt Claim against the applicable Debtors.  With respect to each applicable Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 2A, Class 2B and so on), so that each holder of any Allowed Other Secured Debt Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Debt Claims that are substantially similar to each other and may be included within a single Class.

o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Allowed Class 2 Claim, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) return of the collateral securing such Allowed Class 2 Claim; (C) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (D) any defaults shall be cured

and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 2 Claim; or (E) Reinstatement or such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.  Except with respect to Claims that are treated in accordance with the preceding clause (B), each Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

o    *Impairment and Voting*:  Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan and will not be solicited.

(c)    Class 3 – Senior Secured Notes Claims

o    *Classification*:  Class 3 consists of the Senior Secured Notes Claims.

o    *Allowance*:  Notwithstanding any provisions of Article IX to the contrary, the Senior Secured Notes Claims will be deemed Allowed, without offset, counterclaim or defense of any kind, in the aggregate principal amount of Two Hundred Forty-Two Million Dollars ($242,000,000), plus accrued interest, fees, costs and expenses and other amounts in accordance with the Cash Collateral Order.

o    *Treatment*:  On the Effective Date, each and every Holder of an Allowed Senior Secured Notes Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, shall receive its Pro Rata share of:  (a) Cash in the Debtors' accounts, except for Cash needed in the Reorganized Debtors' operations and to fund the Fuse Litigation Trust, as mutually agreed upon by the Debtors and the Supporting Noteholders, (b) the New Secured Debt, (c) 100% of the New Membership Interests of Reorganized Parent and (d) 100% of the Litigation Trust Interests in the Fuse Litigation Trust.

o    *Impairment and Voting*:  Class 3 is an Impaired Class, and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

(d)    Class 4 – General Unsecured Claims

o    *Classification*:  Class 4 consists of the General Unsecured Claims.

o    *Treatment*:  Because the Debtors have pledged substantially all of their assets that have any material value as Collateral to secure the Senior Secured Notes Claims and no unencumbered assets in the Estates have any material value (taking into account the deficiency claims arising under the Senior Secured Notes and the Administrative Expense Claims that the Holders of the Senior Secured Notes are expected to assert for the diminution in the value of their Collateral during the Chapter 11 Cases), the Holders of Class 4 General Unsecured Claims will receive no distributions under the Plan.

o    *Impairment and Voting*:  Class 4 is Impaired and the Holders of Class 4 Claims are deemed to reject the Plan and will not be solicited.

(e)    <u>Class 5 – Equity Interests in Debtors</u>

o    *Classification*:  Class 5 consists of the Equity Interests in Debtors.

o    *Treatment*:  All Class 5 Equity Interests in the Debtors will be deemed cancelled upon the Effective Date and will be of no further force and effect, whether surrendered for cancellation or otherwise.  The Holders of Class 5 Equity Interests in the Debtors will receive no distributions under the Plan.  Notwithstanding the foregoing, the Equity Interests in the Debtors shall be Reinstated upon the Effective Date and deemed issued to and held by Reorganized Parent, directly or indirectly as applicable, as such Equity Interests were held prior to the Effective Date (except for the Equity Interests of Fuse, LLC, which shall be held directly by the Reorganized Parent).

o    *Impairment and Voting*:  Class 5 is Impaired and the Holders of Equity Interests in the Debtors are deemed to reject the Plan and will not be solicited.

## 7.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan and the right to apply any available statutory cap to such Unimpaired Claims.

## 8.    **Discharge of Claims**

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded in the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

## 9.    **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the

Reorganized Debtors, with the consent of the Supporting Noteholders, reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no distributions under the Plan shall be made on account of any subordinated Claim.

10. **Intercompany Claims**

Intercompany Claims are extinguished by virtue of the substantive consolidation of the Debtors for allowance and distribution purposes under the Plan

## C.    ACCEPTANCE OR REJECTION OF THE PLAN

1. **Presumed Acceptance of Plan**

Classes 1 and 2 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

2. **Presumed Rejection of Plan**

Classes 4 and 5 are Impaired and Holders of Claims in such Classes shall receive no distribution under the Plan on account of the Equity Interests in Parent and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

3. **Voting Class**

Each Holder of an Allowed Claim as of the applicable Voting Record Date in the Voting Class (Class 3) will be entitled to vote to accept or reject the Plan.

4. **Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5. **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan or is deemed to reject the Plan.  The Debtors reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## D.    MEANS FOR IMPLEMENTATION OF THE PLAN

1. **General Settlement of Claims**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

2.    **Corporate Existence**

The Debtors will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, partnerships, associations, or other business entities pursuant to the applicable law in their states of incorporation or organization.

Prior to the Effective Date, the Debtors shall take all actions as necessary and required to form Reorganized Parent. After the Effective Date, Reorganized Parent shall exist with all of the powers pursuant to the New Operating Agreement and the New Organizational Documents.

On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, the New Organizational Documents, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

On the Effective Date or as soon thereafter as is reasonably practicable, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

3.    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and Assets of the Estates (including, without limitation, Causes of Action) and any property and Assets acquired by the Debtors pursuant to the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.  For the avoidance of doubt, the Litigation Trust Assets shall not revest in the Reorganized Debtors and

instead the Litigation Trust Assets shall vest in the Fuse Litigation Trust pursuant to Article VI.B of the Plan.

4.    **New Secured Debt and Sources of Cash for Plan Distributions**

*New Secured Debt.*  On the Effective Date, Operating Subsidiary, as borrower, and Reorganized Parent and certain other Debtors, as guarantors, will incur the New Secured Debt, which will consist of a first lien term loan in the aggregate principal amount of Forty-Five Million Dollars ($45,000,000).  The lenders under the New Secured Debt will be each of the existing Holders of the Senior Secured Notes.

The New Secured Debt will mature in five years from the date of the issuance thereof and will accrue interest at the rate of 12.00% per annum, which shall be payable in Cash, quarterly in arrears.  Excess cash flow of the Reorganized Debtors (to be defined in the New Secured Debt Documents as mutually agreed upon by the Debtors and the Supporting Noteholders), shall be distributed to the Holders of the New Secured Debt on a quarterly basis.  The New Secured Debt shall have a first lien on substantially all of the assets of the Reorganized Debtors, including the New Membership Interests of Reorganized Parent, subject to customary exceptions to be set forth in the New Secured Debt Documents.

On the Effective Date, the Reorganized Debtors will be authorized to execute and deliver the New Secured Debt Documents, and any related instruments and documents, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, security agreements, documents (including UCC financing statements, intellectual property security agreements to be filed in the U.S. Patent & Trademark Office and deposit account control agreements with the Debtors' depositary banks), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity, subject to the lien limitations set forth herein.

*Sources of Cash for Plan Distribution.*  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the New Secured Debt and the Reorganized Debtors' Cash balances, including Cash from operations.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

5.    **Treatment of Vacant Classes**

Any Claim or Interest in a Class is considered vacant under Article III.C of the Plan shall receive no Plan Distribution.

6.    **Key Employee Retention Agreements**

The Key Employee Retention Agreements shall be Filed with the Plan Supplement and implemented on or soon after the Effective Date.

Except as otherwise set forth therein, the Key Employee Retention Agreements shall supersede any existing employment agreement or retention agreement with respect to any individual covered by, included in or receiving compensation under any of the Key Employee Retention Agreements, including any severance benefit plans or policies, any "Liquidation Event" bonuses and any other bonuses, benefits or form of compensation, including accrued

vacation or paid time off benefits, and such existing agreements shall be deemed rejected and all Claims arising under or relating thereto shall be forever waived, extinguished and discharged (other than as set forth in the Key Employee Retention Agreements).

7.      **Issuance of New Membership Interests and Related Documentation**

On the Effective Date, the Reorganized Parent will be authorized to and will issue the New Membership Interests without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  From and after the Effective Date, the Reorganized Debtors will cease to be under any disclosure or other obligations under the Senior Secured Notes Indenture.

The New Membership Interests of Reorganized Parent to be issued and distributed pursuant to the Plan will be exempt from the registration requirements of federal, state or local securities laws to the fullest extent permitted by section 3(a)(9) of the Securities Act, section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, and/or Section 1145(a) of the Bankruptcy Code.  Without limiting the effects of such provisions, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the New Membership Interests and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon execution and delivery by the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (other than as expressly required by such applicable agreement).

The New Membership Interests of Reorganized Parent shall constitute a single class of Equity Security in Reorganized Parent and there shall exist no other Equity Securities, warrants, options, or other agreements to acquire any equity interest in Reorganized Parent.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the New Membership Interests of Reorganized Parent shall be governed by the New Organizational Documents.

On the Effective Date, as a condition to receiving any distribution of New Membership Interests, all holders of the New Membership Interests shall be deemed parties to and bound by the New Operating Agreement that will be filed with the Plan Supplement and that shall contain customary terms including transfer restrictions, preemptive rights, right of first offer, tag-along rights, drag-along rights, and certain information rights.  The New Operating Agreement shall be binding on Reorganized Parent and all parties receiving, and all holders of, the New Membership Interests (whether received under the Plan or otherwise) regardless of whether such parties execute the New Operating Agreement.

8.      **Substantive Consolidation for Plan Purposes**

The Plan serves as a motion by the Debtors seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Estates of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes only.  Substantive consolidation will not (i) alter the state of organization of any Debtor for purposes of determining applicable law of any of the Causes of Action, (ii) alter or impair the legal and equitable rights of the Debtors to enforce any of the Causes of Action, or (iii) otherwise impair,

release, discharge, extinguish or affect any of the Causes of Action or issues raised as a part thereof.

If substantive consolidation is ordered, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated as though they were merged into a single estate for purposes of treatment of and distributions on Claims.  All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors.  All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors.  Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

9.      **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.  Any Entity holding such Liens or Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

10.     **New Organizational Documents**

The New Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Membership Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the Transfer of New Membership Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors may amend and restate their operating agreement and other applicable organizational documents, as permitted by applicable law.

11.     **Managers and Officers of Reorganized Parent**

The New Board will be comprised initially of five (5) members designated by the Supporting Noteholders, including a lead director who shall have such authority and duties as the New Board may determine.

