IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FUSE, LLC, *et al.*,[1] | Case No. 19-10872 (KG) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket Nos. 13 and 14** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ORDER APPROVING THE DEBTORS' DISCLOSURE STATEMENT FOR, AND CONFIRMING, THE DEBTORS' PREPACKAGED JOINT PLAN OF REORGANIZATION

Dated:  May 31, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Ira D. Kharasch (CA Bar No. 109084)
James E. O'Neill (DE Bar 4042)
Maxim B. Litvak (CA Bar No. 215852)
919 N. Market Street, 17th Floor
Wilmington, DE 19899 Courier 19801)
Tel:  (302) 652-4100
Fax: (302) 652-4400
E-mail: rpachulski@pszjlaw.com
        ikharasch@pszjlaw.com
        joneill@pszjlaw.com
        mlitvak@pszjlaw.com

Proposed Counsel for the Debtors and Debtors-in-Possession

---

[1]  The Debtors and the last four digits of their taxpayer identification numbers include:  Fuse Media, Inc. (9721); Fuse Media, LLC (0560); Fuse, LLC (1888); JAAM Productions, LLC (5499); SCN Distribution, LLC (9656); Latino Events LLC (8204); Fuse Holdings LLC (5673); Fuse Finance, Inc. (8683); and FM Networks LLC (6500). The Debtors' headquarters and service address is 700 North Central Avenue, Suite 600, Glendale, CA 91203.

***For the avoidance of doubt, Debtors Fuse Media, Inc. and Fuse Media, LLC are not proponents of the Plan and the provisions of the Plan shall not extend to those entities.***

# TABLE OF CONTENTS

**Page**

Preliminary Statement.............................................................................................. 1

I.    The Restructuring Transactions ................................................................ 2

II.   The Solicitation Process and Voting Results......................................... 3

III.  The Filing of the Debtors' Chapter 11 Cases......................................... 4

IV.  Filing of the Plan Supplement, as Amended, and Proposed Confirmation Order ................................................................................. 6

V.    Objections ................................................................................................ 7

ARGUMENT ............................................................................................................. 8

I.    Approval of the Disclosure Statement is Warranted............................. 8

    A.   Impaired Creditors Received Sufficient Notice of the Confirmation Hearing and the Objection Deadline.................................................. 8

    B.   The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code. ............................................................................ 10

       1.  The Disclosure Statement Contains Adequate Information......... 11

       2.  The Disclosure Statement Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law. ....................... 14

       3.  The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with Bankruptcy Rules. ................... 16

       4.  The Voting Record Date Complied with Bankruptcy Rules. ...... 17

       5.  The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018(b)................................................................ 17

       6.  The Debtors' Vote Tabulation Was Appropriate........................ 17

       7.  Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith. ...................................................... 18

II.   The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ................................................................................. 18

    A.   The Plan Complies with the Applicable Provisions of  the Bankruptcy Code (§ 1129(a)(1))................................................... 18

       8.  The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ..................................... 19

       9.  The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.................................... 21

          a.  Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)). ................................................... 21

          b.  Specification of Unimpaired Classes (§ 1123(a)(2)). ...... 21

          c.  Treatment of Impaired Classes (§ 1123(a)(3))................. 21

          d.  Equal Treatment within Classes (§ 1123(a)(4))............... 21

          e.  Means for Implementation (§ 1123(a)(5)). ...................... 22

          f.  Issuance of Non-Voting Securities (§ 1123(a)(6))........... 23

          g.  Directors and Officers (§ 1123(a)(7)). ............................ 23

       10.  The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.................................... 24

|  |  | 11. | The Plan Complies with Section 1123(d) of the Bankruptcy Code. | 25 |

11.    The Plan Complies with Section 1123(d) of the Bankruptcy Code. ........................................................... 25

12.    The Plan's Release, Exculpation, and Injunction Provisions Comply with the Bankruptcy Code. ............................................. 26

    a.    The Third-Party Release is Appropriate and Complies with the Bankruptcy Code. ............................. 26

    b.    The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code. ............................. 28

    c.    The Injunction Provision is Appropriate and Complies with the Bankruptcy Code. ............................. 30

B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ............................................... 31

13.    The Debtors Complied with Section 1125 of the Bankruptcy Code. ........................................................... 31

14.    The Debtors Complied with Section 1126 of the Bankruptcy Code. ........................................................... 31

C.    The Plan was Proposed in Good Faith (§ 1129(a)(3)). ............................. 32

D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). ................. 33

E.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ..................................... 34

F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ................................................................................ 36

G.    The Plan is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ................................................................................ 36

H.    The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code. ........................................... 38

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ................................................................. 38

J.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ........................................................... 40

K.    The Plan is Feasible (§ 1129(a)(11)). ........................................................... 40

L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ............. 41

M.    All Retiree Benefits, if Applicable, Will Continue Post-Confirmation (§ 1129(a)(13)). ................................................................. 42

N.    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. ............................................................................................ 42

O.    The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code. ........................................................... 43

P.    The Debtors Complied with Section 1129(d) of the Bankruptcy Code. ........................................................................................... 44

Q.    Modifications to the Plan. ........................................................................ 45

R.    Good Cause Exists to Waive the Stay of the Confirmation Order. ......... 45

III.    The UST's Objections to the Plan Should Be Overruled to the Extent Such Objections Are Not Consensually Resolved Prior to the Confirmation Hearing. ............................................................................................ 46

CONCLUSION ................................................................................................................. 53

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A.*
   *(In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071 n.8 (2d Cir. 1983) ............................. 35
*Bank of Amer. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
   526 U.S. 434 n.13 (1999).................................................................................... 39, 46
*Brite v. Sun Country Dev., Inc.*
   *(In re Sun Country Dev., Inc.)*, 764 F.2d 406 (5th Cir. 1985) ................................ 35
*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),*
   764 F.2d 406 (5th Cir. 1985) ................................................................................. 35
*Century Glove, Inc. v. First Amer. Bank of New York,*
   860 F.2d 94 (3d Cir. 1988).......................................................................... 11, 35, 39
*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship*
   *(In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997)...................... 35
*First Am. Bank of N.Y. v. Century Glove, Inc.,*
   81 B.R. 274, 279 (D. Del. 1988).............................................................................. 11
*In re Abbotts Dairies of Pa., Inc.,*
   788 F.2d 143 n.5 (3d Cir. 1986)............................................................................... 35
*In re Adelphia Commc'ns. Corp.,*
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................... 39
*In re Ambanc La Mesa L.P.,*
   115 F.3d 650 (9th Cir. 1997) ................................................................................. 45
*In re Armstrong World Indus., Inc.,*
   348 B.R. 111 (D. Del. 2006) .............................................................................. 7, 19
*In re Article Sentinel, Inc.,*
   Case No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016)................................... 48
*In re Capmark Fin. Grp. Inc.,*
   No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011).... 43
*In re Chapel Gate Apartments, Ltd.,*
   64 B.R. 569, 573 (Bankr. N.D. Tex. 1986)............................................................ 36
*In re Chi. Newspaper Liquidation Corp.,*
   Case No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011).................................... 33
*In re CHL, Ltd.,*
   Case No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012)...................................... 48
*In re Conseco Inc.,*
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ................................................................... 29
*In re Dex One Corp.,*
   Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)..................................... 33
*In re Exide Techs.,*
   303 B.R. 48, 72 (Bankr. D. Del. 2003) ............................................................ 27, 46

*In re Flintkote Co.*,
    486 B.R. 99, 139 (Bankr. D. Del. 2012) .................................................................................. 43
*In re Future Energy Corp.*,
    83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ....................................................................... 36, 46
*In re Gatehouse Media, Inc.*,
    Case No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) ..................................................... 48
*In re Geokinetics Inc.*,
    Case No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ..................................................... 48
*In re Hunt*,
    146 B.R. 178 (Bankr. N.D. Tex. 1992) .................................................................................... 8
*In re Indianapolis Downs, LLC*,
    486 B.R. 286, 304-05 (Bankr. D. Del. 2013) .......................................................................... 29
*In re Lapworth*,
    No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ..................... 33
*In re Lisanti Foods, Inc.*,
    329 B.R. 491, 507 (D.N.J. 2005) ...................................................................................... 11, 36
*In re Local Insight Media Holdings, Inc.*,
    No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011) ................................................................. 29
*In re Majestic Star Casino, LLC*,
    No. 09-14136 (KG) (Bankr. D. Del. Mar. 10, 2011) ............................................................... 29
*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) .......................................................................... 27
*In re MCorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) .................................................................................... 46
*In re Metrocraft Publ'g. Servs., Inc.*,
    39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) .............................................................................. 12
*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006) .................................................................................... 26
*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) ....................................................................................... 35
*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ....................................................................................... 18
*In re PC Liquidation Corp.*,
    383 B.R. 856, 865 (E.D.N.Y. 2008) ........................................................................................ 11
*In re Phx. Petroleum Co.*,
    278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ........................................................................ 11, 12
*In re Physiotherapy Holdings, Inc.*,
    Case No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ...................................................... 48
*In re Physiotherapy Holdings, Inc.*,
    Case No. 13-12965 (KG) (Bankr. Dec. 23, 2013) .................................................................. 33
*In re Placid Oil Co.*,
    753 F.3d 151 (5th Cir. 2014) .................................................................................................. 8
*In re Premier Int'l Holdings, Inc.*,
    Case No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) .......... 33
*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) ..................................................................................... 43