As of the Effective Date, the initial officers of the Reorganized Debtors will be the officers of the Debtors existing immediately prior to the Effective Date.  As of the Effective Date, the Reorganized Parent shall be the sole member of Fuse, LLC, and Fuse, LLC shall be the sole member and manager of the Reorganized Debtors, other than Reorganized Parent, FM

Networks LLC, and Fuse Finance, Inc. Fuse Holdings, LLC shall be the sole member and manager of FM Networks LLC. Fuse, LLC shall be the sole shareholder of Fuse Finance, Inc. Except as set forth in the Plan, any other managers of the Debtors shall be deemed removed as of the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of managers or directors or as an officer of the Reorganized Debtors and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person. Each such manager, director, and officer will serve from and after the Effective Date pursuant to applicable law and the terms of the New Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors. Except as set forth herein, the existing directors and managers of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity.

12.    **Corporate Action**

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, securityholder, manager, member, or partner (or board thereof) of any Entity (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of any stockholders, securityholders, directors, managers, members or partners of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further notice to or any vote, consent, authorization, approval, ratification or other action by the stockholders, directors, managers or members of such Debtors, or the need for any notice to or any vote, consent, authorization, approval, ratification or other , action by any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtor, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or any other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity. On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtor, as applicable, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtor, as applicable, in each case without further notice to or order of the

Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

<p style="text-align:center;">13.    **Cancellation of Notes, Certificates and Instruments**</p>

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim against or Interest in any Reorganized Debtor and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect, including any relating to the Equity Interests in Fuse, LLC.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity.  Notwithstanding such cancellation and discharge, the Senior Secured Notes Indenture shall continue in effect to the extent necessary to: (1) allow the Senior Secured Notes Trustee to enforce the rights, Claims and interests of the Senior Secured Notes Trustee and any predecessor thereto vis-à-vis the Holders of Senior Secured Notes and any parties other than the Debtors or any other Released Party; (2) allow Holders of Senior Secured Notes Claims to receive Plan Distributions; (3) allow the Reorganized Debtors to make distributions pursuant to the Plan; (4) allow the Senior Secured Notes Trustee to receive distributions under the Plan on account of the Senior Secured Notes Claims for further distribution in accordance with the Senior Secured Notes Indenture; (5) allow the Senior Secured Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the Plan and the Cash Collateral Order; (6) preserve any rights of the Senior Secured Notes Trustee to payment of fees, expenses, and indemnification obligations as against any parties other than the Debtors or the Reorganized Debtors, and any money or property distributable to the Beneficial Holders under the relevant instrument, including any rights to priority of payment or to exercise charging liens (including the Senior Secured Notes Charging Lien); and (7) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Senior Secured Notes Trustee or the Holders of Senior Secured Notes Claims under the Plan.  Except as provided pursuant to the Plan, the Senior Secured Notes Trustee and its respective agents, successors, and assigns shall be discharged of all of their obligations associated with the Senior Secured Notes Indenture.  The commitments and obligations (if any) of the Holders of the Senior Secured Notes to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Senior Secured Notes Indenture shall fully terminate and be of no further force or effect on the Effective Date.

14. **Cancellation of Instruments Governing Existing Security Interests**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

15. **Equity Interests in Subsidiaries; Corporate Reorganization**

On the Effective Date and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity, the certificates and all other documents representing the Equity Interests in the Debtors, shall be deemed to be in full force and effect as they existed prior to the Petition Date except for the Equity Interests of Fuse, LLC, which shall be held directly by the Reorganized Parent, and except as expressly modified by the Plan.

16. **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, and without need for any notice to or any vote, consent, authorization, approval, ratification or other action by any Entity or other Person or any director, stockholder, manager, member, or partner (or board thereof) of any Entity, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under in and connection with the Plan.

17. **Plan Supplement, Other Documents and Orders**

The documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consent and the approval of the Supporting Noteholders.

E. **LITIGATION TRUST**

1. **The Litigation Trustee**

*Appointment of the Litigation Trustee*. The Litigation Trustee shall be selected by the Supporting Noteholders. The identity of the Litigation Trustee shall be disclosed prior to the Confirmation Hearing as part of the Plan Supplement in accordance with Section 1129(a)(5) of the Bankruptcy Code. The Litigation Trustee will be compensated by the Fuse Litigation Trust.

*Powers of the Litigation Trustee*. The Litigation Trustee shall be a representative of the Debtors' Estates and shall, subject to the terms of the Litigation Trust Agreement, have the power to make all decisions with respect to the prosecution of the Litigation Claims; *provided*, *however*, that the following actions will require prior written approval of the Litigation Trust Oversight Committee: (a) the selection of any successor Litigation Trustee; (b) any determination to borrow money or incur funded indebtedness; (c) the retention of counsel and other professionals to assist in prosecution of the Litigation Claims and the terms of each professional's engagement, including any alternative fee arrangements; (d) settlement of all or

any portion of the Litigation Claims, and (e) any arrangement for compensation of the Litigation Trustee.

The Litigation Trustee shall consult with, and obtain approval of, the Litigation Trust Oversight Committee with respect to all material decisions regarding (x) the prosecution of the Litigation Claims, including (without limitation) the litigation strategy with respect thereto, and the filing and prosecution of any dispositive or other substantive motions or pleadings, and (y) the assertion or waiver of the Debtors' attorney-client privilege (to which the Litigation Trust shall succeed with respect to the Litigation Trust Assets).

*The Litigation Trustee as the Representative of the Debtors' Estates.* On the Effective Date, the Litigation Trustee, and not the Reorganized Debtors shall be deemed the Estates' representative in accordance with Section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Litigation Trust Agreement, including, without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Litigation Trust Agreement; (2) administer the Litigation Trust Assets, including prosecuting, settling, abandoning or compromising any actions that are or relate to the Litigation Trust Assets; (3) employ and compensate professionals and other agents consistent with Article VI.A of the Plan, *provided, however*, that any such compensation shall be paid by the Fuse Litigation Trust to the extent not inconsistent with the status of the Fuse Litigation Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for U.S. federal income tax purposes; and (4) control attorney/client privilege relating to or arising from the Litigation Trust Assets.

2. **The Fuse Litigation Trust**

On the Effective Date, the Fuse Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purpose of prosecuting the Litigation Claims. The Fuse Litigation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

On the Effective Date, the Litigation Trust Assets shall vest automatically in the Fuse Litigation Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Litigation Trust Assets to the Fuse Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries. The assets comprising the Litigation Trust Assets will be treated for U.S. federal income tax purposes as being transferred by the Debtors to the Litigation Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Litigation Trust Beneficiaries to the Fuse Litigation Trust in exchange for the Litigation Trust Interests in the Fuse Litigation Trust. The Litigation Trust Beneficiaries shall be treated as the grantors and owners of the Fuse Litigation Trust. Upon the transfer of the Litigation Trust Assets, the Fuse Litigation Trust shall succeed to all of the Debtors' rights, title and interest in the Litigation Trust Assets, and the Debtors will have no further interest in or with respect to the Litigation Trust Assets. In pursuing the Litigation Claims, the Litigation Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which any of the Litigation Claims may be brought under section 546 of the Bankruptcy Code.

In connection with the prosecution of the Litigation Claims, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) relating to the Litigation Claims shall be transferred to and shall vest in the Fuse Litigation Trust. The Fuse Litigation Trust's receipt of such privileges associated with the Litigation

Claims shall not operate as a waiver of those privileges possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege. The Fuse Litigation Trust shall also be vested with the Debtors' rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Fuse Litigation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for by the Plan.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses on or after the Effective Date shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court.

The Fuse Litigation Trust shall file annual reports regarding the liquidation or other administration of property comprising the Litigation Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the Litigation Trust Agreement. In addition, the Fuse Litigation Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Section 1.671-4(a).

The Litigation Trust Interests are not intended to constitute "securities." To the extent the Litigation Trust Interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act. If the Litigation Trustee determines, with the advice of counsel, that the Fuse Litigation Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act or other applicable law, then the Litigation Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the SEC to the extent required by applicable law.

The Fuse Litigation Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (a) the distribution of all proceeds from the Litigation Claims available for distribution pursuant to the Plan, or (b) the determination of the Litigation Trust Oversight Committee that the continued prosecution of the Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit. For the avoidance of doubt, if certain Litigation Claims are compromised and settled by the Debtors prior to the Effective Date, or if the Supporting Noteholders determine that the continued prosecution of the Litigation Claims is not likely to yield sufficient proceeds to justify the pursuit of such Litigation Claims by the Fuse Litigation Trust, then notwithstanding the formation of the Fuse Litigation Trust in accordance with the terms of the Plan, the Fuse Litigation Trust may not be funded and the Litigation Trust Oversight Committee may determine to dissolve the Fuse Litigation Trust, in which case the Litigation Trust Assets shall revest in the Reorganized Debtors and shall not be deemed transferred to the Fuse Litigation Trust.

To the extent that the terms of the Plan with respect to the Fuse Litigation Trust are inconsistent with the terms set forth in the Litigation Trust Agreement, then the terms of the Litigation Trust Agreement shall govern.

3.    **The Litigation Trust Oversight Committee**

(a)  The Litigation Trust Oversight Committee shall be comprised of five (5) members with each of the Supporting Noteholders designating one member to serve on the Litigation Trust Oversight Committee. The identity of the members of the Litigation Trust Oversight Committee shall be disclosed in accordance with Section 1129(a)(5) of the Bankruptcy Code.

(b)  The Litigation Trust Oversight Committee shall oversee the Fuse Litigation Trust and the Litigation Trustee.

(c)  The Litigation Trust Oversight Committee shall be authorized to retain and employ Professionals to assist it with and advise it with respect to its duties under the Plan.  All fees and expenses of such Professionals shall be satisfied by the Fuse Litigation Trust.

(d)  The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the final resolution of the Litigation Claims and the final distribution of all proceeds in accordance with the terms of the Litigation Trust Agreement.

4.    **Closing the Chapter 11 Cases**

If applicable, the Fuse Litigation Trust shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules; *provided, however*, that the Fuse Litigation Trust may keep one or more of the Debtors' cases open in order to resolve any Disputed Claims or to pursue Causes of Action or until the Fuse Litigation Trust has been terminated and all remaining Litigation Trust Assets have been distributed.  For the avoidance of doubt, the Chapter 11 Cases may be closed prior to termination of the Fuse Litigation Trust

## F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed rejected in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto;

- have been assumed by order of the Bankruptcy Court;

- are the subject of a motion to assume pending on the Effective Date;

- are identified on a schedule of assumed contracts in the Plan Supplement; or

- are assumed pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the

Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law. Notwithstanding any of the foregoing, the Moelis Sellside Engagement Letter shall be assumed by the Debtors and shall be deemed effective on the Effective Date.