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)..................................................................................... 31, 35
*In re River Village Assocs.*,
   181 B.R. 795, 804 (E.D. Pa. 1995) ....................................................................... 11
*In re Rusty Jones, Inc.*,
   110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) ................................................... 38
*In re S&W Enter.*,
   37 B.R. 153 (Bankr. N.D. Ill. 1984) ...................................................................... 18
*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988)...................................................... 12
*In re Sea Garden Motel & Apartments*,
   195 B.R. 294 (D. N.J. 1996) .................................................................................. 43
*In re Spansion, Inc.*,
   426 B.R. 114, 144 (Bankr. D. Del. 2010) .............................................................. 29
*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) ...................................................... 38
*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................... 43
*In re U.S. Brass Corp.*,
   194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) .................................................... 12
*In re U.S. Truck Co.*,
   47 B.R. 932, 944 (E.D. Mich. 1985)...................................................................... 43
*In re Variant Holding Company, LLC*,
   Case No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) .................................... 48
*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) .............................................................................. 35, 43
*In re Walat Farms, Inc.*,
   70 B.R. 330 (Bankr. E.D. Mich. 1987) .................................................................. 46
*In re Wash. Mut., Inc.*,
   442 B.R. 314, 327 (Bankr. D. Del. 2011) ................................................... 26, 27, 29
*In re Worldcom, Inc.*,
   No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) .............. 33
*In re Zenith Elecs. Corp.*,
   241 B.R. 92, 99-100 (Bankr. D. Del. 1999)........................................................... 12
*John Hancock*,
   987 F.2d at 157 n.5 ................................................................................................. 45
*Kane v. Johns-Manville Corp.*,
   843 F.2d 636, 649 (2d Cir. 1988)........................................................................... 43
*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003)................................................................................... 11
*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950).................................................................................................. 8
*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)................................................................................................ 35
*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414, 417 (3d Cir. 1988)........................................................................... 11

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
   761 F.2d 1374 (9th Cir. 1985) ................................................................ 43
*Sequa Corp. v. Christopher (In re Christopher)*,
   249 F.3d 383 (5th Cir. 2001) .................................................................... 8
*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
   844 F.2d 1142, 1157 (5th Cir. 1988) ...................................................... 11

## STATUTES

11 U.S.C. § 101 ....................................................................................... 40
11 U.S.C. § 1114 ..................................................................................... 48
11 U.S.C. § 1122 .................................................................. 21, 22, 24, 51
11 U.S.C. § 1123 ............................................................................. passim
11 U.S.C. § 1127 ..................................................................................... 51
11 U.S.C. § 1145 ............................................................................. 17, 18
11 U.S.C. § 157 ....................................................................................... 35
11 U.S.C. § 328 ....................................................................................... 40
11 U.S.C. § 330 ....................................................................................... 40
11 U.S.C. § 365 ................................................................... 28, 29, 52
11 U.S.C. § 507 ................................................................... 44, 45, 47

## OTHER AUTHORITIES

31 S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978) ................. 22
7 Collier on Bankruptcy ......................................................................... 40
H.R. Rep. No. 95-595, at 412, reprinted in 1978 U.S.C. C.A.N. 5963, 6368 (1977) ................. 22

## RULES

Fed. R. Bankr. P. 2002 ...................................................................... 10, 11
Fed. R. Bankr. P. 3017 ................................................................ 10, 11, 19
Fed. R. Bankr. P. 3018 .................................................................... 19, 20
Fed. R. Bankr. P. 3019 .................................................................... 51, 52
Fed. R. Bankr. P. 3020 .......................................................................... 52
Fed. R. Bankr. P. 506 ................................................................ 16, 17, 18
Fed. R. Bankr. P. 6004 .......................................................................... 52
Fed. R. Bankr. P. 6006 .......................................................................... 52
Fed. R. Bankr. P. 701 ............................................................................ 18

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law in support of approval of *the Disclosure Statement for the Debtors' Prepackaged Joint Plan of Reorganization* [Docket No. 14] (the "Disclosure Statement") and confirmation of the *Debtors' Prepackaged Joint Plan of Reorganization* [Docket No. 13] (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

## PRELIMINARY STATEMENT

1.      After months of active and arm's-length prepetition negotiations, the Debtors, in consultation with their advisors, reached agreement on the terms of the Plan with the Supporting Noteholders, representing a substantial majority by principal amount of the Holders of Senior Secured Notes Claims.  The Debtors believe that the Plan is the best restructuring alternative reasonably available to these estates.

2.      The Plan is comprised of the following key elements:

- Senior Secured Notes will be exchanged for (a) Cash in the Debtors' accounts, except for Cash needed in the Reorganized Debtors' operations as mutually agreed upon by the Debtors and the Supporting Noteholders, (b) the New Secured Debt consisting of the $45 million term loan facility, (c) 100% of the New Membership Interests of Reorganized Parent, and (d) 100% of the Litigation Trust Interests in the Fuse Litigation Trust;

- allowed Other Secured Debt Claims either will be reinstated or paid in full under the Plan, or will receive the Collateral securing such claims;

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

The Debtors are in the process of proposing certain non-material amendments to the Plan in order to address comments of the Office of the United States Trustee and potentially others.

- the Holders of Class 4 General Unsecured Claims will receive no distributions under the Plan because the Debtors have pledged substantially all of their assets that have any material value as Collateral to secure the Senior Secured Notes Claims and no unencumbered assets in the Estates have any material value (taking into account the deficiency claims arising under the Senior Secured Notes and the Administrative Expense Claims that the Holders of the Senior Secured Notes are expected to assert for the diminution in the value of their Collateral during the Chapter 11 Cases); and

- Equity Interests in the Debtors will be extinguished.  However, such Equity Interests shall be reinstated upon the Effective Date and deemed issued to and held by Reorganized Parent, directly or indirectly as applicable, as such Equity Interests were held prior to the Effective Date (except for the Equity Interests of Fuse, LLC, which shall be held directly by the Reorganized Parent).

3.    Having commenced the Debtors' solicitation prepetition and provided broad notice of the Plan and an opportunity to object to all stakeholders, the Debtors are now in position to confirm the Plan and consummate their restructuring.

4.    The factual basis for confirmation of the Plan will be provided through the testimony of: (a) Miguel Roggero, Chief Executive Officer of the Debtors and (b) Asher Cohen of FTI Consulting, Inc.  The Debtors previously filed the Declaration of David Hartie of Kurtzman Carson Consultants LLC with respect to the solicitation of votes and tabulation of ballots on the Plan [Docket No. 133] (the "Voting Declaration").

## RELEVANT BACKGROUND

**I.    The Restructuring Transactions**

5.    In light of current market conditions and operating results, the Debtors could not continue to service their existing debt load, without jeopardizing their business.  The Debtors therefore proceeded on a prepetition basis to negotiate a comprehensive balance sheet restructuring that will position the Debtors for long-term success.  The Disclosure Statement and

the Plan are the products of these extensive good-faith, arm's-length negotiations between the

Debtors and the Supporting Noteholders that began in earnest months ago.  Because Holders of

Class 3 Senior Secured Notes Claims are the only impaired creditor Class not deemed to reject

under the Plan, only such Holders are entitled to vote on the Plan (the "Voting Class").

6.      The Debtors commenced the solicitation of the Plan prior to the Petition

Date and concluded the solicitation process postpetition.  The results of the solicitation reveal

that the Plan has the support of 100% of the Holders of Senior Secured Notes Claims who voted

on the Plan, representing approximately $234 million of the $242 million in outstanding

principal amount of Senior Secured Notes.

## II.      The Solicitation Process and Voting Results

7.      The Debtors commenced their prepetition solicitation of the Plan on April

18, 2019.  On such date, the Debtors caused their solicitation agent, Kurtzman Carson

Consultants LLC (the "Solicitation Agent"), to distribute packages containing the Disclosure

Statement, the Plan, the Plan Supplement, and ballots (the "Solicitation Package") to be

delivered to the Holders of Senior Secured Notes (Class 3).  The Debtors established May 9,

2019 at 4:00 p.m. (prevailing Eastern Time) as the deadline (the "Voting Deadline") for the

receipt of votes from the Holders of Claims in the Voting Class.

8.      Holders of Claims in the Voting Class that received the Solicitation

Package were directed in the Disclosure Statement and ballots to follow the instructions

contained in the ballots to complete and submit their respective ballots to cast a vote to accept or

reject the Plan.  The Disclosure Statement and applicable ballot expressly provide that such

holders needed to submit their ballots so that such ballots were actually received by the

Solicitation Agent on or before the Voting Deadline in order to be counted.  Aside from the

Voting Class, no other Holders of Claims or Equity Interests were provided with a Solicitation

Package because they are either:  (a) unimpaired under, and conclusively presumed to have

accepted, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired, entitled to

receive no distribution on account of such claims or interests under the Plan, and therefore

deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

9.      As set forth in the Voting Declaration, 100% of the Holders of Class 3

Senior Secured Notes Claims in amount and 100% in number voted to accept the Plan,

representing approximately $234 million of the $242 million in outstanding principal amount of

Senior Secured Notes.