2.    **Assignment of Executory Contracts or Unexpired Leases**

In the event of an assignment of an Executory Contract or Unexpired Lease, at least ten (10) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption and assignment that will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be Filed, served and actually received by the Debtors at least three (3) Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

3.    **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  The Debtor or Reorganized Debtor, as the case may be, will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.

Any Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as

otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XII.D of the Plan. All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

4.    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Following the Petition Date, the Debtors may serve a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any). If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be Filed, served and actually received by the Debtors at least five (5) Business Days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption. In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

5.    **Assumption of Director and Officer Insurance Policies**

The Debtors and, upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

Further, the Reorganized Debtors shall be authorized and required to purchase tail coverage with a term of at least three (3) years from and after the termination of any existing director and officers' liability insurance policies and containing the same coverage that exists under such policies as of the Effective Date.

6.      **Indemnification Provisions**

All Indemnification Provisions currently in place (whether in the by-laws, operating agreements, certificate of incorporation or organization, board resolutions, member consents, contracts, or otherwise) for the following:  (i) the Senior Secured Notes Trustee; and (ii) directors, managers, officers and employees of the Debtors who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities, for or on behalf of the Debtors, will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan.  No such Reinstatement or assumption shall in any way extend the scope or term of any Indemnification Provision beyond that contemplated in the underlying contract or document as applicable.

7.      **Compensation and Benefit Programs**

Except as otherwise provided in the Plan, including Article V.F hereof, which exclusively governs all compensation and benefits for parties covered by or included in the Key Employee Retention Agreements and except for any employee equity or equity-based compensation or incentive plan, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees and retirees that are not parties to, covered by or included in the Key Employee Retention Agreements, including, without limitation, all accrued vacation (other than accrued vacation for any employee above such employees applicable cap, which amount shall be governed by a separate arrangement between the Debtors and such employee) vacation plans, savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors shall honor, in the ordinary course of business, all such arrangements with such employees; provided however, that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under (a) the Key Employee Retention Agreements unless such person is explicitly named and identified in such agreements or (b) any policy, program or plan that has expired or been terminated, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan.

8.      **Insurance Policies**

Other than the insurance policies otherwise discussed herein, all other insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be assumed by the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All existing insurance policies shall vest in the Reorganized Debtors.

G.      **PROVISIONS GOVERNING DISTRIBUTIONS**

1.      **Dates of Distributions**

Except as otherwise provided in the plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be

deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

At the close of business on the Distribution Record Date, the transfer ledgers for the Senior Secured Notes shall be closed, and there shall be no further changes in the record holders of such indebtedness.  The Reorganized Debtors, the Distribution Agent, the Senior Secured Notes Trustee, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Senior Secured Notes occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.      **Distribution Agent**

Except as provided therein, all distributions under the Plan shall be made by the Reorganized Debtors as Distribution Agent, or by such other Entity designated by the Debtors as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtors, or such other Entity designated by the Debtors to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals, transfer agents and registrars to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

3.      **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

4.      **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.  To the extent that Cash, New Secured Debt, or New Membership Interests to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole dollar, such Cash or stock shall be treated as unclaimed property under Article VIII.H of the Plan.

- 45 -

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar.  To the extent that Cash, New Secured Debt, or New Membership Interests to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole dollar, such Cash or stock shall be treated as unclaimed property under Article VII.H of the Plan.

No fractional shares shall be issued or distributed under the Plan.  Each Person entitled to receive New Membership Interests shall receive the total number of whole New Membership Interests to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of New Membership Interests, the actual distribution of such interests shall be rounded to the next lower whole number.

5.     **Distributions on Account of Claims Allowed After the Effective Date**

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

6.     **General Distribution Procedures**

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

7.     **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim Filed by such Holders (to the extent such proofs of claim are Filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, or (3) at the addresses in the Debtors' books and records.  Notwithstanding the foregoing, distributions to Beneficial Holders of Senior Secured Notes Claims shall be made to the Senior Secured Notes Trustee or its designee for further distribution in accordance with the Senior Secured Notes Indenture.

8.     **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash, New Secured Debt, or New Membership Interests within one year from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the

Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

9.     **Withholding Taxes**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Reorganized Debtors shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with the distribution of the New Membership Interests to each Holder of an Allowed Senior Secured Notes Claim, the Reorganized Debtors may take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including, after consultation with each such Holder of an Allowed Senior Secured Notes Claim, either withholding from distributions a portion of the New Membership Interests and selling such securities or requiring such Holder of an Allowed Senior Secured Notes Claim to contribute the necessary cash to satisfy the tax withholding obligations.

10.     **Setoffs**

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and Causes of Action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and Causes of Action that the Reorganized Debtors possesses against such Holder.

11.     **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V, Section M or Section N of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to Reorganized Parent or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

If the record holder of the Senior Secured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Senior Secured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then, upon satisfaction of the Senior Secured Notes Claims, each such Holder of the Senior Secured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under the Plan with holders of New Membership Interests in a manner consistent with the customary practices of DTC used in connection with such distributions.  All New Membership Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Membership Interests are permitted to be held through DTC's book-entry system; and *provided, further*, that to the extent the New Membership Interests are not eligible for distribution in accordance with DTC's customary practices, Reorganized Parent will take all such reasonable actions as may be required to cause distributions of the New Membership Interests under the Plan.

12. **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Parent and other applicable Distribution Agent:  (x) evidence reasonably satisfactory to Reorganized Parent and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Parent and other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VIII.K of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Parent and other applicable Distribution Agents.

H. **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1. **Disputed Claims**

The Reorganized Debtors may, in their discretion, file with the Bankruptcy Court an objection to the allowance of any Disputed Claim or any other appropriate motion or adversary proceeding with respect thereto.  All such objections shall be litigated to Final Order, *provided, however*, that the Reorganized Debtors, may compromise, settle, withdraw or resolve any objections to Claims without further order of the Bankruptcy Court.  Unless otherwise provided in the Confirmation Order, the Reorganized Debtors are authorized to settle, or withdraw any objections to, any Disputed Claim following the Effective Date without further notice to creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of the Plan.  Under no circumstances will any distributions be made on account of Disallowed Claims.  The Reorganized Debtors are under no obligation to object to the allowance of any Claim to the extent that there are no assets available to make a distribution to the Holder of such Claim or such Class of Claims under the Plan.

2. **Procedures Regarding Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final

Order or by stipulation between the Debtors and the Holder of the Claim. No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

The Debtors (prior to the Effective Date) or the Reorganized Debtors (after the Effective Date) may, at any time and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously Filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan shall irrevocably constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim. Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors or the Reorganized Debtors in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount.

3.    **Allowance of Claims**

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, the Reorganized Debtors shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

(a)    <u>Allowance of Claims</u>

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan or by orders of the Bankruptcy Court. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

(b)    <u>Prosecution of Objections to Claims and Equity Interests</u>

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Reorganized Debtors, will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class or otherwise. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c)    Estimation

After the Confirmation Date but before the Effective Date, the Debtors and, after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## I.    CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Consummation

Consummation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article X.B of the Plan of the following:

- The Bankruptcy Court will have entered a Final Order by no later than June 30, 2019 (unless such date is extended with the written consent of the Debtors and the Supporting Noteholders) in form and in substance satisfactory to the Debtors and the Supporting Noteholders approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and confirming the Plan.

- The Plan and Plan Supplement and all schedules, documents, supplements and exhibits to the Plan will have been Filed in form and substance acceptable to the Debtors and the Supporting Noteholders.

- The proposed Confirmation Order will be in form and substance acceptable to the Debtors and the Supporting Noteholders.

- The Confirmation Order shall have been entered and shall be a Final Order in form and substance acceptable to the Debtors and Supporting Noteholders. The Confirmation Order will provide that, among other things, (a) the Debtors, the Reorganized Debtors, the Litigation Trustee, the Litigation Trust Oversight Committee and the Fuse Litigation Trust, as applicable, are authorized to take all actions necessary or appropriate to consummate the Plan and the Restructuring Transactions, including, without limitation, (i) entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan, (ii) distributing the New Membership Interests pursuant to the exemptions from registration under section 3(a)(9) and/or section 4(a)(2) of the Securities Act, Rule 701 et seq. under the Securities Act or section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements, (iii) making all distributions and issuances as required under the Plan, including Cash and

the New Membership Interests; and (iv) entering into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the New Secured Debt and the Key Employee Retention Agreements and the awards contemplated thereunder; (b) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (c) the implementation of the Plan in accordance with its terms is authorized; and (d) pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax.

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order) in form and substance acceptable to the Debtors and Supporting Noteholders, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

- All documents and agreements necessary to implement the Plan, including without limitation, the New Secured Debt Documents, the New Membership Interests, the New Organizational Documents, and the Key Employee Agreements, in each case in form and substance acceptable to the Debtors and the Supporting Noteholders, will have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto. All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements.

- All consents, actions, documents, certificates and agreements necessary to implement the Plan, including, without limitation, the New Organizational Documents, will have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

- The Confirmation Date will have occurred.

- The New Secured Debt Documents shall have been executed and delivered by all of the parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the New Secured Debt, if applicable, shall have been waived or satisfied in accordance with the terms thereof, and the closing of the New Secured Debt, if applicable, shall be deemed to occur concurrently with the occurrence of the Effective Date.

- The Restructuring Expenses and the Senior Secured Notes Trustee Fees shall have been paid in full to the extent not otherwise paid in accordance with the Cash Collateral Order.

- The Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Plan pursuant to the documentation acceptable to the Debtors and the Supporting Noteholders.