10.      Holders of Class 1 (Other Priority Claims) and Class 2 (Other Secured

Debt Claims) are unimpaired and are presumed to have accepted the Plan.  Class 4 General

Unsecured Claims and Class 5 Equity Interests in Debtors receive no recovery on account of

their general unsecured claims or Equity Interests pursuant to the Plan, are deemed to have

rejected the Plan, and were not entitled to vote on the Plan.

## III.    The Filing of the Debtors' Chapter 11 Cases

11.      On April 22, 2019 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code.

12.      On April 23, 2019, the Debtors filed the *Debtors' Motion for Entry of an*

*Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement, (B)*

*Confirmation of Prepackaged Plan of Reorganization, and (C) the Assumption of Executory*

*Contracts and Cure Amounts; (II) Fixing the Deadlines to Object to Disclosure Statement,*

*Prepackaged Plan, and Proposed Assumption or Rejection of Executory Contracts and Cure*

*Amounts; (III) Approving (A) Prepetition Solicitation Procedures and (B) Form and Manner of*

*Notice of Commencement, Combined Hearing, Assumption of Executory Contracts and Cure*

*Amounts Related Thereto, and Objection Deadlines; (IV) Conditionally (A) Directing the United*

*States Trustee not to Convene Section 341(a) Meeting of Creditors and (B) Waiving Requirement*

*of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (V)*

*Granting Related Relief* [Docket No. 12] (the "Scheduling Motion").  Pursuant to the Scheduling

Motion, among other requests for relief, the Debtors sought a combined hearing on approval of

the Disclosure Statement and confirmation of the Plan.

        13.      On April 24, 2019, the Court entered the *Order (I) Scheduling Combined*

*Hearing on (A) Adequacy of Disclosure Statement, (B) Confirmation of Prepackaged Plan of*

*Reorganization, and (C) The Assumption of Executory Contracts and Cure Amounts; (II) Fixing*

*the Deadlines to Object to Disclosure Statement, Prepackaged Plan, and Proposed Assumption*

*or Rejection of Executory Contracts and Cure Costs; (III) Approving (A) Prepetition Solicitation*

*Procedures and (B) Form and Manner of Notice of Commencement, Combined Hearing,*

*Assumption of Executory Contracts and Cure Amounts Related Thereto, and Objection*

*Deadlines; (IV) Conditionally (A) Directing the United States Trustee not to Convene Section*

*341(a) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial*

*Affairs and Schedules of Assets and Liabilities; and (V) Granting Related Relief* [Docket No. 57]

(the "Scheduling Order").  Pursuant to the Scheduling Order, the Court (a) established May 29,

2019, at 4:00 p.m. (prevailing Eastern Time), as the deadline to object to the Disclosure

Statement and the Plan (the "Objection Deadline") and (b) approved the form and manner of the

confirmation hearing notices (the "Notice").

14.     The Debtors served the Notice in accordance with the terms of the

Scheduling Order.  The Debtors completed their solicitation on the Voting Deadline.  Thereafter,

as set forth in the Voting Declaration, the Debtors completed their final tabulation of the ballots

following a complete review of all ballots received.  As set forth above, Holders of Senior

Secured Notes (Class 3), the only Voting Class, unanimously voted to accept the Plan.

**IV.     Filing of the Plan Supplement, as Amended, and Proposed Confirmation Order**

15.     On April 23, 2019, the Debtors filed the *Plan Supplement* [Docket No.

15], which included the following exhibits: (a) New Operating Agreement of Reorganized

Parent; (b) Key Employee Retention Agreements; (c) New Secured Debt Documents; (d)

Litigation Trust Agreement; (e) Assumed Contracts; (f) Disclosure of Directors of Reorganized

Parent and Officers of Reorganized Debtors; and (g) Preserved Causes of Action of Debtors

Against Third Parties.

16.     On May 21, 2019, the Debtors filed the *Amended Plan Supplement*

[Docket No. 151], revising and updating certain of the foregoing exhibits.  The amended Plan

Supplement and the original Plan Supplement are referenced together herein as the "Plan

Supplement."

17.     The Debtors propose that the Court enter an order approving the Disclosure Statement and confirming the Plan in the form attached hereto as **Exhibit A** (the "Proposed Confirmation Order").

## V.     Objections

18.     Through a successful mediation session before the Honorable Cecelia G. Morris, the Debtors resolved the objections to the Plan and to the assumption of executory contracts asserted by AT&T Services, Inc. and affiliates, including DIRECTV, LLC (together, "AT&T") [Docket No. 165].  In consideration of the assumption of the affected contracts, the Debtors and AT&T will mutually release each other of any other claims, which matter will be addressed by separate motion.

19.     In addition, the Debtors have received objections from Complex Media, Inc. [Docket No. 158] and Freewheel Media Inc. [Docket No. 160] in the nature of cure objections, which have been resolved, and an objection from the Office of the United States Trustee (the "UST") to the adequacy of the Disclosure Statement and confirmation of the Plan, which remains pending.

20.     The Debtors provided an extension of the objection deadline to the Official Committee of Unsecured Creditors (the "Committee") through end of the day Friday, May 31, 2019.  The Debtors will supplement this brief as necessary in response to any filing by the Committee.

## ARGUMENT

21.     This brief is divided into three parts.  ***First***, the Debtors request approval

of the Disclosure Statement and a finding that the Debtors complied with the Scheduling Order.

***Second***, the Debtors set forth their arguments demonstrating that the Plan satisfies section 1129

of the Bankruptcy Code and, accordingly, request that the Court confirm the Plan.[3]  ***Third***, the

Debtors respond to pending objections of the UST.

## I.     Approval of the Disclosure Statement is Warranted.

### A.     Impaired Creditors Received Sufficient Notice of the Confirmation Hearing and the Objection Deadline.

22.     Under Bankruptcy Rule 3017(a), a hearing on the adequacy of the

disclosure statement generally requires 28 days' notice.[4]  Similarly, Bankruptcy Rule 2002(b)

provides that parties in interest should receive 28 days' notice of the objection deadline and the

hearing to consider approval of the disclosure statement.  Courts have adopted the general rule

that due process requires "notice reasonably calculated, under all the circumstances, to inform

interested parties of the pendency of a proceeding."[5]  When evaluating the notice and the

sufficiency thereof, courts will consider first, whether "the notice apprised the claimant of the

pendency of an action affecting his rights," and second, whether "the notice allowed sufficient

---

[3]  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) (stating that a court must determine whether a plan meets the requirements of section 1129 in order to confirm such plan).

[4]  Fed. R. Bankr. P. 3017(a) ("the court shall hold a hearing on at least 28 days' notice to the debtor, creditors, equity security holders and other parties in interest . . . to consider the disclosure statement and any objections or modifications thereto").

[5]  *In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

time to permit the claimant to present his objections."[6]  Whether a particular method of notice is reasonably calculated to inform interested parties is determined on a case-by-case basis.[7] Notably, the Debtors have <u>not</u> sought to shorten the periods of time provided under Bankruptcy Rules 3017(a) and 2002(b) with respect to notice of the hearing to consider approval of the Disclosure Statement and the Plan.

23.     On April 18, 2019, the Solicitation Agent transmitted copies of the Solicitation Package, which included the Plan, the Plan Supplement, and the Disclosure Statement, to the Voting Class.  The deadline for submission of ballots on the Plan was May 9, 2019, twenty-one (21) days after the commencement of the solicitation process.

24.     On April 24, 2019, the Court entered the Scheduling Order, which approved the prepetition solicitation process and set objection and reply deadlines for the hearing to consider approval of the Disclosure Statement and confirmation of the Plan, and the notice requirements related thereto.  Further, the Court approved the form of Notice and service thereof.

25.     Consistent with the Scheduling Order, the Debtors transmitted the Notice to all parties on the Debtors' creditor matrix informing the recipients of, among other things:  (a) the commencement of these chapter 11 cases; (b) the date and time set for the Confirmation Hearing; and (c) the Objection Deadline.

26.     The Notice included instructions regarding how to obtain the Plan and the Disclosure Statement through the Debtors' restructuring website, http://kccllc.net/fusemedia.

---

[6]  *Christopher v. Kendavis Holding Co. (In re Kendavis Holding Co.)*, 249 F.3d 383, 387 (5th Cir. 2001).

[7]  *In re Freedom Communications Holdings, Inc.*, 472 B.R. 257, 261 (Bankr. D. Del. 2012) (courts assess "the sufficiency of notice against the backdrop of the factual circumstances in each case").

27.     Accordingly, for the reasons set forth below, the Debtors submit that all parties affected by the Plan were provided with adequate notice of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan and the Objection Deadline.

**B.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code.**

28.     To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code, and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).

29.     Section 1125(g) of the Bankruptcy Code provides that:

> [A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

11 U.S.C. § 1125(g).

30.     Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b).