2.      **Waiver of Conditions**

The conditions to Consummation of the Plan set forth in Article X thereof may be waived by the Debtors with the consent of the Supporting Noteholders and the Senior Secured Notes Trustee (solely with respect to the condition set forth in Article X.A(j) of the Plan) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. To the extent that a condition to Consummation of the Plan requires the consent of the Supporting Noteholders or the Senior Secured Notes Trustee, such conditions may only be waived by the Debtors with the consent of the Supporting Noteholders or the Senior Secured Notes Trustee, as applicable. The failure to satisfy or waive a condition to Consummation may be asserted by the Debtors or the Reorganized Debtors, the Supporting Noteholders or the Senior Secured Notes Trustee (solely with respect to the condition set forth in Article X.A(j) of the Plan) regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors or Reorganized Debtors, the Supporting Noteholders or the Senior Secured Notes Trustee to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

3.      **Effect of Non Occurrence of Conditions to Consummation**

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**J.      RELEASE, INJUNCTION AND RELATED PROVISIONS**

1.      **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.      **Release**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTORS AND THE REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION, THE FUSE LITIGATION TRUST AND THE LITIGATION TRUSTEE (COLLECTIVELY, THE "<u>RELEASING PARTIES</u>") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY,

IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS, THEIR ESTATES OR THE REORGANIZED DEBTORS (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; *PROVIDED, HOWEVER*, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY OFFSET, DEFENSE, COUNTERCLAIM, REDUCTION, OR CREDIT THAT THE DEBTORS OR REORGANIZED DEBTORS MAY HAVE WITH REGARD TO ANY CLAIM ASSERTED AGAINST THEM BY A RELEASED PARTY; (II) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT; (III) ANY CAUSES OF ACTION ARISING FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (IV) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE AND WITHOUT NEED FOR ANY NOTICE TO OR ANY VOTE, CONSENT, AUTHORIZATION, APPROVAL, RATIFICATION OR OTHER ACTION BY ANY ENTITY OR OTHER PERSON OR ANY DIRECTOR, STOCKHOLDER, SECURITY HOLDER, MANAGER, MEMBER, OR PARTNER (OR BOARD THEREOF) OF ANY ENTITY AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.  NOTWITHSTANDING THE FOREGOING, THE DEBTORS ARE NOT RELEASING THE DEBTORS (BUT THEY ARE RELEASING THE RELATED PERSONS TO THE DEBTORS PURSUANT TO THIS PARAGRAPH).

The Released Parties are, collectively, the following parties each in its capacity as such: (a) the Debtors; (b) the Debtors' current and former directors and officers; (c) the Reorganized Debtors; (d) the Senior Secured Notes Trustee; (e) the Supporting Noteholders; (f) the Holders of the Senior Secured Notes Claims who vote in favor of the Plan; and (g) the Related Persons of each of (a) through (f) of the foregoing.

**K.**     **THIRD PARTY RELEASE BY HOLDERS OF CLAIMS**

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING AND THE RESTRUCTURING TRANSACTIONS, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, THE RELEASED PARTIES ARE DEEMED FOREVER RELEASED AND DISCHARGED BY THE (I) THE HOLDERS OF ALL CLAIMS WHO VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, (III) HOLDERS OF CLAIMS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (IV) HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN, AND (V) THE SENIOR SECURED NOTES TRUSTEE, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT SUCH HOLDERS OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIM OR INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, THE RESTRUCTURING TRANSACTIONS, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE DISCLOSURE STATEMENT, THE PLAN, THE NEW SECURED DEBT DOCUMENTS AND RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS (INCLUDING THE PLAN DOCUMENTS), THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, OR ANY OTHER ACT OR OMISSION, OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT IS A CRIMINAL ACT OR CONSTITUTES INTENTIONAL FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT.

1.     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and

other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

2. **Exculpation**

The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided, further*, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided, further*, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

The Exculpated Parties are, collectively: (a) the Debtors, (b) the Reorganized Debtors, (c) the Supporting Noteholders, (d) the Senior Secured Notes Trustee, (e) the Fuse Litigation Trust, (f) the Litigation Trust Oversight Committee, (f) the Litigation Trustee, and (g) the respective Related Persons of each of the foregoing Entities.

3. **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## L.   BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT

PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## M.    CONFIRMATION PROCEDURES

### 1.    Confirmation Hearing

**The date has not yet been set for the Confirmation Hearing.**  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

**The date has not yet been set for the Confirmation Objection Deadline**.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline once it is set.

---

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

---

### 2.    Filing Objections to the Plan

Any objection to confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim or the amount of Equity Interests held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline (once set) by the Notice Parties, as defined in Article I.C.15 herein.

## N.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors have complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- The Debtors will disclose the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim against the Debtors or Equity Interest in the Parent will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111 (b)(2) applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

1.      **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors' management, together with the Debtors' financial advisors, prepared a Liquidation Analysis, a copy of which is attached hereto as **Exhibit C**.

The Liquidation Analysis presents "High" and "Low" estimates of Liquidation Proceeds, thus representing a range of management's assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof.  The "High" and "Low" estimates of Liquidation Proceeds for the Chapter 11 Cases are $16.9 million and $21.5 million, respectively. For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as **Exhibit C**.  It is assumed that the liquidation would occur over a period of two to four months.  The projected date of conversion to a hypothetical chapter 7 liquidation (the "Assumed Effective Date") is May 31, 2019.  In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Holders of the Senior Secured Notes to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

2.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the

need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors' management, with the assistance of the Debtors' financial advisors, developed a business plan and prepared financial projections through fiscal year 2020 (the "Financial Projections").  The Financial Projections, together with the assumptions on which they are based, are attached hereto as **Exhibit D**.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan and the added funding availability under the Exit Facility, the Reorganized Debtors should have sufficient Cash flow and Cash on hand to make all payments required pursuant to the Plan while conducting ongoing business operations.  The Debtors believe that confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE DEBTORS' MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period covered by the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

3.    **Valuation**

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, the Debtors have been advised by FTI, their financial advisor, with respect to the estimated value of the Company on a going-concern basis. FTI estimates that the total enterprise value of the Reorganized Debtors to be substantially greater than liquidation value, but substantially less than the face amount of the Senior Secured Notes Claims, as of an assumed Effective Date.  Such estimate of the enterprise value of the Reorganized Debtors do not reflect values that could be attainable in public or private markets,

and are not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.

Depending on the results of the Reorganized Debtors' operations, changes in the financial markets and/or other economic conditions, the value of the Reorganized Debtors may change significantly.  In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities.  Actual market prices of such securities also may be affected by the Debtors' history in the Chapter 11 Cases, conditions affecting generally the industry in which the Debtors participate, and by other factors not capable of accurate prediction.  Accordingly, the reorganization enterprise value estimated by FTI does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.  The equity value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value.  Such trading value may be materially different from the reorganization equity value estimated by FTI.  Indeed, there can be no assurance that a trading market will develop for the New Membership Interests.  The estimated reorganization enterprise value depends upon achieving the future financial results set forth in the Financial Projections, as well as the realization of certain other assumptions that are not guaranteed.

ADDITIONALLY, THE VALUE RANGE ASCRIBED IN THIS DISCLOSURE STATEMENT TO THE PLAN CONSIDERATION TO BE DISTRIBUTED TO CREDITORS DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, NOR IS IT INTENDED TO BE AN ESTIMATE OF THE MARKET TRADING VALUE OF THE NEW MEMBERSHIP INTERESTS, NEW SECURED DEBT OR ANY OTHER CONSIDERATION TO BE ISSUED PURSUANT TO THE PLAN OR THE VALUE OF THE DEBTORS' BUSINESS AND ASSETS.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHOM MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.  ACTUAL PRICES OF SECURITIES MAY ALSO BE AFFECTED BY THE DEBTORS' HISTORY IN THE CHAPTER 11 CASES, CONDITIONS AFFECTING GENERALLY THE INDUSTRY IN WHICH THE DEBTORS PARTICIPATE AND BY OTHER FACTORS NOT CAPABLE OF ACCURATE PREDICTION.  ACTUAL MARKET VALUES THAT MAY BE REALIZED THROUGH THE SALE OF SUCH SECURITIES OR OTHERWISE MAY BE SIGNIFICANTLY DIFFERENT THAN THE ESTIMATED VALUES DISCUSSED HEREIN.  ACCORDINGLY, THE REORGANIZATION ENTERPRISE VALUE ESTIMATED BY FTI DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS.  THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW MEMBERSHIP INTERESTS.  THE ESTIMATED REORGANIZATION ENTERPRISE VALUE DEPENDS UPON ACHIEVING THE FUTURE FINANCIAL RESULTS SET FORTH IN THE FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS THAT ARE NOT GUARANTEED.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY FTI.  THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  FURTHER, VALUATION OF AN OPERATING BUSINESS IS A COMPLEX ANALYTICAL PROCESS, SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND BEYOND THE CONTROL OF FTI AND THE DEBTORS. CONSEQUENTLY, SUCH VALUATION WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL RESULTS, FINANCIAL CONDITION AND PROSPECTS OF A BUSINESS, ALL OF WHICH ARE DIFFICULT TO PREDICT.  FTI DOES NOT PROVIDE ASSURANCES OR GUARANTEES ON THE ACHIEVABILITY OF ANY FORECASTS, PROJECTIONS OR OTHER FORWARD-LOOKING MATTERS. UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY OCCUR AND ACTUAL RESULTS MAY VARY FROM THOSE CONTEMPLATED HEREIN.  SUCH VARIATIONS MAY BE MATERIAL.  AS A RESULT, THE ESTIMATED RANGE OF VALUES SET FORTH IN THIS DISCLOSURE STATEMENT IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUBSEQUENT EVENTS THAT COULD AFFECT FTI'S VALUATION CONCLUSIONS INCLUDE ADVERSE CHANGES IN INDUSTRY PERFORMANCE OR MARKET CONDITIONS AND CHANGE SIN THE BUSINESS, FINANCIAL CONDITION AND RESULTS OF OPERATIONS.  BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER FTI, THE DEBTORS NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.

IN PREPARING ITS VALUATION ANALYSIS, FTI HAS RELIED ON THE ACCURACY OF HISTORICAL FINANCIAL INFORMATION PROVIDED BY THE DEBTORS, HAS ASSUMED THAT ALL EVENTS AND DEVELOPMENTS SUBSEQUENT TO THE DATES OF SUCH FINANCIAL INFORMATION HAVE BEEN DISCLOSED TO FTI, HAS NOT INDEPENDENTLY VERIFIED THE ACCURACY OR THE COMPLETENESS OF INFORMATION PROVIDED TO IT AND DOES NOT ASSUME ANY RESPONSIBILITY WITH RESPECT TO IT.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE STATEMENTS, FINANCIAL PROJECTIONS AND VALUE ASCRIBED TO THE DEBTORS AND THE PLAN CONSIDERATION ARE NOT INTENDED, AND SHOULD NOT BE CONSTRUED, TO BE INVESTMENT ADVICE IN ANY MANNER WHATSOEVER.  FURTHER, NO OPINION, COUNSEL OR INTERPRETATION IS INTENDED IN MATTERS THAT REQUIRE LEGAL, ACCOUNTING, TAX, INSURANCE OR OTHER APPROPRIATE PROFESSIONAL ADVICE.  SUCH OPINIONS, COUNSEL OR INTERPRETATIONS SHOULD BE OBTAINED FROM THE APPROPRIATE PROFESSIONAL SOURCES.