31.     Prepetition solicitations must therefore either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information" as defined in section 1125(a) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b), as applicable, of the Bankruptcy Code.

### 1.     The Disclosure Statement Contains Adequate Information.

32.     The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[8]  "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[9]  Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate

---

[8]  *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Amer. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) ("[S]ection 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

[9]  11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources).

information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[10]

33.    Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

i.    the events which led to the filing of a bankruptcy petition;

ii.    the relationship of a debtor with the affiliates;

iii.    a description of the available assets and their value;

iv.    the anticipated future of the company;

v.    the source of information stated in the disclosure statement;

vi.    the present condition of a debtor while in chapter 11;

vii.    the claims asserted against a debtor;

viii.        the estimated return to creditors under a chapter 7 liquidation;

ix.    the future management of a debtor;

x.    the chapter 11 plan or a summary thereof;

xi.    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

xii.    the information relevant to the risks posed to claimants under the plan;

---

[10] *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court."); *In re River Village Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (same); *In re Phx. Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes adequate information in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) (same).

xiii.     the actual or projected realizable value from recovery of

preferential or otherwise voidable transfers;

xiv.     the litigation likely to arise in a nonbankruptcy context; and

xv. the tax attributes of a debtor.[11]

34.     The Disclosure Statement contains adequate information.  For instance, the Disclosure Statement contains descriptions and summaries of, among other things: (a) both the Plan and the Debtors' related reorganization efforts; (b) certain events and relevant negotiations preceding the commencement of these chapter 11 cases; (c) the key terms of the restructuring; (d) risk factors affecting the Plan, including risks related to the restructuring transactions contemplated under the Plan, risks related to the Debtors' business, and risks related to the reorganized Debtors; (e) a liquidation analysis setting forth the estimated return that holders of Claims and Equity Interests would receive in a hypothetical chapter 7 case; (f) financial projections and valuation information that would be relevant to a creditor's determination of whether to accept or reject the Plan; and (g) federal tax law consequences of the Plan.

---

[11] *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics is not necessary in every case.  *U.S. Brass*, 194 B.R. at 425. Moreover, in evaluating the adequacy of a particular disclosure statement, the court should take account of the expertise and resources (including outside advisors and relevant information already possessed or publicly available) of the claimants whose votes are being solicited.  *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999).

2.    **The Disclosure Statement Demonstrates that the Debtors Complied with Applicable Nonbankruptcy Law.**

35.    Under section 1126(b) of the Bankruptcy Code (cited above), prepetition solicitation must either comply with generally applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information" under section 1125 of the Bankruptcy Code. The Debtors submit that their prepetition solicitation with respect to the Plan is exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and similar state securities or "blue sky" laws ("Blue Sky Laws").

36.    The Debtors are relying on sections 3(a)(9) and section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder to exempt from registration under the Securities Act and Blue Sky Laws the offer of New Membership Interests of Reorganized Parent on account of the treatment of Claims in connection with the Solicitation and the Plan. The Company is also relying on section 1145 of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of the New Membership Interests of Reorganized Parent on account of the treatment of Claims in connection with the Plan. Further, to the extent the Litigation Trust Interests are deemed to be "securities," the issuance of such interests is exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act.

37.    Section 3(a)(9) of the Securities Act provides an exemption from registration when an issuer issues new securities in exchange for its own outstanding securities,

such exchange is made only to existing security holders, no compensation or other remuneration is paid for soliciting such exchange offer, and the existing security holders are not asked to part with anything of value except the outstanding securities.  Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" within the meaning of U.S. securities laws.

38.     The Debtors do not have any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchange of the Senior Secured Notes, except for reasonable, actual and necessary out-of-pocket expenses of mailing.  In addition, none of its financial advisors engaged to provide financial analysis and assist the Debtors with addressing the financial aspects of the restructuring or any broker, dealer, salesperson, agent or any other person has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the Solicitation or the Plan (and the transactions contemplated thereby).  Further, the Debtors believe that many if not all of the Supporting Noteholders receiving the New Membership Interests under the Plan will be accredited investors.

39.     The Debtors are relying on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act to exempt the issuance of the New Membership Interests of Reorganized Parent on account of the treatment of

15

Claims in connection with the Plan.  Section 1145(a)(1) of the Bankruptcy Code provides that

registration requirements of Section 5 of the Securities Act and any applicable Blue Sky Laws

will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of

reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of

securities hold a claim against, an interest in or claim for administrative expense against the

debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or

are reissued principally in such exchange and partly for cash and property.

   40. Hence, the Debtors submit that they have complied with applicable

nonbankruptcy law in accordance with the requirements of section 1126(b) of the Bankruptcy

Code.

   **3.**  **The Ballots Used to Solicit Holders of Claims Entitled
to Vote on the Plan Complied with Bankruptcy Rules.**

   41. Bankruptcy Rule 3017(d) requires the Debtors to transmit a form of ballot,

which substantially conforms to Official Form No. 314, only to "creditors and equity security

holders entitled to vote on the plan."  Bankruptcy Rule 3018(c) provides that "[a]n acceptance or

rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the

creditor or equity holder or an authorized agent, and conform to the appropriate Official Form."

The forms of ballots used here complied with the Bankruptcy Rules and are consistent with

Official Form No. 314.  Further, no party has objected to the sufficiency of the ballots.  Based on

the foregoing, the Debtors submit that they satisfied the requirements of Bankruptcy Rules

3017(d) and 3018(c), and this Court has already approved, pursuant to the Scheduling Order, the

form of ballots that were used prepetition.

**4.      The Voting Record Date Complied with Bankruptcy Rules.**

42.      In a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to receive ballots and related solicitation materials are to be determined "on the date specified in the solicitation."  Fed. R. Bankr. 3018(b).  As clearly specified in the Disclosure Statement and ballots, April 5, 2019 was the Voting Record Date.  No party in interest objected to the Voting Record Date, which was approved by this Court in the Scheduling Order.

**5.      The Debtors' Solicitation Period Complied with Bankruptcy Rule 3018(b).**

43.      The Debtors' solicitation period complied with Bankruptcy Rule 3018(b).  First, as set forth above, the Plan and Disclosure Statement were transmitted to all Holders of Senior Secured Notes Claims (Class 3).  Second, the solicitation period, which lasted from April 18, 2019 through May 9, 2019, was reasonable and appropriate under the circumstances and provided ample opportunity for creditors to cast their ballots.  As set forth above, the Holders of Claims in the Voting Class voted unanimously to accept the Plan, and none of them objected to the length of the solicitation period.  Accordingly, the Debtors submit that they satisfied the requirements of Bankruptcy Rule 3018(b), as this Court also concluded in the Scheduling Order.

**6.      The Debtors' Vote Tabulation Was Appropriate.**

44.      As described in the Scheduling Motion, the Debtors used standard tabulation procedures in tabulating creditor votes.  Specifically, the Solicitation Agent reviewed all ballots received through May 9, 2019, in accordance with the procedures described in the Scheduling Motion and the Disclosure Statement.  The Debtors respectfully submit that the

results of the Debtors' tabulation of votes confirm that, with respect to Holders of Senior Secured Notes Claims (Class 3) (the only Voting Class under the Plan), the requisite majorities in amount and number of voting claims and interests voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

> **7.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

45.     Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

46.     As set forth the Scheduling Motion, the Debtors and the Supporting Noteholders at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

### A.  The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

47.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification

of claims and the contents of a plan of reorganization, respectively.[12]  As explained below, the

Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well

as other applicable provisions.

> **8.    The Plan Satisfies the Classification
> Requirements of Section 1122 of the Bankruptcy Code.**

48.    The classification requirement of section 1122(a) of the Bankruptcy Code

provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan
> may place a claim or an interest in a particular class only if
> such claim or interest is substantially similar to the other
> claims or interests of such class.

11 U.S.C. § 1122(a).

49.    For a classification structure to satisfy section 1122 of the Bankruptcy

Code, not all substantially similar claims or interests need to be grouped in the same class.[13]

Instead, claims or interests designated to a particular class must be substantially similar to each

other.[14]

50.    The Plan's classification of Claims and Equity Interests satisfies the

requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity

Interests into five (5) separate Classes, with each Class differing from the Claims and Equity

---

[12]  31 S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at
412, reprinted in 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill.
1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly
broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing
Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[13]  *See Armstrong World Indus., Inc.*, 348 B.R. at 159.

[14]  *Id.*

Interests in each other Class in a legal or factual nature or based on other relevant criteria.[15]
Specifically, the Plan provides for the separate classification of Claims and Equity Interests into
the following Classes:

  a.  <u>Class 1</u>:  Other Priority Claims;

  b.  <u>Class 2</u>:  Other Secured Debt Claims;

  c.  <u>Class 3</u>:  Senior Secured Notes Claims;

  d.  <u>Class 4</u>:  General Unsecured Claims; and

  e.  <u>Class 5</u>:  Equity Interests in Debtors.