4.    **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding

any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Classes 1,and 2 are not Impaired under the Plan, and, as a result, the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.

Claims in Class 3 are Impaired under the Plan, and as a result, the Holders of Claims in such Class are entitled to vote on the Plan. Classes 4 and 5 are Impaired, receive no recovery under the Plan, and are deemed to reject.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein. As stated above, Class 3 will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

5. **Confirmation Without Acceptance by Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

6.      **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

7.      **Fair and Equitable Test**

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtors intend to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XV.D of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

O.    **CONSUMMATION OF THE PLAN**

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article XV.A of the Plan.

**ARTICLE IV.**
**RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

A.    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.    **Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.    **The Debtors May Fail to Satisfy the Vote Requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

4.    **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that:  (a) such

plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article X.A of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtors or the Reorganized Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan.  Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

5.      **Non-Consensual Confirmation of the Plan May Be Necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors intend to request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

6.      **Continued Risk Upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms

7.      **The Debtors May Object to the Amount or Classification of a Claim or Equity Interest.**

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors. Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8.      **The Effective Date May Not Occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

9.      **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated

during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Articles XI-XII of the Plan provide for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.  The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert their claims against the Debtors' estates into equity, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

**B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1.     **There May Be a Lack of a Trading Market for the New Membership Interests.**

The New Membership Interests to be issued to the Holders of Allowed Senior Secured Notes Claims will be subject to certain restrictions on transferability.

The following types of transfers are not permitted:

(A)     if such transfer would (i) violate any applicable securities or other laws, (ii) unless the New Membership Interests are registered pursuant to Sections 12(b) or 12(g) of the Exchange Act, result in the Company having shareholders of record exceeding in number either (a) 2000 or more accredited investors or (b) 500 or more persons who are not accredited investors or (iii) limit, impair or eliminate the Company's net operating losses;

(B)     if the transferee is (a) a competitor, customer or supplier of the Company and (b) such transfer would be adverse to the Company, in each case as determined by the New Board;

(C)     if the transferee creates a foreign ownership, control or influence (FOCI) issue.

There can be no assurance, however, that any market will develop or as to the liquidity of any market that may develop for any such securities.

2.     **To Service the Reorganized Debtors' Indebtedness and Meet Their Operational Needs, the Reorganized Debtors Will Require a Significant Amount of Cash.  Their Ability to Generate Cash Depends on Many Factors Beyond Their Control.**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund planned capital expenditures will depend on their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond their control.

The Reorganized Debtors' business may not generate sufficient cash flow from operations. Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized. The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. A failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

In addition, if the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations, the Reorganized Debtors may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional equity capital or refinance all or a portion of their indebtedness. In the absence of such operating results and resources, the Reorganized Debtors could face substantial cash flow problems and might be required to sell material assets or operations to meet their debt service and other obligations. The Reorganized Debtors will be unable to predict the timing of such asset sales or the proceeds that they could realize from such sales and that they will be able to refinance any of their indebtedness, including the New Secured Debt, on commercially reasonable terms or at all.

3.     **The Estimated Valuation of the Reorganized Debtors and the New Membership Interests and the Estimated Recoveries to Holders of Allowed Claims Are Not Necessarily Representative of the Private or Public Sale Values of the New Membership Interests.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of Reorganized Parent's securities. The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

4.     **Large Holders of the Senior Secured Notes May Control Reorganized Parent.**

Implementation of the Plan will result in a small number of holders or their assignees owning a significant percentage of the outstanding New Membership Interests of Reorganized Parent. A small number of holders of the Senior Secured Notes or their assignees could hold a controlling percentage of the New Membership Interests. These holders or their assignees could, among other things, exercise a controlling influence over the business and affairs of Reorganized Parent and the other Reorganized Debtors.

5.     **It is Unlikely That Reorganized Parent Will Pay Dividends in the Foreseeable Future.**

All of the Reorganized Debtors' projected cash flow will be required to be used in the foreseeable future (a) to make payments under the New Secured Debt, (b) to fund Reorganized Parent's other obligations under the Plan, and (c) for working capital and capital expenditure

purposes.  In addition, the New Secured Debt is expected to contain certain restrictions on Reorganized Parent's ability to pay dividends.  Accordingly, the Debtors do not anticipate that Reorganized Parent will pay cash dividends on the New Membership Interests in the foreseeable future.

      6.     **Tax Implications of the Plan.**

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  There can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the U.S. federal income tax treatment in the Plan, or that a court would not sustain such a challenge. *See* "Summary of Certain U.S. Federal Income Tax Consequences of the Plan," at Article VII herein.

## C.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

      1.     **The Financial Information Contained Herein is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit was Performed.**

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

      2.     **Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support; and (f) customer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS

DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

**D.     DISCLOSURE STATEMENT DISCLAIMER**

1.     **The Information Contained Herein is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

2.     **This Disclosure Statement was Not Approved by the Securities and Exchange Commission.**

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.     **The Debtors Relied on Certain Exemptions From Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126, as applicable, of the Bankruptcy Code and Rule 3016(b) of the Bankruptcy Rules and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer and issuance of New Membership Interests to Holders of Senior Secured Notes Claims has not been registered under the Securities Act or Blue Sky Laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the Solicitation, the issuance of the New Membership Interests will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 3(a)(9) of the Securities Act, section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act.

4.     **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the federal securities laws.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.     **No Legal or Tax Advice is Provided to You by This Disclosure Statement.**

**<u>This Disclosure Statement is not legal or tax advice to You</u>**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity.  Each Holder of a Claim or an Equity Interest should consult his

or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

6. **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

Neither the Supporting Noteholders, nor their respective representatives, members, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties whatsoever concerning the information contained herein.

7. **No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

8. **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

9. **The Information Used Herein was Provided by the Debtors and was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the

Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.    **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

<div align="center">

**ARTICLE V.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

</div>

A.    **LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims and Equity Interests will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation.  The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

B.    **FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves the Debtors' business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior

management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases also will make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships. Further, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings. The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing in order to service their debt and other obligations. It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all. If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

## ARTICLE VI.
## ISSUANCE AND RESALE OF NEW MEMBERSHIP INTERESTS UNDER THE PLAN

**A.    EXEMPTION FROM REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND BLUE SKY LAWS**

      1.    **Section 3(a)(9) and Section 4(a)(2) of the Securities Act (Solicitation of the Plan)**

The Debtors are relying on exemptions from the registration requirements of the Securities Act including, without limitation, section 3(a)(9), section 4(a)(2) and section 18(b)(4)(E) thereof, to exempt the offering of the New Membership Interests to Holders of Senior Secured Notes Claims pursuant to the Solicitation. Section 3(a)(9) provides an exemption from registration when an issuer issues new securities in exchange for its own outstanding securities, such exchange is made only to existing security holders, no compensation or other remuneration is paid for soliciting such exchange offer, and the existing security holders are not asked to part with anything of value except the outstanding securities. Section 18(b)(4)(E) of the Securities Act provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under section 3(a)(9) of the Securities Act. Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of U.S. securities laws.

The Debtors do not have any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchange of the Senior Secured Notes, except for reasonable, actual and necessary out-of-pocket expenses of mailing. In addition, none of its financial advisors engaged to provide financial analysis and assist the Debtors with addressing the financial aspects of the restructuring or any broker, dealer, salesperson, agent or any other person has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the Solicitation or the Plan (and the transactions contemplated thereby). Further, the Debtors believe that many of the Supporting Noteholders receiving the New Membership Interests under the Plan will be accredited investors.

2.    **Section 1145 of the Bankruptcy Code (Distribution to Holders of Senior Secured Notes)**

The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the offering, issuance and distribution of the New Membership Interests to Holders of Senior Secured Notes Claims (the "Section 1145 Securities") pursuant to the Plan.  Section 1145(a)(1) of the Bankruptcy Code provides that registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are reissued principally in such exchange and partly for cash and property.

**B.    RESALES OF NEW MEMBERSHIP INTERESTS**

1.    **Resales of the 1145 Securities**

To the extent that the issuance of the Section 1145 Securities pursuant to the Plan is covered by section 1145 of the Bankruptcy Code, the Section 1145 Securities generally may be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual states' Blue Sky Laws are examined.  In addition, the Section 1145 Securities governed by section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act pursuant to an exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in Section 1145(b) of the Bankruptcy Code) with respect to the Section 1145 Securities.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who, except with respect to ordinary trading transactions of an entity that is not an issuer, (i) purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if such purchase is with a view to distributing any security received or to be received in exchange for such a claim or interest; (ii) offers to sell securities offered or sold under a plan of reorganization for the holders of those securities; (iii) offers to buy securities offered or sold under a plan of reorganization from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with such plan of reorganization, with the consummation of such plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or (iv) is an "issuer" (as the term is defined in section 2(a)(11) of the Securities Act) with respect to such securities.

The definition of an "issuer" for purposes of whether a person is an "underwriter" under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover the entity issuing the securities and "control persons" of such issuer of the securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting

securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by persons deemed to be "underwriters" (which by definition includes "control persons") (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  However, Restricted Holders may be permitted to sell their Section 1145 Securities without registration if they are able to comply with the provisions of Rule 144 of the Securities Act (as discussed below).  The Debtors express no view as to whether any Person or Entity would be deemed an "underwriter" with respect to the Section 1145 Securities and, in turn, whether any recipient of Section 1145 Securities may freely resell such securities.

**Recipients of securities under the Plan may be able to resell such securities pursuant to one or more exemptions from registration under the federal securities law. The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and Blue Sky Laws.**

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF NEW MEMBERSHIP INTERESTS TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON.  ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS.  ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY NEW MEMBERSHIP INTERESTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH NEW MEMBERSHIP INTERESTS.**

## C.    LISTING OF NEW MEMBERSHIP INTERESTS

There is not now and there may not be a public market for the New Membership Interests and the Debtors do not intend to register the New Membership Interests under the Exchange Act or seek any listing of the New Membership Interests on any exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Membership Interests will ever develop or, if such market does develop, that it will be maintained.