        51.    Claims and Equity Interests assigned to each particular Class described
above are substantially similar to the other Claims and Equity Interests in such Class.  In
addition, valid business, legal, and factual reasons justify the separate classification of the
particular Claims or Equity Interests into the Classes created under the Plan, and no unfair
discrimination exists between or among holders of Claims and Equity Interests.  Namely, the
Plan separately classifies the Claims because each holder of such Claims or Equity Interests may
hold (or may have held) rights in the Estates legally dissimilar to the Claims or Equity Interests
in other Classes.  For example, Claims (rights to payment) are classified separately from Equity
Interests (representing ownership in the business).  Secured Claims are classified separately from
unsecured Claims because the Debtors' obligations with respect to the former are secured by
collateral.  Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

---

[15]  *See* Plan at Article III.

9. **The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

52.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan filed by a corporate debtor must satisfy.  The Plan satisfies each of these requirements.

       a.     *Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).*

53.     Article III.F of the Plan properly designates classes of Claims and Equity Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

       b.     *Specification of Unimpaired Classes (§ 1123(a)(2)).*

54.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III.F of the Plan that is Unimpaired.

       c.     *Treatment of Impaired Classes (§ 1123(a)(3)).*

55.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this requirement by setting forth the treatment of each Class in Article III.F of the Plan that is Impaired.

       d.     *Equal Treatment within Classes (§ 1123(a)(4)).*

56.     Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The

Plan meets this requirement because holders of Allowed Claims or Equity Interests will receive the same rights and treatment as other holders of Allowed Claims or Equity Interests within such Holders' respective class.

e.     *Means for Implementation (§ 1123(a)(5)).*

57.     Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  The Plan satisfies this requirement because Article V. of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented.  Among other things, Article V of the Plan:

a.   provides for the cancellation of all existing Equity Interests in the Debtors, except for the Equity Interests in Fuse, LLC, which shall be held directly by Reorganized Parent;

b.   authorizes the issuance of the New Membership Interests in Reorganized Parent;

c.   authorizes the Reorganized Debtors' consummation of the New Secured Debt;

d.   provides for the implementation of the Key Employee Retention Agreements;

e.   authorizes the Debtors and/or Reorganized Debtors to take all actions necessary to effectuate the Plan, including those actions necessary to effect the Restructuring Transactions;

f.   authorizes the adoption of and entry into the Plan Documents;

g.  provides for the vesting of Estate assets in the Reorganized Debtors;

h.  provides for the preservation and vesting of certain Causes of Action in the Fuse Litigation Trust; and

i.  provides for the appointment of the members of the New Board and the officers, directors, and/or managers of each of the Reorganized Debtors.

   f. *Issuance of Non-Voting Securities (§ 1123(a)(6)).*

58. Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.  By its own terms, section 1123(a)(6) applies only to corporations.  The Plan provides that the Amended Organizational Documents of Reorganized Parent will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. *See* Article V.N. of the Plan.  The remaining Debtors are exempt from the requirements of section 1123(a)(6) of the Bankruptcy Code because they are not corporations.  As such, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

   g. *Directors and Officers (§ 1123(a)(7)).*

59. Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."  Article V.K. of the Plan outlines the manner of selecting the members of the New Board of Reorganized Parent, which accords with applicable state law, the Bankruptcy Code, and

the interests of creditors and equity security holders, and public policy.  Additionally, the

members of the New Board of Reorganized Parent and the officers of the Reorganized Debtors

were disclosed in the Plan Supplement.  Accordingly, the Plan satisfies section 1123(a)(7) of the

Bankruptcy Code, and no party has asserted otherwise.

> **10.    The Plan Complies with the Discretionary**
> **Provisions of Section 1123(b) of the Bankruptcy Code.**

60.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary

provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b)

of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of

claims or interests; (b) provide for the assumption or rejection of executory contracts and

unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging

to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with

the applicable provisions of chapter 11.[16]

61.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.

Specifically, under Article III.F of the Plan, Classes 1 and 2 are Unimpaired because the Plan

leaves unaltered the legal, equitable, and contractual rights of the holders of Claims within such

Classes.[17]  Classes 3 is Impaired because the Plan modifies the rights of the holders of Claims

within such Class as contemplated in section 1123(b)(1) of the Bankruptcy Code.[18]  Classes 4

and 5 are also Impaired because these Classes will not receive any distribution on account of

---

[16]  11 U.S.C. § 1123(b)(1)–(3), (6).

[17]  *See* Plan at Article III.

[18]  *See id.*

General Unsecured Claims or the Equity Interests in Debtors in such classes.  In addition and under section 1123(b)(2) of the Bankruptcy Code, Article VII.A of the Plan provides for the rejection of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, other than those that have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto, or have been identified for assumption.  Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.  No party has asserted that the Plan does not comply with section 1123(b).

> **11.    The Plan Complies with**
> **Section 1123(d) of the Bankruptcy Code.**

62.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

63.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of cures under each Executory Contract and Unexpired Lease identified to be assumed under the Plan by payment of the cure, if any, on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Article VII of the Plan.[19]  In accordance with Article VII.D of the Plan and section 365 of the Bankruptcy Code, the Debtors will satisfy any Cures under each Executory Contract and Unexpired Lease to be assumed under the Plan on the Effective Date or on such other terms as the parties to such

---

[19]  *See* Plan at Article VII.D.

Executory Contracts or Unexpired Leases otherwise agree.  No party has asserted that the Plan

does not comply with section 1123(d).

> ### 12.    The Plan's Release, Exculpation, and Injunction
> ### Provisions Comply with the Bankruptcy Code.

64.    The Plan includes certain Debtor and third-party releases, an exculpation

provision, and an injunction provision.  These provisions comply with the Bankruptcy Code and

prevailing law because, among other things, they are the product of extensive good faith, arm's

length negotiations and were a material inducement for the Supporting Noteholders to vote in

favor of the Plan.  No Holder of a Claim against, or Equity Interest in, any Debtor has objected to

the Plan's release, exculpation, and injunction provisions.  As addressed further in Section III

below, the UST has objected to the Debtor release.  The remaining third-party releases,

exculpation, and injunction provisions are addressed in this section.

> a.   *The Third-Party Release is Appropriate and Complies with the*
> *Bankruptcy Code.*

65.    Article XII of the Plan contains a third-party release provision (the "Third-

Party Release") that should be approved pursuant to Third Circuit law.  The Third-Party Release

provides that each Released Party shall be released from claims and causes as set forth in the

Plan.[20]

66.    Courts in this jurisdiction routinely approve such release provisions if they

are consensual, and even non-voting creditors may be "deemed" to consent to provide releases of

---

[20]  The "Released Parties," as defined in the Plan, means, collectively, and in each case in its capacity as such: the
following parties each in its capacity as such:  (a) the Debtors; (b) the Debtors' current and former directors and
officers; (c) the Reorganized Debtors; (d) the Senior Secured Notes Trustee; (e) the Supporting Noteholders; (f) the
Holders of the Senior Secured Notes Claims who vote in favor of the Plan; and (g) the Related Persons of each of (a)
through (f) of the foregoing.

non-debtor third parties in the context of a chapter 11 plan, particularly where the creditor-releasors' claims are unimpaired by the Plan.[21]  Courts have also held that third party releases may be binding upon unimpaired holders of claims without their affirmative consent.[22]

67.    The Third-Party Release satisfies this standard.  **First**, the Plan, including the Third-Party Release, was unanimously accepted by the Voting Class under the Plan (Holders of Senior Secured Notes Claims (Class 3)).  Of the remaining Classes, (i) Class 1 and Class 2 are Unimpaired and deemed to consent to the Plan and (ii) Class 4 and Class 5 are deemed to reject the Plan and will receive no distribution under the Plan.  The Third-Party Release does not apply to the Holders of Claims in Class 4 and 5.  It only applies to Holders of Claims who are Unimpaired under the Plan and Holders of Claims in Class 3 who do not vote to reject the Plan and to opt-out of the Third Party Release.

68.    Moreover, the Debtors provided extensive notice of these chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan to all parties in

---

[21] *See Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-05 (Bankr. D. Del. 2013) (approving as consensual third-party release that applied to unimpaired holders of claims deemed to accept the plan because the releasing creditors received consideration by payment in full and did not object to the releases); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (finding "the silence of the unimpaired classes . . . was persuasive" in determining that releases of third parties by unimpaired creditors who did not object to the releases were permissible).

[22] In *In re Indianapolis Downs, LLC*, the court confirmed a plan whereby creditors who either: (i) voted to reject or accept the plan and failed to "opt-out"; (ii) failed to return their ballots; or (iii) whose claims were unimpaired, and therefore, were not entitled to vote consented to the plan's third-party release provision.  486 B.R. 286, 305 (Bankr. D. Del. 2013); *see also In re Conseco Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding a release provision binding unimpaired creditors who abstained from voting on the plan and did not otherwise opt out to be consensual); *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (KG) (Bankr. D. Del. Nov. 3, 2011) (confirming plan that treated holders of claims and interest that did not vote to reject plan or were not members of a class deemed to reject plan as releasing parties); *In re Majestic Star Casino, LLC*, No. 09-14136 (KG) (Bankr. D. Del. Mar. 10, 2011) (confirming plan that treated holders of claims and interests that did not vote to accept plan as releasing parties).

interest.  Parties who were entitled to vote on the Plan and who voted to reject the Plan were afforded an "opt out" of the Third-Party Releases.  The release provisions in avoiding the "opt out" mechanism of the Plan were conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, and the Ballots.  And there was specific mention of such Third-Party Releases and the requirement to object to such releases in the notice of commencement sent by the Debtors to all parties in interest in these cases.