**ARTICLE VII.**
**SUMMARY OF CERTAIN U.S. FEDERAL INCOME**
**TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF**
**ALLOWED SENIOR SECURED NOTES CLAIMS**

The following disclosure (the "Tax Disclosure") summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to a Holder of Allowed Senior Secured Notes Claims (but not the taxation of those to whom such a Holder subsequently transfers New Membership Interests or New Secured Debt).  The Debtors have not requested, and will not request, a ruling from the Internal Revenue Service (the "IRS") or an

opinion of counsel with respect to any of the tax aspects of the Plan, and the discussion below is not binding upon the IRS or the courts.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

The Tax Disclosure summarizes only certain of the U.S. federal income tax consequences to a Holder associated with the Plan's implementation and does not address state, local or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, non-U.S. governmental institutions, expatriates, controlled foreign corporations, passive foreign investment companies, investors in partnerships and other pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Membership Interests as part of a straddle, hedge, conversion transaction, or other integrated investments, persons subject to the alternative minimum tax or the Medicare tax on certain investment income, persons using mark-to-market method of accounting, those who hold a Claim as an ordinary income asset, and holders of Claims who are themselves in bankruptcy).  In addition, the Tax Disclosure does not attempt to consider whether the particular circumstances of any Holder of a Claim may modify or alter the consequences described below, and assumes that all Senior Secured Notes Claims are held as "capital assets" within the meaning of Tax Code Section 1221 (generally, property held for investment).  This Tax Disclosure does not address the U.S. federal income tax consequences to Holders of Equity Interests in Parent.  The remainder of the Claims and Interests are not being solicited and hence not specifically addressed.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the regulations promulgated thereunder by the U.S. Department of the Treasury ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS in effect on the date hereof.  Changes in, or new interpretations of, such rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

A.       **DEFINITION OF U.S. PERSON AND NON-U.S. PERSON**

In this Tax Disclosure, a "U.S. Person" is any Person that is

- an individual that is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States, or of any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (1) one or more U.S. Persons have the authority to control all substantial decisions of the trust, and a United States court is able to exercise primary supervision over the administration of the trust; or (2) the trust is of a certain type, was in existence on August 20, 1996, was treated as a United States person on August 19, 1996 under the then-applicable Tax Code, and has made a valid election to be treated as a U.S. Person under the Tax Code.

A "Non-U.S. Person" is any Person that is not a U.S. Person and is not a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a Holder of a Senior Secured Notes Claim is a partnership (including any entity treated as a partnership for U.S. federal income tax purposes), the treatment of a partner in the partnership will depend on whether the partner is a Non-U.S. Person and the extent of the partnership's activities in the United States. A partner in a partnership that is a Holder of a Senior Secured Notes Claim is urged to consult its own tax advisor regarding the U.S. federal, state and local and non-U.S. tax consequences to it under the Plan.

## B.    TREATMENT OF THE SATISFACTION OF SENIOR SECURED NOTES CLAIMS FOR CASH, LITIGATION TRUST INTERESTS, NEW SECURED DEBT AND NEW MEMBERSHIP INTERESTS

For U.S. federal income tax purposes (i) all of the equity interests of Parent are owned by Fuse Media LLC, thus causing Parent to be treated as a disregarded entity, and (ii) Fuse Media LLC is treated as a partnership. As a result, the cancellation of the Equity Interests in Parent and the satisfaction of the Allowed Senior Secured Notes Claims for Cash, the Litigation Trust Interests, the New Secured Debt, and the New Membership Interests pursuant the Plan should be treated for U.S. federal income tax purposes as a taxable disposition of all of the assets of Parent and its subsidiaries to the Holders of the Allowed Senior Secured Notes Claims in satisfaction of such Claims, followed by the deemed contribution by such Holders of all the assets of Parent and its subsidiaries (other than the Litigation Trust Assets) to Reorganized Parent in exchange for the New Secured Debt and the New Membership Interests received under the Plan and the deemed contribution of the Litigation Trust Assets to the Fuse Litigation Trust in exchange for the Litigation Trust Interests received under the Plan.

Reorganized Parent is expected to be treated as a newly formed partnership for U.S. federal income tax purposes. As a result, the tax consequences of the deemed sale of the assets of Parent, including any cancellation of indebtedness income, should be recognized by the former holders of the Equity Interests of Parent and not by Reorganized Parent or any holders of New Membership Interests.

## C.    TAX CONSEQUENCES FOR U.S. PERSONS HOLDING ALLOWED SENIOR SECURED NOTES CLAIMS

The Plan provides for the Reorganized Parent to pay excess Cash, issue the New Secured Debt, and transfer New Membership Interests and Litigation Trust Interests, Pro Rata, to Holders of Allowed Senior Secured Notes Claims, in exchange for the full and final satisfaction, settlement, release and discharge of such Claims.

### 1.    Exchange of Senior Secured Notes Claims for New Membership Interests, New Secured Debt, and Cash

Each Holder of an Allowed Senior Secured Notes Claim should be treated as exchanging such Claim for (i) an undivided interest in each of the assets of Parent and its subsidiaries and (ii)

the Cash received under the Plan, in a taxable exchange under Section 1001 of the Tax Code. Following such taxable exchange, each such Holder should be treated as contributing its undivided interest in the assets of Parent and its subsidiaries (other than the Litigation Trust Assets) to a newly formed partnership in exchange for such Holder's interests in the New Membership Interests and the New Secured Debt, in tax-free exchange under Section 721 of the Tax Code.

Each U.S. Person holding Allowed Senior Secured Notes Claims should generally recognize gain or loss equal to the difference between (1) the fair market value of such U.S. Person's undivided interest in the assets of Parent and its subsidiaries, the Litigation Trust Assets and Cash received (other than the value received for Accrued Interest, as discussed below), and (2) the U.S. Person's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Person, the nature of the Claim in such U.S. Person's hands, whether the Claim was purchased at a discount (as discussed below), and whether and to what extent the U.S. Person previously has claimed a bad debt deduction with respect to its Claim. Capital gain will be long-term capital gain if at the time of the exchange the U.S. Person held its Claim for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as discussed below. A U.S. Person's initial tax basis in the New Membership Interests and New Secured Debt acquired in the tax-free exchange described above should equal the fair market value of the assets received in satisfaction of such U.S. Person's Claims and deemed contributed to the Reorganized Parent, as described above. A U.S. Person's holding period in such New Membership Interests and New Secured Debt should begin the day following the Effective Date.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain recognized by a U.S. Person holding an Allowed Senior Secured Notes Claim may be treated as ordinary income, to the extent of the amount of accrued market discount on such Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if such U.S. Person's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Person on a taxable disposition of Allowed Senior Secured Notes Claims that were acquired with a market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the U.S. Person, unless the U.S. Person elected to include the market discount in income as it accrued.

2.      **Distributions in Discharge of Accrued Interest**

A U.S. Person holding an Allowed Senior Secured Notes Claim who, under its accounting method, did not previously include in its income accrued but unpaid interest ("Accrued Interest") attributable to that Allowed Claim, and who exchanges such an Allowed Claim for Cash or other property (including New Membership Interests, New Secured Debt and Litigation Trust Interests) pursuant to the Plan, should be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such Accrued Interest, regardless of whether that U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Person's Allowed Claim is a capital asset in its hands. The tax basis of any property received in exchange for Allowed Claims for Accrued Interest should be the fair market value of such property. The holding period for such property should begin the day after the exchange.

A U.S. Person holding an Allowed Senior Secured Notes Claim generally should be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any Accrued Interest claimed was previously included in its gross income and is not paid in full by the applicable Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

Under the Plan, except as otherwise specified, distributions in respect of Allowed Senior Secured Notes Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. However, there can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

**U.S. PERSONS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

3.      **Limitations on the Use of Capital Losses**

A U.S. Person who recognizes capital losses as a result of the distribution under the Plan, as a Holder of a New Membership Interest, or as a result of a disposition of a New Membership Interest, New Secured Debt or Litigation Trust Interests, will be subject to limits on the use of such capital losses. For a non-corporate U.S. Person, capital losses may be used to offset any capital gains (without regard to holding periods), and also to offset ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of all the U.S. Person's capital losses over all the U.S. Person's capital gains. A non-corporate U.S. Person may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Persons, capital losses may only be used to offset capital gains. A corporate U.S. Person that has more capital losses than may be used in a tax year may generally carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

D.      **TAX CONSEQUENCES FOR NON-U.S. PERSONS HOLDING ALLOWED SENIOR SECURED NOTES CLAIMS**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Persons that hold Allowed Senior Secured Notes Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Persons are complex. Each non-U.S. Person should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Persons and the ownership and disposition of the New Membership Interests and New Secured Debt.

Whether a Non-U.S. Person realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Persons.

1.      **Gain Recognition**

Any gain realized by a Non-U.S. Person on the exchange of its Claim for New Membership Interests, New Secured Debt, Litigation Trust Interests and Cash generally should

- 79 -

not be subject to U.S. federal income tax unless (1) such gain is effectively connected with the conduct by such Non-U.S. Person of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Person in the United States); or (2) in the case of U.S. source gains or losses derived by an individual Non-U.S. Person, such individual is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

If the first exception applies, the Non-U.S. Person generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Person's conduct of a trade or business within the United States in the same manner as a U.S. Person.  In addition, if such a Non-U.S. Person is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  If the second exception applies, the Non-U.S. Person generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Person's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

### 2.    Distributions in Discharge of Accrued Interest

A Non-U.S. Person holding an Allowed Senior Secured Notes Claim who exchanges that Claim for New Membership Interests, New Secured Debt, Litigation Trust Interests and Cash pursuant to the Plan should be treated as receiving interest income to the extent of any consideration so received allocable to Accrued Interest that was not previously taken into account for U.S. federal income tax purposes, regardless of whether such Non-U.S. Person realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Non-U.S. Person's Allowed Claim is a capital asset in its hands.