69.      **Second**, the Third-Party Release is integral to the Plan and a condition of the global settlement embodied thereby – the provisions of which were vigorously negotiated prepetition with the goal of achieving a "fresh-start" for the Debtors and a clean break for the Debtors' stakeholders.

70.      **Third**, the Third-Party release was given for consideration.  All parties in interest benefit from the Restructuring Transactions contemplated by the Plan which will greatly improve the Debtors' liquidity profile and position them for future success.  The alternative is the potential for a value-destructive, fire-sale liquidation.

71.      Accordingly, the Third-Party Release is justified under Third Circuit law and the circumstances here, and should be approved.

b.      *The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code.*

72.      Article XII.B of the Plan provides that each Exculpated Party[23] shall be released and exculpated from any Cause of Action arising out of acts or omissions in connection

---

[23]  As revised, collectively:  (a) the Debtors, (b) the Reorganized Debtors, (c) and their Related Persons who served in such capacity during the Chapter 11 Cases.

with these chapter 11 cases and certain related transactions, except for acts or omissions that are

found to have been the product of actual fraud or gross negligence (the "Exculpation Provision").

73. At the outset, it is important to underscore the difference between the

Third-Party Release and the Exculpation Provision. Unlike the Third-Party Release, the

Exculpation Provision has been revised to limit it to estate fiduciaries (*i.e.*, the Debtors and their

Related Persons who served in such capacity during the Chapter 11 Cases) and does not affect

the liability of third parties *per se*, but rather sets a standard of care of gross negligence or actual

fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the

Debtors' restructuring.[24]  A bankruptcy court has the power to approve an exculpation provision

in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds

that the plan has been proposed in good faith.[25]  As such, an exculpation provision represents a

legal conclusion that flows inevitably from several different findings a bankruptcy court must

reach in confirming a plan.[26]  Once the court makes its good faith finding, it is appropriate to set

the standard of care of the parties involved in the formulation of that chapter 11 plan.[27]

Exculpation provisions, therefore, appropriately prevent future collateral attacks.  Here, the

Exculpation Provision is likewise appropriate and vital because it provides protection to those

---

[24] *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[25] *See* 11 U.S.C. § 1129(a)(3).

[26] *See* 11 U.S.C. § 157(b)(2)(L).

[27] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

estate fiduciaries who served to further the restructuring process and falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

74. Further, the Exculpation Provision represents an integral piece of the overall settlement embodied by the Plan and, as revised, is narrowly tailored to exclude acts of gross negligence or willful misconduct, and relates only to acts or omissions in connection with, or arising out of the administration of the Debtors' chapter 11 cases and their restructuring. Accordingly, the Exculpation Provision should be approved.

       c.    *The Injunction Provision is Appropriate and Complies with the Bankruptcy Code.*

75. The injunction provision set forth in Article XII.C. of the Plan (the "Injunction Provision") merely implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Equity Interests discharged, released, exculpated, or settled under the Plan. The Injunction Provision is thus a key provision of the Plan because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan. Further, the injunction provided for in the Plan is consensual to the extent that it is not the subject of a pending objection. As such, the Court should approve the Injunction Provision.[28]

---

[28] *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. Dec. 23, 2013) (stating that injunctions in the plan were necessary to preserve and enforce the releases and exculpations granted by the plan and were narrowly tailored to achieve that purpose); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Chi. Newspaper Liquidation Corp.*, Case No. 09-11092 (CSS) (Bankr. D. Del. Aug. 17, 2011) (same); *In re Premier Int'l Holdings, Inc.*, Case No. 09-12019 (CSS), 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (same).

### B. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

76.     The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the plan proponent comply with the applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[29]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 13. The Debtors Complied with Section 1125 of the Bankruptcy Code.

77.     As discussed in Part I of this memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code, and no party has asserted otherwise.

### 14. The Debtors Complied with Section 1126 of the Bankruptcy Code.

78.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.

---

[29]  *See In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

79.     As set forth in Part I of this memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the holders of Allowed Claims in Class 3 Senior Secured Notes Claims— the only class entitled to vote on the Plan.  The Debtors did not solicit votes from holders of Claims and Equity Interests in Classes 1, 2, 4 and 5, because holders of such Claims and Equity Interests are either Unimpaired and deemed to accept the Plan under section 1126(f) or Impaired and conclusively presumed to have rejected the Plan under section 1126(g).  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only holders of Claims in Class 3 were entitled to vote to accept or reject the Plan.

80.     As described above, Class 3 voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.  Based upon the foregoing, the Debtors submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

**C.     The Plan was Proposed in Good Faith (§ 1129(a)(3)).**

81.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[30]  To determine whether a

---

[30] *See, e.g., PWS Holding Corp.*, 228 F.3d at 242 (*quoting In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997 (*quoting Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove*, Cir. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ; *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[31]

82.    The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[32]  Here, the Plan was proposed in good faith in order to enable the Debtors to right-size their balance sheet, preserve the value of the Debtors as a going concern (which inures to the benefit of stakeholders enterprise-wide), and position the Debtors for long-term success. Moreover, the Plan is the product of extensive arm's-length negotiations among the Debtors and the Supporting Noteholders, and is supported by virtually all Holders of Senior Secured Notes Claims.  The Plan's overwhelming support by the Holders of Senior Secured Notes Claims (Class 3), is strong evidence that the Plan is likely to succeed.  Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy law.  No party has asserted that the Plan does not comply with section 1129(a)(3) of the Bankruptcy Code.

> **D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

83.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.  Courts have

---

[31]  *See, e.g., T-H New Orleans*, 116 F.3d at 802 (*quoting In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

[32]  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[33]

84.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Debtors submit that payments of Professional Fee Claims are the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these chapter 11 cases, and the Debtors may not pay Professional Fee Claims absent Court approval.  Further, all such Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code.  Article II.A of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than thirty (30) days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.  No party has asserted that the Plan does not comply with section 1129(a)(4) of the Bankruptcy Code.

### E.     The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).

85.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any

---

[33] *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

compensation for such insider.  Additionally, the Bankruptcy Code provides that the appointment

or continuance of such officers and directors be consistent with the interests of creditors and

equity security holders and with public policy.[34]  The "public policy requirement would enable

[the court] to disapprove plans in which demonstrated incompetence or malevolence is a

hallmark of the proposed management."[35]

86.    The Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.  In

the Plan and the Plan Supplement, the Debtors identified the members of the New Board of the

Reorganized Parent and the officers and directors of each of the Reorganized Debtors to serve as

of the Effective Date.

87.    The Reorganized Debtors' appointment of officers and directors is

"consistent with the interests of creditors and equity security holders and with public policy."[36]

The proposed officers and directors of the Reorganized Parent of the Reorganized Debtors have

significant knowledge and business and industry experience, are competent, and will give the

Reorganized Debtors both continuity and fresh insights into running their businesses.[37]  The

Debtors believe control of the Reorganized Debtors by the proposed individuals will be

beneficial, and no party in interest has objected to the Plan on these grounds.  Therefore, the

requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

---

[34]  *See* 11 U.S.C. § 1129(a)(5)(A)(ii).

[35]  *See* 7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2012).

[36]  11 U.S.C. § 1129(a)(5)(A)(ii).

[37]  *See In re Rusty Jones, Inc.,* 110 B.R. 362, 372, 375 (Bankr. N.D. Ill. 1990) (stating that 1129(a)(5) not satisfied where management had no experience in the debtor's line of business); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149–50 (Bankr. S.D.N.Y. 1984) (continuation of debtors' president and founder, who had many years of experience in the debtors' businesses, satisfied section 1129(a)(5)).

88.     Finally, the Debtors satisfied section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors sufficiently disclosed the identity of all insiders that the Reorganized Debtors will employ or retain and the nature of any compensation for such insiders in compliance with the Bankruptcy Code.[38]  No party has asserted that the Plan does not comply with section 1129(a)(5) of the Bankruptcy Code.

### F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).

89.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases.

### G.     The Plan is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

90.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

With respect to each impaired class of claims or interests—

(A)     each holder of a claim or interest of such class—

(i)      has accepted the plan; or

(ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less

---

[38] *See Armstrong World Indus.*, 348 B.R. at 165 (finding disclosure of identities and nature of compensation of persons to serve as directors and officers on the effective date sufficient for section 1129(a)(5) of the Bankruptcy Code).

than the amount that such holder would so receive or retain if the debtor were

liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

11 U.S.C. § 1129(a)(7).

91.     The best interests test applies to individual dissenting holders of impaired

claims and interests rather than classes, and is generally satisfied through a comparison of the

estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that

debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[39]  As

noted elsewhere, Classes 1 and 2 are Unimpaired, and thus none of the Holders of Claims or

Equity Interests in those Classes can invoke section 1129(a)(7).  The only impaired classes are

Classes 3, 4 and 5, which are comprised of the Voting Class, General Unsecured Claims and

Equity Interests in the Debtors.