Under the Plan, except as otherwise specified, distributions in respect of Allowed Senior Secured Notes Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to Accrued Interest.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  However, there can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

Subject to the discussion in "Backup Withholding" below, the payment to a Non-U.S. Person of interest, including Accrued Interest attributable to Senior Secured Notes, should not be subject to U.S. federal withholding tax pursuant to the "portfolio interest exception," *provided* that the Non-U.S. Person (1) provides Reorganized Parent with the appropriate IRS Form W-8, (2) does not actually or constructively own 10% or more of stock of Reorganized Parent, as measured by voting power, (3) is not a "controlled foreign corporation" that is related to Reorganized Parent within the meaning of the Tax Code, and (4) is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code.

If a Non-U.S. Person cannot satisfy the requirements of the portfolio interest exception described above, payments of interest, including Accrued Interest, made to such Non-U.S. Person, should be subject to a withholding tax at a rate of 30%, *provided, however*, that a Non-U.S. Person may be eligible to claim an exemption from or reduction in the rate of withholding under an applicable income tax treaty.

If payments of accrued untaxed interest are effectively connected with a Non-U.S. Person's trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base) and such Non-U.S. Person provides Reorganized Parent with an IRS Form W-8ECI (or successor form), such Non-U.S. Person should generally not be subject to withholding tax but will be subject to U.S. federal income tax in the same manner as a U.S. Person (unless an applicable income tax treaty provides otherwise).  A Non-U.S. Person that is a corporation for U.S. federal income tax purposes may also be subject to branch profits tax with respect to such Non-U.S. Person's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty).

### E.     TAX TREATMENT OF THE FUSE LITIGATION TRUST

The Fuse Litigation Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a disregarded entity). However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Fuse Litigation Trust has been structured with the intention of complying with such general criteria. The Litigation Trust Agreement will limit the investment powers of the Litigation Trustee in accordance with Rev. Proc. 94-45 and will require the Fuse Litigation Trust to distribute at least annually to the Litigation Trust Beneficiaries (as such may have been determined at such time) its net income (net of any payment of or provision for Taxes), except for amounts retained as reasonably necessary to maintain the value of the Litigation Trust Assets or to meet claims or contingent liabilities. Also, all parties (including the Litigation Trustee and Litigation Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Fuse Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so treated for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Fuse Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the U.S. federal income tax consequences to the Fuse Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed herein.

The Litigation Trust Beneficiaries will be treated as receiving an amount equal to the fair market value of their interests in the Fuse Litigation Trust in exchange for their Claims. The Litigation Trust Beneficiaries will be treated for U.S. federal income tax purposes as owning their shares of the Litigation Trust Assets, including the Litigation Claims, and will be required to include their allocable shares of each item of income, gain, deduction, loss and credit of the Fuse Litigation Trust in determining their taxable income. The Litigation Trust Agreement will require consistent valuation of the Litigation Trust Assets by the Reorganized Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries for all U.S. federal income tax and reporting purposes. The Litigation Trustee will send to each Litigation Trust Beneficiary a statement setting forth the information necessary for such Litigation Trust Beneficiary to determine its share of items of income, gain, loss, deduction, or credit of the Litigation Trust for federal income tax purposes.

F.    **TAXATION OF REORGANIZED PARENT AND HOLDERS OF NEW MEMBERSHIP INTERESTS**

1.    **Tax Consequences for a Holder of New Membership Interests**

Reorganized Parent is expected to be treated as a partnership for U.S. federal income tax purposes, and due to the expected imposition of certain transfer restrictions on the holders of its interests, Reorganized Parent is not expected to be a "publicly traded partnership" for U.S. federal income tax purposes.  As a result, the Reorganized Parent generally is not itself expected to be subject to U.S. federal income tax, but each Holder of New Membership Interests will be required to take into account its allocable share of the Reorganized Parent's items of income, gain, loss, deduction and/or credit for the taxable year of the Reorganized Parent ending within or with the taxable year of the Holder, without regard to whether such Holder has received or will receive corresponding distributions from the Reorganized Parent. Each item generally will have the same character and source as though the Holder realized the item directly.

If a Holder of a New Membership Interest receives a cash distribution (or deemed cash distribution) in an amount that exceeds such Holder's adjusted tax basis in its interest in the Reorganized Parent, such Holder would be required to recognize, for U.S. federal income tax purposes, gain to the extent of that excess.  Such amount would generally be treated as gain from the sale or exchange of its New Membership Interest, as discussed in more detail below.

The Reorganized Parent expects to file annually a U.S. federal income tax information return on IRS Form 1065 and will provide an IRS Schedule K-1 (or equivalent) to Holders of New Membership Interests as soon as practicable following the end of each Fiscal Year. For any given year, the Reorganized Parent may be unable to provide this information to its Holders prior to the due date for the filing of tax returns with respect to that year.  Each Holder will be responsible for the preparation and filing of such Holder's own income tax returns, and each Holder should be prepared to obtain extensions of the filing date for its income tax returns at the U.S. federal, state and local levels.

The Reorganized Parent may be subject, or required, to withhold and pay over any U.S. or non-U.S. withholding taxes (including interest and penalties thereon) directly or indirectly imposed with respect to any Holder of New Membership Interests or other taxes imposed on the Reorganized Parent (including pursuant to a Reorganized Parent level audit).  The amount of any such taxes withheld will be deemed distributed to the relevant Holder and deemed paid by that Holder to the relevant taxing jurisdiction.  Due to the complexity of the application of withholding tax rules, Holders of New Membership Interests may be subject to under-withholding or over-withholding.

The general partner of the Reorganized Parent may be authorized to make, on behalf of the Reorganized Parent, all tax determinations and elections in its discretion, including an election under Section 754 of the Tax Code to adjust the tax basis of the Reorganized Parent's property upon distributions of the Reorganized Parent's property (including cash) or transfers of interests in the Reorganized Parent.

Under the Tax Code, adjustments in tax liability with respect to the Reorganized Parent's items generally will be made at the Reorganized Parent level in a partnership proceeding which the Reorganized Parent's "partnership representative" will control, rather than by individual audits of the Holders of New Membership Interests.  Any audit adjustment that results in additional tax (including interest and penalties thereon) generally will be assessed and collected at the Reorganized Parent level in the taxable year of adjustment unless the Reorganized Parent makes an election to issue adjusted tax information to those Holders that were Holders of New Membership Interests in the taxable year subject to audit.  In general, the Reorganized Parent

may enter into a settlement agreement with the IRS on behalf of, and binding upon, Holders of New Membership Interests.  It is possible that Holders will be directly subject to audit of Reorganized Parent items, or that a Reorganized Parent-level audit will result in an audit of the Holder's own returns, which may give rise to additional taxation on a current or retroactive basis.

2.    **Certain Additional Tax Consequences for U.S. Person Holding New Membership Interests**

(a)    Phantom Income

Each U.S. Person should be prepared to be subject to U.S. federal income tax with respect to any and all income earned by the Reorganized Parent without a corresponding distribution made by the Reorganized Parent, thus giving rise to an out-of-pocket payment by the U.S. Person.  In addition, a U.S. Person may be subject to a U.S. federal income tax liability if the Reorganized Parent adopts or is required to use certain methods of accounting which result in the acceleration of taxable income.

(b)    Limitation on Deductibility of Losses

For U.S. federal income tax purposes, a U.S. Person's ability to use its share of the Reorganized Parent's losses and to deduct its share of the Reorganized Parent's expenses is subject to certain limitations.  Such limitations will include a limitation on the allowance of the U.S. Person's share of the Reorganized Parent's losses to the adjusted basis of the U.S. Person's interests in the Reorganized Parent.  In addition, certain U.S. Persons may be subject to other limitations, including: (i) the limitation on the allowance of the U.S. Person's share of the Reorganized Parent's losses allocable to a particular "activity" to the amount that the U.S. Person is considered to have "at risk" with respect to the activity; (ii) the limitation on the allowance of the U.S. Person's share of the Reorganized Parent's losses from "passive activities" to the U.S. Person's income from passive activities; (iii) the recently enacted limitation on the allowance of the U.S. Person's "excess business losses"; (iv) the limitation on the deduction of "investment interest" to the U.S. Person's "net investment income"; (v) the limitation on the deduction of "business interest expense" at potentially both the Reorganized Parent and Holder levels; and (vi) the disallowance for miscellaneous itemized deductions through tax year 2025 (and limitations on such deductions thereafter).

(c)    Qualified Business Income Deduction

For taxable years beginning on or before December 31, 2025, a U.S. Person may be entitled to deduct up to 20% of certain U.S. "qualified business income" earned through the Reorganized Parent, subject to certain limitations.  Many aspects of such rules are uncertain.  U.S. Persons should consult their own tax advisors regarding all aspects of such rules and their potential application to income from the Reorganized Parent.

(d)    Sale, Exchange or Other Disposition of New Membership Interests.

Upon a U.S. Person's subsequent sale, exchange or other taxable disposition of the New Membership Interests, the U.S. Person should recognize gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the transferred interests.  The amount realized will generally include the U.S. Person's share of the Reorganized Parent's liabilities outstanding at the time of the disposition.  Gain from the disposition of an New Membership Interest will be treated as ordinary income to the extent of the U.S. Person's distributive share of any "unrealized receivables" and "inventory items." Gain or loss will generally be treated as capital gain or loss to the extent a sale of assets by the Reorganized Parent would qualify for such treatment.  Capital gain will be long-term capital gain if at the time of the

sale, exchange or other disposition the U.S. Person held the New Membership Interests for more than one year, provided, that a capital contribution by the U.S. Person within the one-year period ending on such date may cause part of such gain or loss to be short-term.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  If the U.S. Person took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Membership Interests, a U.S. Person may be required to treat gain recognized on the taxable disposition of the New Membership Interests as ordinary income under the recapture rules of Section 108(e)(7) of the Tax Code.

3.  **Certain Additional Tax Consequences for Non-U.S. Person Holding New Membership Interests**

(a)  <u>Income of the Reorganized Parent</u>

The U.S. federal income tax treatment of a Non-U.S. Person holding New Membership Interests is complex and will vary depending upon the Non-U.S. Person's particular circumstances and the activities of the Reorganized Parent.

The income of the Reorganized Parent is expected to be effectively connected with a United States trade or business ("ECI"), and as a result Non-U.S. Persons will be directly subject to U.S. federal income taxes (including for corporate non-U.S. Persons, the branch profits tax described above) and filing obligations each year with respect to their allocable share of the Reorganized Parent's income, regardless of whether the Reorganized Parent makes any cash distributions. Moreover, non-U.S. Persons generally will be subject to U.S. federal withholding taxes on ECI (at the highest rate of tax applicable to U.S. taxpayers) and other U.S.-source income.  In addition, under the U.S. Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA") rules, any income from the disposition of a "United States real property interest" ("USRPI") (including the stock of a "United States real property holding company" ("USRPHC")) held by the Reorganized Parent would generally be treated as ECI and subject to similar tax, withholding and reporting requirements.