92.     As set forth in the Disclosure Statement[40] and as will be established at the

Confirmation Hearing, the Debtors, with the assistance of their advisors, prepared a liquidation

analysis that estimates recoveries for members of each class under the Plan.  The projected

recoveries under the Plan are equal to or in excess of the recoveries estimated in a hypothetical

chapter 7 liquidation.[41]  The liquidation analysis prepared by the Debtors estimates that creditors

will realize approximately $16.9 million to $21.5 million in a chapter 7 liquidation, which

---

[39] *See Bank of Amer. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *Century Glove*, 1993 WL 239489, at *7; *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[40] *See* Disclosure Statement at Ex. C.

[41] *Id.*

translates into a recovery of 6% to 8% for Holders of Senior Secured Notes Claims and no

recovery for Holders of General Unsecured Claims.  By contrast, under the Plan, Holders of

Senior Secured Notes Claims are projected to realize a substantially greater recovery than

liquidation value.

93.     Accordingly, under the foregoing analysis, the Plan complies with section

1129(a)(7), and no party has asserted otherwise.

> **H.     The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

94.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of

claims or interests must either accept a plan or be unimpaired under a plan.

95.     Of the impaired Classes of Claims and Equity Interests under the Plan,

Class 3 voted to accept the Plan.  Holders of General Unsecured Claims in Class 4 and Holders

of Equity Interests in Class 5 were deemed to have rejected the Plan and thus were not entitled to

vote.  While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to

the Impaired Class that was deemed to reject, the Plan is confirmable nonetheless because it

satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

> **I.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

96.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority

claims be paid in full on the effective date of a plan and that the holders of certain other priority

claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the

Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy

Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

97.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Expense Claim, unless otherwise agreed, will be paid in full on account of such Allowed Administrative Expense Claim.  Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, Article II.B. of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each holder of an Allowed Priority Tax Claim, unless otherwise agreed, will be paid in full on account

of such Allowed Priority Tax Claim.  Thus, the Debtors submit that the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

> ### J.  At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

98.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.

99.    As set forth above, holders of non-insider Senior Secured Notes Claims (Class 3)—which is impaired under the Plan—voted to accept the Plan.  The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

> ### K.  The Plan is Feasible (§ 1129(a)(11)).

100.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[42]  Rather, a debtor must provide only a reasonable assurance of success.[43]  There is a relatively low threshold of proof necessary

---

[42]  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

[43]  *See Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

to satisfy the feasibility requirement.[44]  As demonstrated below, the Plan is feasible within the

meaning of section 1129(a)(11) of the Bankruptcy Code.

101.    As will be established at the Confirmation Hearing, the Plan is feasible.

First, as set forth in the Disclosure Statement, the Debtors thoroughly analyzed their ability post-

confirmation to meet their obligations under the Plan and continue as a going concern without

the need for further financial restructuring.  Second, as set forth in the Disclosure Statement, the

Debtors prepared projections of their financial performance through fiscal year 2020.  These

financial projections demonstrate the Debtors' ability to meet their obligations under the Plan.

And third, upon the Effective Date, the Debtors expect to have sufficient funds to make all

payments contemplated by the Plan, both from cash on hand and receipts from operations.  Thus,

the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and no party has asserted

otherwise.

**L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

102.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll

fees payable under section 1930 of title 28 [of the United States Code], as determined by the

court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code

provides that "any fees and charges assessed against the estate under [section 1930 of] chapter

123 of title 28" are afforded priority status.

---

[44]  *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code
does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy
§ 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea
Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D.
Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

103.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because

Article XV.B of the Plan provides that all such fees and charges, to the extent not previously

paid, will be paid when due or as soon thereafter as practicable until these chapter 11 cases are

closed, and no party has asserted otherwise.

**M.    All Retiree Benefits, if Applicable, Will Continue Post-Confirmation (§ 1129(a)(13)).**

104.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree

benefits continue post-confirmation at any levels established in accordance with section 1114 of

the Bankruptcy Code.  To the extent section 1129(a)(13) of the Bankruptcy Code is applicable to

the Debtors, the Reorganized Debtors will continue to pay, in accordance with applicable law,

any retiree benefits (as defined in section 1114 of the Bankruptcy Code) for the period during

which the Debtors have obligated themselves to provide such benefits, except as otherwise

provided in the Key Employee Retention Agreements.  Consequently, the requirements of

section 1129(a)(13) of the Bankruptcy Code are satisfied under the Plan.

**N.    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

105.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of

domestic support obligations.  Since the Debtors are not subject to any domestic support

obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.

Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor

is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an

"individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.

Finally, each of the Debtors are a moneyed, business, or commercial corporation, and therefore,

section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a

corporation or trust that is not a moneyed, business, or commercial corporation or trust be made

in accordance with any applicable provisions of nonbankruptcy law, is not applicable to these

chapter 11 cases.

O.    **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

106.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable

requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of

the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section

1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by

all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the

plan proponent must show that the plan does not "discriminate unfairly" and is "fair and

equitable" with respect to the non-accepting impaired classes.[45]

107.    A plan is "fair and equitable" with respect to an impaired class of claims

or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority"

rule.[46]  This requires that an impaired rejecting class of claims or interests either be paid in full or

that a class junior to the impaired accepting class not receive any distribution under a plan on

---

[45] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[46] *See Bank of Amer.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

account of its junior claim or interest.[47]  The Debtors submit that the Plan satisfies the "fair and

equitable" requirement notwithstanding that Class 4 General Unsecured Claims and Class 5

Equity Interests in Debtors are deemed to reject the Plan.

108.     Further, courts will deny confirmation if a plan undervalues a debtor and

would result in senior creditors receiving more than full compensation on account of their

allowed claims, at the expense of junior creditor or equity holders.[48]

109.     Here, Holders of Class 3 Senior Secured Notes Claims are not receiving a

full recovery under the Plan.  The Debtors estimate that the total enterprise value of the

Reorganized Debtors to be substantially greater than liquidation value, but substantially less than

the face amount of the Senior Secured Notes Claims.  Hence, it is entirely fair and equitable and

not unfairly discriminatory for Holders of Class 4 General Unsecured Claims and Class 5 Equity

Interests in Debtors to receive no recovery under the Plan.

**P.     The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

110.     The purpose of the Plan is not to avoid taxes or the application of section 5

of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested

that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the

requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

---

[47]  *See id.*

[48]  *See In re Exide Technologies*, 303 B.R. 48, 66 (Bankr. D. Del. 2003) (Carey, J.) (finding that plan undervalued debtors and denying confirmation); *In re MCorp Fin., Inc.,* 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (Clark, J.) (denying confirmation under section 1129(b) where plan failed to establish upper limit to creditor distributions at the expense of rejecting stockholders); *In re Future Energy Corp.*, 83 B.R. 470, 495 n.39 (Bankr. S.D. Ohio 1988) ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard."); *In re Walat Farms, Inc.*, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) (noting that it "would do violence to the 'fair and equitable' standard by paying [the creditor] more than its claim").

### Q.     Modifications to the Plan.

111.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation as long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent

of a plan files the plan with modifications with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

accepted by all creditors and equity security holders who have previously accepted the plan if the

court finds that the proposed modifications do not adversely change the treatment of the claim of

any creditor or the interest of any equity security holder.[49]

### R.     Good Cause Exists to Waive the Stay of the Confirmation Order.

112.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is

stayed until the expiration of 14 days after the entry of the order, unless the Court orders

otherwise."  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing

the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to

assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.

Each rule also permits modification of the imposed stay upon court order.

113.    The Debtors submit that good cause exists for waiving and eliminating

any stay of the Proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and

---

[49]  *See, e.g.*, *In re Global Safety Textiles Holdings LLC*, Case No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, Case No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

6006 so that the Proposed Confirmation Order will be effective immediately upon its entry.[50]  As addressed above, these chapter 11 cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.

114.    Under the circumstances, there is no reason for further delay if the Debtors, with the consent of the Supporting Noteholders, determine that declaring the effectiveness of the Plan should occur immediately.  The Debtors believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## III.    The UST's Objections to the Plan Should Be Overruled to the Extent Such Objections Are Not Consensually Resolved Prior to the Confirmation Hearing

115.    As noted above, the UST has objected to the adequacy of the Disclosure Statement and confirmation of the Plan.

116.    **UST Disclosure Statement Objections.**  The UST takes issue with the fact that the original Plan Supplement only listed Causes of Action against AT&T as specifically identified Causes of Action against third parties that were to be preserved under the Plan. Although all Causes of Action against AT&T have now been settled, at the time that the original Plan Supplement was prepared, those were the only affirmative Causes of Action known to the

---

[50]  *See, e.g.*, *In re Article Sentinel, Inc.*, Case No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court*) In re Variant Holding Company, LLC*, Case No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) (same); *In re Physiotherapy Holdings, Inc.*, Case No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, Case No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, Case No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, Case No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same); *In re CHL, Ltd.*, Case No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) (same).