In general, different rules from those described above may apply in the case of a Non-U.S. Persons (i) who has an office or fixed place of business in the United States or is otherwise carrying on a U.S. trade or business; or (ii) who is an individual present in the United States for 183 days or more in a taxable year.  Such persons are urged to consult their tax advisors.

If the Reorganized Parent receives any U.S. source income that is not ECI, the Non-U.S. Persons will generally be subject to U.S. federal withholding tax of 30 percent on payments of interest, dividends, certain dividend-equivalent amounts, and certain other payments, unless a reduction or exception applies under domestic law (e.g., the "portfolio interest exemption" described above) or pursuant to a treaty.  A Non-U.S. Person generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by delivering IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Person certifies, under penalties of perjury, its status as a Non-U.S. Person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Due to the complexity of the withholding tax rules, the Reorganized Parent may over-withhold or under-withhold U.S. federal income taxes in respect of a non-U.S. Person's allocable share of the Reorganized Parent's income, in which case the non-U.S. Person may need to apply for a refund of any such over-withheld U.S. taxes or may be subject to interest and penalties on any under-withheld U.S. taxes.

      (b)    <u>Non-U.S. Person's Sale, Exchange or Other Disposition of New Membership Interests</u>

Upon a Non-U.S. Person's subsequent sale, exchange or other taxable disposition of the New Membership Interests, such Non-U.S. Person's gain or loss (generally computed as such Non-U.S. Person's amount realized less its adjusted tax basis in its New Membership Interest (in each case, as determined for U.S. federal income tax purposes)) would generally be treated as ECI and subject to U.S. federal income tax to the extent that such Non-U.S. Person would be allocated ECI if the Reorganized Parent sold all of its assets, in a hypothetical liquidation, at fair market value on the date of the sale or exchange, and in the event that Reorganized Parent held an interest in a USRPI, to the extent of the portion of the proceeds attributable to such USRPI. Further, the purchaser of a New Membership Interest is required to withhold (subject to certain exceptions) 10% of the amount realized (which generally includes the Non-U.S. Person's share of the Reorganized Parent's liabilities at the time of the disposition) by a Non-U.S. Person in connection with the disposition of a New Membership Interest, or (subject to certain exceptions) 15% in the case of certain amounts relating to USRPIs.

## G.    TAXATION OF HOLDERS OF NEW SECURED DEBT

    1.    **U.S. Person Holding New Secured Debt**

    (a)    <u>Payments of Stated Interest</u>

Stated interest on the New Secured Debt will be included in a U.S. Person's gross income and taxed as ordinary interest income at the time such interest is accrued or received in accordance with a U.S. Person's method of accounting for U.S. federal income tax purposes.

A debt instrument with a "stated redemption price at maturity" that exceeds its "issue price" by an amount that equals or exceeds the statutory de minimis amount will be issued with original issue discount ("OID") for United States federal income tax purposes in an amount equal to such excess. A holder of a debt instrument issued with OID will be required to accrue and include OID in its gross income as ordinary income in advance of the receipt of the cash payment attributable to the OID. The New Secured Debt is not expected to be issued with OID; however, no assurance can be provided in this regard and Holders are urged to consult their own tax advisors regarding the potential U.S. federal, state and local and non-U.S. tax consequences to it if the New Secured Debt were issued with OID. The remainder of this Tax Disclosure assumes the New Secured Debt will not be issued with OID.

    (b)    <u>Sale, Exchange or Other Disposition of New Secured Debt</u>

Upon the sale, redemption, retirement, exchange or other taxable disposition (each a "disposition") of New Secured Debt, a U.S. Person generally will recognize taxable gain or loss equal to the difference, if any, between (i) such U.S. Person's amount realized on the disposition (less any amount attributable to accrued but unpaid stated interest on such New Secured Debt) and (ii) such U.S. Person's tax basis in such New Secured Debt. Any amount realized on the disposition that is attributable to accrued but unpaid stated interest will be taxable as ordinary interest income to the extent not previously included in your gross income in the manner described above under "—Payments of Stated Interest". A U.S. Person's gain or loss generally will be capital gain or loss. This capital gain or loss will be long-term capital gain or loss if, at the time of the disposition, such U.S. Person has held the New Secured Debt for more than one year. The deductibility of capital losses is subject to certain limitations as described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.

2.    **Non-U.S. Person Holding New Secured Debt**

(a)    U.S. Federal Withholding Tax

Subject to the discussion in "Backup Withholding" below, the payment to a Non-U.S. Person of interest on the New Secured Debt may be subject to U.S. federal withholding tax in the same manner as payments of Accrued Interest as described in "—Distributions in Discharge of Accrued Interest" above.  Any gain recognized upon the disposition of the New Secured Debt (other than any amount representing accrued but unpaid stated interest, which is treated as described immediately above) generally will not be subject to U.S. federal withholding tax, subject to the discussion below regarding FATCA.

(b)    U.S. Federal Income Tax

Except for the possible application of U.S. federal withholding tax discussed above, and subject to the discussion below regarding backup withholding and FATCA, as defined below, a Non-U.S. Person generally will not be subject to U.S. federal income tax on payments of principal of and stated interest on the New Secured Debt, or on any gain realized from (or accrued stated interest treated as received in connection with) the disposition of the New Secured Debt unless:

- in the case of stated interest payments or disposition proceeds representing accrued stated interest, the Non-U.S. Person cannot satisfy the requirements of the "portfolio interest" exception described above (and such Non-U.S. Person's U.S. federal income tax liability has not otherwise been fully satisfied through the U.S. federal withholding tax described above);

- in the case of gain, the Non-U.S. Person is an individual who is present in the United States for 183 days or more during the taxable year of the disposition of the New Secured Debt and specific other conditions are met (in which case, except as otherwise provided by an applicable income tax treaty, the gain, which may be offset by U.S.-source capital losses, generally will be subject to a flat 30% U.S. federal income tax, even though such Non-U.S. Person is not considered a resident alien under the Tax Code); or

- any stated interest or gain is effectively connected with the Non-U.S. Person's conduct of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a United States "permanent establishment" maintained by such Non-U.S. Person.

If a Non-U.S. Person is engaged in a trade or business within the United States, and stated interest or gain in respect of such Non-U.S. Person's New Secured Debt is effectively connected with the conduct of such trade or business, the stated interest or gain generally will be exempt from the U.S. federal withholding tax described above and instead will be subject to U.S. federal income tax on a net basis at the regular graduated rates and in the manner applicable to a U.S. Person (unless an applicable income tax treaty provides otherwise).  In addition, a Non-U.S. Person that is a corporation may be subject to a branch profits tax equal to 30% of its effectively connected earnings and profits for the taxable year, as adjusted for certain items, unless a lower rate applies under an applicable income tax treaty.

# H.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their

U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." Such foreign entities may avoid withholding if (1) the foreign financial institution enters into an agreement with the U.S. Treasury Department to collect and disclose information regarding U.S. account holders of that foreign financial institution (including certain account holders that are foreign entities that have U.S. owners) and satisfies other requirements; or (2) specified other foreign entities unless such entity certifies that it does not have any substantial U.S. owner and such entity satisfies other specified requirements. For purposes of this paragraph, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends or interest, including interest on the New Secured Debt), and also include gross proceeds from the sale or disposition of any property of a type which can produce U.S. source interest or dividends (which would include the New Secured Debt) if such sale or other disposition occurs after December 31, 2018. However, under recently proposed Treasury regulations that may be relied upon pending finalization, the withholding tax on gross proceeds would be eliminated and, consequently, FATCA withholding on gross proceeds is not currently expected to apply. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. Each Non-U.S. Person should consult its tax advisors regarding the possible implications of the FATCA withholding tax and the reporting obligations.

## I.    INFORMATION REPORTING AND BACKUP WITHHOLDING

### 1.    Information Reporting

In general, information reporting requirements may apply to payments of stated interest on the New Secured Debt and to the proceeds of a disposition of the New Secured Debt, New Membership Interests or Litigation Trust Interests received by a U.S. Person or, depending on the circumstances, by a Non-U.S. Person, regardless of whether withholding was required. Copies of the information returns reporting such payments and withholding, if any, may also be made available to the tax authorities in the country in which a Non-U.S. Person resides under the provisions of an applicable treaty.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

### 2.    Backup Withholding

In the case of a U.S. Person, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan, payments of interest on the New Secured Debt, and the proceeds of a disposition of the New Membership Interests, the New Secured Debt or Litigation Trust Interests, unless such U.S. Person provides a properly executed IRS Form W-9 to the applicable withholding agent.

In the case of a Non-U.S. Person, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan and payments of interest on the New Secured Debt, and depending the circumstances may also apply to the proceeds received from a disposition of New Membership Interests, New Secured Debt or Litigation Trust Interests, unless in each case such Non-U.S. Person provides a properly executed applicable IRS Form W-8 to the applicable withholding agent (or otherwise establishes such Non-U.S. Person's eligibility for an exemption).

Holders should consult their own tax advisors regarding application of the backup withholding rules to their particular circumstances and the availability of and procedure for

- 87 -

obtaining an exemption from backup withholding.  U.S. backup withholding tax is not an additional tax.  Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

## J.    GENERAL DISCLAIMER

THE FOREGOING U.S. FEDERAL INCOME TAX SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## ARTICLE VIII.
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that all Holders of Senior Secured Notes Claims support confirmation of the Plan and vote to accept the Plan.

*[Remainder of Page Intentionally Blank]*

Dated:  April 18, 2019

Respectfully submitted,

_____/s/_____
Miguel Roggero
Interim Chief Executive Officer
FUSE, LLC, *et al.*

**FILED BY:**

PACHULSKI STANG ZIEHL & JONES LLP

___*/s/*_____
Richard M. Pachulski (CA Bar No. 62337)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
                ikharasch@pszjlaw.com
                mlitvak@pszjlaw.com
                joneill@pszjlaw.com

Proposed Counsel for the Debtors
and Debtors-in-Possession

**[Signature page to Disclosure Statement for
Debtors' Prepackaged Joint Plan of Reorganization]**