Debtors that they specifically wanted to preserve.  Of course, as clearly provided in the Plan and the Disclosure Statement, all other Causes of Actions vest with the Reorganized Debtors or the Fuse Litigation Trust, as applicable, on the Effective Date.  This point was addressed in the amended Plan Supplement filed on May 21, 2019 (more than one week prior to the deadline to object to the Plan), to pick up the definition of Litigation Claims in the Plan.[51]  Contrary to the UST's position, no holder of General Unsecured Claims should be lulled into believing that Avoidance Actions are waived under the Plan because the Plan provides that such Causes of Action are preserved.  There is no ambiguity on this point and certainly none that has been raised by any economic stakeholder.

117.    The UST also objects that the Disclosure Statement does not specifically discuss the nature, amount, or value of the claims that are being transferred to the Fuse Litigation Trust.  However, the Debtors are not required to analyze every possible claim that may belong to their estates and assess a value to it in order to confirm a plan.  That would make every confirmation process, especially a prepackaged one, inherently unwieldy and impractical to manage.  The Debtors do not yet have an analysis of all of their potential claims.  The Debtors specifically intended to preserve their Causes of Action against AT&T, but those claims have now been resolved.  All other estate claims will be preserved through the Plan, whatever the value of such claims may be.

118.    There is also nothing to disclose about the possibility of a potential sale at some unspecified point in the future and post-Effective Date that the Holders of the New

---

[51]  The amended Plan Supplement has now been added to the website for the Debtors' claims and solicitation agent, Kurtzman Carson Consultants, LLC.

Membership Interests in the Reorganized Parent may decide to embark upon.  Any such sale

process has not yet commenced.

119.    **UST Plan Objections.**  The UST's objections to the Plan are focused on

the release to be provided by the Debtors to various non-Debtor parties and the need for

evidentiary support.  Specifically, the "Released Parties" under the Plan consist of, collectively,

and in each case in its capacity as such:  (a) the Debtors; (b) the Debtors' current and former

directors and officers; (c) the Reorganized Debtors; (d) the Senior Secured Notes Trustee; (e) the

Supporting Noteholders; (f) the Holders of the Senior Secured Notes Claims who vote in favor of

the Plan; and (g) the Related Persons of each of (a) through (f) of the foregoing.[52]

120.    The Released Parties were generally instrumental to the settlements and

resolutions incorporated into the Plan with the Supporting Noteholders and the Holders of Senior

Secured Notes Claims who have now unanimously voted in favor of the Plan.  No other parties

are affected by the releases in the Plan because all other creditors are either Unimpaired under

the Plan, as in the case of Class 1 and Class 2, or receive no recovery under the Plan, as in the

case of Class 4 and Class 5.

121.    *The Debtor Release is Appropriate and Complies with the Bankruptcy*

*Code.*  Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may

provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to

---

[52]  The term "Related Persons" means, with respect to any Person, such Person's predecessors, successors, assigns
and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their
respective current and former officers, directors, principals, employees, employers, shareholders, members
(including *ex officio* members), general partners, limited partners, agents, managers, managing members, financial
advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other
professionals, in each case acting in such capacity at any time, and any Person claiming by or through any of them.

the estate."  Accordingly, pursuant to section 1123(b)(3)(A), the Debtors may release estate causes of action as consideration for concessions made by their various stakeholders pursuant to the Plan.  In considering the appropriateness of such releases, courts in the Third Circuit generally consider "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[53]  The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule,[54] while courts generally determine whether a release is proper by reference to the following factors:

    a.  whether the non-debtor has made a substantial contribution to the debtor's reorganization;

    b.  whether the release is essential to the debtor's reorganization;

    c.  agreement by a substantial majority of creditors to support the release;

    d.  identity of interest between the debtor and the third party; and

    e.  whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[55]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[56]

---

[53] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

[54] *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[55] *See e.g.*, *In re Zenith Elecs.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion*, 426 B.R. at 143 n.47 (citing the *Zenith* factors); *Wash. Mut.*, 442 B.R. at 346 (same).

[56] *See e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

122.     Article XI.B of the Plan provides for releases by the Debtors and the Reorganized Debtors of any and all Causes of Action, including any derivative claims, the Debtors could assert against the Released Parties (the "Debtor Release").

123.     The Debtor Release easily meets the controlling standard.  As described above, the Plan (including the Debtor Release) complies with the Bankruptcy Code's absolute priority rule.  Class 3 is the only Voting Class under the Plan and that Class voted unanimously to approve the Plan.  The only impaired, non-voting classes under the Plan are Class 4, which consists of General Unsecured Claims, and Class 5, which consists of the Equity Interests in Debtors.  With respect to both Class 4 and Class 5, no class of equal priority is receiving more favorable treatment and no class that is junior to the rejecting class will receive or retain any property on account of the Claims or Equity Interests in such junior class.  In addition to being fair and equitable, the Debtor Release is in the best interest of the estates for the reasons set forth below.

124.     *First*, the Debtors are not aware of the existence of any viable claims being released.

125.     *Second*, an identity of interest exists between the Debtors and the parties to be released.  Most of the Released Parties are stakeholders and critical participants in the Plan process and share a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder. *See In re Tribune Co*., 464 B.R. 126, 187 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an identity of interest between the debtors and the settling parties

where such parties "share[d] the common goal of confirming the [Plan] and implementing the [Plan Settlement]"); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize"). As to the Debtors' current and former directors and officers who are being released, there is an identity of interest between the Debtors and these parties as they would have indemnity obligations against the Debtors to the extent of any liability. All such indemnification obligations are Reinstated under the Plan, at Article VI.F.

126.    ***Third***, the Voting Class (Class 3) unanimously voted in favor of the Plan, including the Debtor Release. This level of support provides clear evidence that the Plan, including the releases that are an indispensable feature of the Plan, maximizes the value of the estates and has overwhelming creditor support. *In re Delta Air Lines, Inc.*, 370 B.R. 537, 544, 546 (Bankr. S.D.N.Y. 2007), *aff'd*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd,* 309 F. App'x 455 (2d Cir. 2009) (finding that approximately 90 percent, in amount and number, of bondholders voting in favor of a chapter 11 plan demonstrated "overwhelming support" for the settlement that was incorporated in and made part of the plan).

127.    ***Fourth***, the Debtor Release is predicated on substantial contributions by many of the parties benefitting from that release. The Debtor Release includes the Senior Secured Notes Trustee, the Supporting Noteholders, and the Holders of the Senior Secured Notes Claims who vote in favor of the Plan. Without the support of these parties, there would be no Plan and no ability by the Debtors to successfully reorganize. As to the Debtors' Related

Persons, these parties have provided direct benefits to the Debtors' estates by diligently

discharging their duties and contributing to the overall success of the Plan and these cases.

Further, the terms of the Plan, including the Debtor Release, were vigorously negotiated amongst

the Released Parties.  The result is a compromise that reflects a true arm's-length negotiation

process.

128.    Accordingly, the Debtor Release is fair, equitable, and in the best interest

of the estates, is justified under the controlling Third Circuit standard, and should be approved.

129.    *The UST's Remaining Objections Lack Merit.*  The Plan contains a

standard and innocuous provision at Article V.A entitled "General Settlement of Claims" that

reads as follows:

> Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy
> Rule 9019, and in consideration for the classification, distributions,
> releases and other benefits provided under the Plan, upon the
> Effective Date, the provisions of the Plan will constitute a good
> faith compromise and settlement of all Claims and Equity Interests
> and controversies resolved pursuant to the Plan.

130.    There is nothing unusual or inappropriate about the foregoing provision.

It simply effectuates a settlement of all Claims and Equity Interests pursuant to the various

provisions of the Plan.  There is no hidden discharge here.  Rather, this language merely

effectuates the other implementing and treatment provisions of the Plan.

131.    The UST raises substantive consolidation as an evidentiary burden, but

there is little here to prove.  The Plan does not effectuate a substantive consolidation of the

Debtors' organizational structures – it only contemplates substantive consolidation for voting

and distribution purposes as a matter of convenience.  All Holders of Senior Secured Notes

Claims have joint and several claims against each of the Debtors that are proponents of the Plan. Each such Debtor is an obligor under the Senior Secured Notes. Hence, it makes little sense to have the Holders of Class 3 Claims vote separately on the Plan as to each Debtor proponent or, for that matter, to receive distributions from one Debtor as opposed to another, especially given that the vast majority of the Debtors' assets and operations are administered through a single Debtor, Fuse, LLC.

132.    Finally, the Key Employee Retention Agreements implemented under the Plan are a post-Effective Date item and not an administrative expense of these estates. There will be no retention or bonus payments to be made upon the Effective Date, nor is the Court being asked to approve any such retention or bonus payments. Hence, section 503(c) of the Bankruptcy Code simply does not apply.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, and granting such other and further relief as is just and proper.

Dated:  May 31, 2019            PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
_____
Richard M. Pachulski (CA Bar No. 90073)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar 4042)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel:  (302) 652-4100
Fax:  (302) 652-4400
E-mail:   rpachulski@pszjlaw.com
         ikharasch@pszjlaw.com
         mlitvak@pszjlaw.com
         joneill@pszjlaw.com

Proposed Counsel for the Debtors and
Debtors-in-Possession